MANATT, PHELPS & PHILLIPS, LLP
JOHN M. GATTI (State Bar No. 138492)
E-mail: jgatti@manatt.com
LAUREN J. FRIED (State Bar No. 309005)
E-mail: lfried@manatt.com
NICHOLAS FRONTERA (State Bar No. 307479)
E-mail: nfrontera@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Tel.:  (310) 312-4000; Fax:  (310) 312-4224

*Attorneys for Plaintiff*
TRACY CHAPMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY CHAPMAN,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>ONIKA TANYA MARAJ p/k/a<br>NICKI MINAJ and DOES 1-10,<br><br>　　　　　Defendants. | No. 2:18-cv-09088-VAP<br><br>Honorable Virginia A. Phillips<br><br>**APPLICATION OF PLAINTIFF TRACY CHAPMAN FOR LEAVE TO FILE UNDER SEAL; <u>REDACTED</u> Exhibits**<br><br>Final Pretrial Conf.:　　October 5, 2020<br>Trial Date:　　　　　October 13, 2020<br><br>[Concurrently filed with: 1. Declaration of Nicholas Frontera; and 2. [Proposed] Order] |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

APPLICATION OF PLAINTIFF FOR
LEAVE TO FILE UNDER SEAL

326696915.2

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** pursuant to Federal Rule of Civil Procedure 26(c), Local Rule 79-5.2.2, and the Court's inherent authority over its own files and records, Plaintiff Tracy Chapman ("Plaintiff") applies for leave to file under seal the following documents attached in <u>unredacted</u> form to the concurrently filed Sealed Declaration of Nicholas Frontera in support:

1.  Plaintiff's Motion for Partial Summary Judgment; Memorandum of Points and Authorities in support of Motion for Partial Summary Judgment, attached in redacted form hereto as **Exhibit A** and attached in unredacted form as **Exhibit A** to the Frontera Declaration in support of this Application for Leave to File Under Seal.

2.  Plaintiff's Separate Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment, attached in redacted form hereto as **Exhibit B** and attached in unredacted form as **Exhibit B** to the Frontera Declaration in support of this Application for Leave to File Under Seal.

3.  Pages 68:1-69:25 (App'x pp. 59-60) of the Excerpts of the Transcript of the Deposition of Onika Tanya Maraj, attached in redacted form hereto as **Exhibit C** as well as to the Declaration of Nicholas Frontera in Support of Plaintiff's Motion for Partial Summary Judgment as **Exhibit 6** and attached in unredacted form as **Exhibit C** to the Frontera Declaration in support of this Application for Leave to File Under Seal.  **(Designating Party: Defendant Onika Tanya Maraj.)**

4.  The August 3 - August 7, 2018 text messages between Onika Tanya Maraj and Nas, attached in redacted form hereto as **Exhibit D** as well as to the Declaration of Nicholas Frontera in Support of Plaintiff's Motion for Partial Summary Judgment as **Exhibit 17** and attached in unredacted form as **Exhibit D** to the Frontera Declaration in support of this Application for

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

1

326696915.2

APPLICATION OF PLAINTIFF FOR
LEAVE TO FILE UNDER SEAL

1    Leave to File Under Seal.  **(Designating Party: Defendant Onika Tanya**
2    **Maraj.)**

3    5.    Pages 100:24-104:35 (App'x pp. 160-63) and pages 132:1-133:25 (App'x
4          pp. 164-65.) of the Excerpts of the Transcript of the deposition of Aston
5          George Taylor, attached in redacted form hereto as **Exhibit E** as well as to
6          the Declaration of Nicholas Frontera in Support of Plaintiff's Motion for
7          Partial Summary Judgment as **Exhibit 16** and attached in unredacted form as
8          **Exhibit E** to the Frontera Declaration in support of this Application for
9          Leave to File Under Seal.  **(Designating Party: Aston George**
10         **Taylor/Defendant Onika Tanya Maraj.)**

11   6.    The August 3 - August 11, 2018 Instagram direct messages between
12         Defendant Onika Tanya Maraj and Aston George Taylor, attached in
13         redacted form hereto as **Exhibit F** as well as to the Declaration of Nicholas
14         Frontera in Support of Plaintiff's Motion for Partial Summary Judgment as
15         **Exhibit 15** and attached in unredacted form as **Exhibit F** to the Frontera
16         Declaration in support of this Application for Leave to File Under Seal.
17         **(Designating Party: Aston George Taylor/Defendant Onika Tanya**
18         **Maraj.)**

19         Although there is a strong presumption in favor of access to court documents,
20   courts may seal documents if the party seeking to seal a judicial record
21   demonstrates a "compelling reason." *In re Roman Catholic Archbishop of Portland*
22   *in Oregon*, 661 F.3d 417, 429 (9th Cir. 2011).  Plaintiff is seeking to file these
23   documents under seal pursuant to United States District Court for the Central
24   District of California Local Rule 79-5.2.2(b) because those documents were
25   designated confidential by Defendant Onika Tanya Maraj ("Defendant") and Aston
26   George Taylor ("Mr. Taylor") pursuant to a Protective Order in this action.  (Dkt.
27   No. 21.)  A true and correct copy of the Protective Order is attached hereto as
28   **Exhibit G**.  Paragraph 12 of the Protective Order requires that Protected Materials,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

326696915.2

2

APPLICATION OF PLAINTIFF FOR
LEAVE TO FILE UNDER SEAL

1    including those marked "confidential" pursuant to the Protective Order, be filed
2    under seal absent written authorization from the Designating Party.

3        Pursuant to Local Rule 79-5.2.2(b), counsel for Plaintiff separately met and
4    conferred with counsel for Defendant and counsel for Taylor regarding the need to
5    file the documents and testimony at issue under seal.

6        With regard to the documents designated by Defendant, counsel exchanged
7    various emails and also met and conferred telephonically on August 14, 2020 to
8    attempt to eliminate the need to file under seal.  After meeting and conferring, the
9    documents and testimony that Defendant has designated as confidential and
10   believes should be sealed consist of text messages between Defendant and Nas,
11   who featured on the work at issue in this Action.  While Plaintiff does not believe
12   that these documents warrant sealing, in accordance with Local Rule 79-5.2.2(b),
13   Plaintiff will not file such documents publicly absent an order by this Court ruling
14   on this Application.

15       With regards to the documents at issue that were previously designated
16   confidential by Mr. Taylor, on August 14, 2020, counsel for Mr. Taylor agreed in
17   writing via email pursuant to Section 7.2 of the Protective Order that those
18   documents may be filed publicly.  However, during meet and confer discussions
19   with counsel for Defendant, counsel for Defendant expressed that notwithstanding
20   the fact that Mr. Taylor gave written consent to publicly file the documents and
21   testimony he designated confidential, Defendant believes that certain of those
22   documents—documents reflecting "[Ms. Maraj's] private communications with
23   [Mr. Taylor] and [Mr. Taylor's] deposition testimony describing those
24   communications"—should nevertheless be filed under seal because they
25   "implicate[] [Ms. Maraj's] privacy interests."  Plaintiff does not agree that the
26   Protective Order grants Defendant the right to insist that documents and testimony
27   produced by or obtained from a non-party be maintained confidential after the non-
28   party has agreed in writing that the documents may be publicly filed.  Nor does

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

APPLICATION OF PLAINTIFF FOR
LEAVE TO FILE UNDER SEAL

326696915.2

1  Plaintiff agree that such documents warrant sealing based on their contents.

2  However, in accordance with Local Rule 79-5.2.2(b), Plaintiff will not file such

3  documents publicly absent an order by this Court ruling on this Application.

4  Pursuant to Local Rule 79-5.2.2(b)(ii), in the event any portion of this

5  Application is denied, Plaintiff will file the applicable documents in their entirety

6  for public view and consideration by the Court.

7

8

9  Dated:  August 17, 2020

Respectfully submitted,

10  MANATT, PHELPS & PHILLIPS, LLP
John M. Gatti

11  Lauren J. Fried
Nicholas Frontera

12

13  By:  /s/ John M. Gatti
_____

John M. Gatti

14  *Attorneys for Plaintiff*
TRACY CHAPMAN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

4

APPLICATION OF PLAINTIFF FOR
LEAVE TO FILE UNDER SEAL

326696915.2

**[REDACTED]** EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANATT, PHELPS & PHILLIPS, LLP
JOHN M. GATTI (State Bar No. 138492)
E-mail: jgatti@manatt.com
LAUREN J. FRIED (State Bar No. 309005)
E-mail: lfried@manatt.com
NICHOLAS FRONTERA (State Bar No. 307479)
E-mail: nfrontera@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Tel.: (310) 312-4000; Fax: (310) 312-4224

*Attorneys for Plaintiff*
TRACY CHAPMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY CHAPMAN,<br><br>              Plaintiff,<br><br>     vs.<br><br>ONIKA TANYA MARAJ p/k/a<br>NICKI MINAJ and DOES 1-10,<br><br>              Defendants. | No. 2:18-cv-09088-VAP-SS<br><br>Honorable Virginia A. Phillips<br><br>**[*REDACTED*] NOTICE OF MOTION<br>AND MOTION FOR PARTIAL<br>SUMMARY JUDGMENT;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT<br>THEREOF**<br><br>Hearing Date:      September 14, 2020<br>Hearing Time:      2:00 p.m.<br><br>Final Pretrial Conf.:   October 5, 2020<br>Trial Date:      October 13, 2020<br><br>[Concurrently filed with: 1. Separate<br>Statement; 2. Appendix of Evidence; and 3.<br>[Proposed] Order] |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

MOTION FOR PARTIAL SUMMARY JUDGMENT
OF PLAINTIFF TRACY CHAPMAN

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on September 14, 2020 at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom No. 8A of the United States District Court for the Central District of California, located at 350 West 1st Street, Los Angeles, California 90012, Plaintiff Tracy Chapman ("Ms. Chapman"), by and through her undersigned attorneys, will and hereby does move under Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment in her favor as to liability for her cause of action for copyright infringement in her Complaint against Defendant Onika Tanya Maraj p/k/a Nicki Minaj ("Ms. Maraj").

Ms. Chapman is entitled to partial summary judgment on her claim for copyright infringement liability because there are no genuine disputes as to any material facts with regard to Ms. Maraj's actions.  It is undisputed that beginning in June 2018, Ms. Maraj and her representatives and/or agents made multiple requests to license Ms. Chapman's copyright in her well-known musical composition *Baby Can I Hold You* (the "Composition") for use in Ms. Maraj's recording (featuring Nas) *Sorry* (the "Infringing Work"), which Ms. Maraj created without Ms. Chapman's consent for inclusion on Ms. Maraj's then-forthcoming album, *Queen* (the "Album").

Ms. Chapman, through her agents and representatives, repeatedly denied Ms. Maraj's after-the-fact requests to use the Composition.  Notwithstanding those denials, Ms. Maraj continued working on the Infringing Work and publicizing it on social media.  Ultimately, while Ms. Maraj did not include the Infringing Work on the Album, she distributed the Infringing Work to a well-known disc jockey at the popular New York City radio station HOT 97, who promoted the Infringing Work on his social media accounts, stating that Ms. Maraj had given him something ▉▉▉▉" that is "CONFIDENTIAL ▉▉▉▉".  The disc jockey then played the Infringing Work on HOT 97, and, possibly, through other outlets.  None of Ms. Maraj's actions relating to her liability are debatable.  The facts are undisputed.  Ms.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

MOTION FOR PARTIAL SUMMARY JUDGMENT
OF PLAINTIFF TRACY CHAPMAN

Maraj violated Ms. Chapman's copyright by creating an illegal derivative work and distributing that work. Moreover, these actions were indisputably willful. Ms. Maraj had knowledge of the illegality of her actions and proceeded. Thus, Ms. Chapman's copyright claim is appropriate for summary judgment.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Statement of Undisputed Material Facts and Conclusions of Law, the concurrently filed Declarations of Tracy Chapman and Nicholas Frontera, the concurrently lodged proposed Order, all other pleadings and papers on file in this action, and upon such argument and/ or evidence that the Court may consider at or before the hearing on this motion.

Pursuant to Local Rule 7-3, this Motion is made following the conference of counsel, which took place on July 29, 2020. Due to the global pandemic, the parties were unable to meet in-person, but did meet and confer telephonically. During the conference, counsel for the parties thoroughly discussed the substance of the arguments set forth herein, as well as potential resolution of the disagreements, in an attempt to eliminate the need for this Motion; the parties were unable to reach an agreement obviating the necessity for this motion.

Dated: August 17, 2020

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP
John M. Gatti
Lauren J. Fried
Nicholas Frontera

By:  /s/ John M. Gatti
     John M. Gatti
     *Attorneys for Plaintiff*
     TRACY CHAPMAN

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................. 1

II.     FACTUAL BACKGROUND ............................................................ 2

        A.      Plaintiff Tracy Chapman and the Composition ..................... 2

        B.      Defendant Onika Tanya Maraj and Infringing Work ............ 3

        C.      Ms. Chapman Denies Ms. Maraj's Various Requests for
                Authorization to Use the Composition in the Infringing Work ........... 4

        D.      Ms. Maraj Continues to Create and Distributes the Infringing
                Work Despite the Denials ................................................... 6

III.    LEGAL STANDARD ..................................................................... 10

IV.     MS. MARAJ'S INFRINGING WILLFUL CONDUCT IS NOT
        DISPUTED AND IS THEREFORE SUBJECT TO SUMMARY
        JUDGMENT .................................................................................. 10

        A.      Ms. Chapman Owns a Valid Copyright in the Composition ............. 11

        B.      Ms. Maraj Willfully Created an Unauthorized Derivative Work ....... 12

                1.      It is Undisputed That Ms. Maraj Created an Unauthorized
                        Derivative Work, i.e., the Infringing Work .............................. 12

                2.      Ms. Maraj's Actions in Creating an Unauthorized
                        Derivative Work Were Willful As a Matter of Law ............... 14

        C.      Ms. Maraj Willfully Distributed the Infringing Work ...................... 16

                1.      The  Undisputed Facts Establish that Ms. Maraj
                        Distributed the Infringing Work .................................................. 16

                2.      The Undisputed Evidence Establishes that Ms. Maraj's
                        Distribution was Willful .............................................................. 19

V.      CONCLUSION ............................................................................. 21

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

i

MOTION FOR PARTIAL SUMMARY JUDGMENT
OF PLAINTIFF TRACY CHAPMAN

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001)..................................................................11, 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................10

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
    874 F.3d 1064 (9th Cir. 2017)................................................................14

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
    758 F. Supp. 1522 (S.D.N.Y. 1991)........................................................19

*Brave New Films 501(c)(4) v. Weiner*,
    626 F.Supp.2d 1013 (N.D. Cal. 2009)....................................................16

*Broadcast Music, Inc. v. McDade & Sons, Inc.*,
    928 F. Supp. 2d 1120 (D. Ariz. 2013)................................................14, 15

*BWP Media USA, Inc. v. P3R, LLC*,
    2014 WL 3191160 (C.D. Cal. Jul. 3, 2014) ............................................19

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*,
    213 F.3d 474 (9th. Cir. 2000) ................................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..............................................................................10

*Columbia Pictures Television v. Krypton Bd. of Birmingham, Inc.*,
    106 F.3d 284 (9th Cir. 1997)..................................................................19

*Edu. Testing Serv. v. Simon*,
    95 F. Supp. 2d 1081 (C.D. Cal. 1999)................................................11, 13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ..............................................................................11

*Fox Broad. Co., Inc. v. Dish Network L.L.C.*,
    747 F.3d 1060 (9th Cir. 2013)................................................................12

*Fox Film Corp. v. Doyal*,
    286 U.S. 123 (1932) ................................................................................1

*Gilliam v. American Broadcasting Cos.*,
    538 F.2d 14 (2nd Cir. 1976) ..................................................................16

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

ii

MOTION FOR PARTIAL SUMMARY JUDGMENT
OF PLAINTIFF TRACY CHAPMAN

1
2

**TABLE OF AUTHORITIES**
**(Continued)**

Page

3
4
*Gregory v. United States,*
178 F.3d 1294 (6th Cir. 1999) ............................................... 10

5
*Hearst Corp. v. Stark,*
639 F. Supp. 970 (N.D. Cal. 1986) ........................................ 14

6
7
*Holley v. Crank,*
400 F.3d 667 (9th Cir. 2004) ................................................. 16

8
9
*Marisa Christina, Inc. v. Bernard Chaus, Inc.,*
808 F. Supp. 356 (S.D.N.Y. 1992) ........................................ 11

10
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ............................................................. 10

11
12
*Miksad v. Dialog Info. Servs., Inc.,*
900 F.2d 263 (9th Cir. 1990) ................................................. 10

13
*Peer Int'l Corp. v. Pausa Records, Inc.,*
909 F.2d 1332 (9th Cir. 1990) .......................................... 14, 19

14
15
*Perfect 10, Inc. v. Giganews, Inc.,*
847 F.3d 657 (9th Cir. 2017) ................................................. 13

16
17
*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,*
907 F. Supp. 1361 (N.D. Cal. 1995) ..................................... 13

18
*Rentmeester v. Nike, Inc.,*
883 F.3d 1111 (9th Cir. 2018) ............................................... 11

19
20
*S.O.S., Inc. v. Payday, Inc.,*
886 F.2d 1081 (9th Cir. 1989) .......................................... 11, 16

21
*Sega Enters. Ltd. v. MAPHIA,*
948 F. Supp. 923 (N.D. Cal. 1996) ....................................... 14

22
23
*Stewart v. Abend,*
495 U.S. 207 (1990) ............................................................... 1

24
25
*UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.,*
446 F. Supp. 2d 1164 (E.D. Cal. 2006) .............................. 11, 13

26
27
*Warner Bros. Entm't Inc. v. Duhy,*
No. CV 09-5798-GHK, 2009 WL 5177956 (C.D. Cal. Nov. 30,
2009) .................................................................................... 19

28
*Washington Shoe Co. v. A-Z Sporting Goods Inc.,*
704 F.3d 668 (9th Cir. 2012) ................................................. 14

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

iii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

**STATUTES**

17 U.S.C.A. § 504(c)(2)............................................................................... 11

17 U.S.C. § 106................................................................................... 11, 12

17 U.S.C. §§ 106(1)-(3)................................................................................ 12

17 U.S.C. § 106(3)..................................................................................... 16

17 U.S.C. § 410(c)..................................................................................... 11

17 U.S.C. § 602(a)..................................................................................... 12

**OTHER AUTHORITIES**

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, §
    13.08[C][1] (2016) ............................................................. 13

**RULES**

Fed. R. Civ. P. 56..................................................................................... 10

Fed. R. Civ. P. 56(a) ............................................................................... 10

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

iv

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

It is the bedrock principle of Copyright Law that an author of an original work has the right to control how her work is exploited.  "In fact, [the Supreme Court] has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work."  *Stewart v. Abend*, 495 U.S. 207, 229 (1990) (citing *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)).

This case presents a prototypical example of copyright infringement through violation of this basic principle.  Defendant Onika Tanya Maraj p/k/a Nicki Minaj ("Ms. Maraj") sought a license to interpolate Plaintiff Tracy Chapman's ("Ms. Chapman") hit song *Baby Can I Hold You* (the "Composition") in Ms. Maraj's song *Sorry* (the "Infringing Work") for her then-forthcoming album *Queen* (the "Album").  Ms. Chapman, who has a long-established and well-known practice of denying derivative uses of her works, clearly and unequivocally denied Ms. Maraj's request for use multiple times.  Unhappy with this result, the day after receiving the final denial from Ms. Chapman's attorney, Ms. Maraj continued working on the Infringing Work and devised a plan to promote her Album by distributing the Infringing Work on the radio through a prominent New York disc jockey, Aston George Taylor p/k/a Funkmaster Flex ("Mr. Taylor").  Specifically, Ms. Maraj personally reached out to Mr. Taylor and asked him to play the Infringing Work on his popular radio show the same week her album, *Queen,* debuted, and, that she would text him the Infringing Work.  Within 24 hours, Mr. Taylor received the Infringing Work, posted on social media that he had received the Infringing Work from Ms. Maraj, and, ultimately, played the Infringing Work on his radio show the night after Ms. Maraj's album release.  The Infringing Work went viral and was reposted all over the Internet, causing Ms. Chapman to incur significant expenses in connection with, among other things issuing takedown notices, and necessitating this lawsuit.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

1

MOTION FOR PARTIAL SUMMARY JUDGMENT
OF PLAINTIFF TRACY CHAPMAN

Each of these facts is indisputable based on the documentary evidence and testimony in the record.  Ms. Maraj's actions constitute copyright infringement on multiple fronts and lack any legal justification.

Based on the foregoing, Ms. Chapman respectfully requests this Court grant her motion for partial summary judgment as to the issue of liability for copyright infringement, and enter a judgment in favor of Ms. Chapman, and against Ms. Maraj, concluding that: (1) Ms. Maraj infringed Ms. Chapman's Composition by creating the Infringing Work without permission, (2) Ms. Maraj's conduct was willful, (3) Ms. Maraj infringed Ms. Chapman's Composition by distributing the Infringing Work, and (4) Ms. Maraj's conduct was willful.  Should the Court grant this Motion, and, respectfully, it should, the only remaining issue will be the amount of damages, including fees and costs, to which Ms. Chapman is entitled.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff Tracy Chapman and the Composition

Ms. Chapman is an internationally known Grammy Award-winning singer, songwriter, and musician who first gained popularity in the late 1980s.  Ms. Chapman's self-titled debut album, which she released in 1988, features such hits as the Composition and *Fast Car*.  The Composition was a huge success, and reached the Top 50 on Billboard Magazine's Hot 100 chart.  Ms. Chapman's debut album was a triumph, garnering Ms. Chapman a 1989 Grammy Award for Best Contemporary Folk Album and a nomination for Album of the Year.  Ms. Chapman won two more Grammy Awards in 1989 for Best New Artist and for Best Female Pop Vocal Performance for *Fast Car*.  Ms. Chapman's achievements continued throughout her career.  During the 1990s and 2000s, Ms. Chapman received several more Grammy nominations, including for Best Rock Song for *Give Me One Reason*, which she won, and many other awards.  At every turn, Ms. Chapman's music has been critically acclaimed and respected.

Ms. Chapman wrote the Composition in 1982, and obtained a copyright

registration for the work (and other musical compositions)—PAu000556755—from the United States Copyright Office on October 20, 1983.  (Undisputed Fact ("UF") 1, 2, Declaration of Nicholas Frontera ("Frontera Decl."), ¶ 5, Ex. 4; *id.* at ¶ 27, Ex. 26; Declaration of Tracy Chapman ("Chapman Decl.") at ¶ 2.)[1]  Ms. Chapman later entered into a co-publishing agreement with, and granted a partial assignment of the copyright in the Composition to, SBK April Music, Inc. ("SBK").  (Chapman Decl. at ¶ 4.)   SBK later obtained a copyright registration for the Composition-- PA0000417830—on or about May 5, 1989, listing it and Purple Rabbit Music, Chapman's publishing designee, as the copyright claimants.  (Frontera Decl., ¶ 6, Ex. 5; Chapman Decl. at ¶ 3.)  On May 15, 2016, SBK's rights in the Composition transferred back to Ms. Chapman, making her the sole owner of the copyright in the Composition.  (UF 3, Chapman Decl., ¶ 4, Ex. 1.)

## B.   Defendant Onika Tanya Maraj and Infringing Work

Ms. Maraj is a well-known rapper and hip hop recording artist.  In 2017, Ms. Maraj began recording the Infringing Work.  (UF 4 Frontera Decl., ¶ 7, Ex. 6 (Deposition of Onika Tanya Maraj ("Maraj Dep.") at 50:25-51:3.)  The Infringing Work features fellow rapper and hip hop recording artist Nasir bin Olu Dara Jones p/k/a Nas ("Nas").  (UF 5, Frontera Decl., ¶ 7, Ex. 6 (Maraj Dep. at 50:25-51:3.))  Ms. Maraj hoped to include the Infringing Work on her upcoming album *Queen*. (Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 19.)   Ms. Maraj acknowledged that the Infringing Work was a "musical interpolation . . . that incorporated music and lyrics from the Composition."  (UF 6-8, Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶¶ 19, 20.) Specifically, Ms. Maraj admitted "that the Infringing Work uses a majority of the Composition's lyrics."  (UF 7 Frontera Decl., ¶ 9, Ex. 8 at p. 81 (Suppl. Resp. to RFA No. 8); *id.* at ¶ 10, Ex. 9 (containing side by side comparison of the

---

[1] The Declaration of Tracy Chapman and the Declaration of Nicholas Frontera are attached to Plaintiff's Appendix of Evidence in Support of Motion for Partial Summary Judgment.  All references to page numbers are to the consecutively numbered pages of the Appendix.  References to "UF" are to the undisputed facts contained in Plaintiff's Separate Statement of Undisputed Facts.

Composition and the Infringing Work);  *id.* at ¶ 9, Ex. 8 at p. 81 (Suppl. Resp. to RFA No. 10) (admitting lyrics were accurately listed in exhibit).)   Because of this, Ms. Maraj "knew that [she] needed a License to use the Composition in the Infringing Work in order to include the Infringing Work on [her] album Queen." (UF 9, Frontera Decl., ¶ 9, Ex. 8 at p. 80 (Suppl. Resp. to RFA No. 5)).)   Despite this, Ms. Maraj began recording the Infringing Work, which interpolates the Composition, without first seeking Ms. Chapman's authorization to do so. (Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 20.)

### C.   Ms. Chapman Denies Ms. Maraj's Various Requests for Authorization to Use the Composition in the Infringing Work

On May 23, 2018, Joshua Berkman ("Mr. Berkman"), a representative from Ms. Maraj's record label, Republic Records, e-mailed Deborah Mannis-Gardner ("Ms. Mannis-Gardner") of DMG Clearances, Inc., the number one clearance company in the world, to request that she obtain a clearance to use the Composition in the Infringing Work.  (UF 11, Frontera Decl., ¶ 11, Ex. 10 at p. 99 ; *id.* at ¶ 12, Ex. 11 (Deposition of Deborah Mannis-Gardner ("Mannis-Gardner Dep.") at 107:11-108:8, 132:11-108:8, 133:9-14.))   Shortly thereafter, Ms. Mannis-Gardner notified Mr. Berkman that "if [the requested clearance song] is shelly thunder/foxy brown (sic) reggae version of Sorry written by Tracy Chapman then its (sic) not available for sampling."  (UF 12, Frontera Decl., ¶ 11, Ex. 10 at p. 99;  *id.* at ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 110:10-110:14.))   Indeed, Ms. Mannis-Gardner knew that Ms. Chapman was on the "do not sample list"—an unwritten list of artists that are well-known in the music industry for not allowing samples of their works.  (Frontera Decl., ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 111:9-23, 115:14-116:4.))   Ms. Mannis-Gardner knew this based on her more than 30 years of industry and clearance experience.  (*Id.*; *see also id.* at 132:11-108:8, 133:9-14, 134:21-135-3.)

Despite Ms. Mannis-Gardner notifying Mr. Berkman that Ms. Chapman did

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

4

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

not allow for sampling, Mr. Berkman instructed Ms. Mannis-Gardner to attempt to clear the Infringing Work anyway.  (UF 13, Frontera Decl., ¶ 13, Ex. 12; *id.* at ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 112:19-114:3).))  Accordingly, on June 26, 2018, Ms. Mannis-Gardner contacted Gelfand, Rennert & Feldman, LLP ("Gelfand"), Ms. Chapman's business managers, to attempt to clear the Infringing Work.  (Chapman Decl. at ¶ 5, Ex. 2 at p. 27; Frontera Decl., ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 117:2-119:17, 120:20-121:12.))  In her request, Ms. Mannis-Gardner stated that "[w]hen . . . Tracy Chapman was with Sony/ATV her material was always denied", and asked "[i]s she still on the do not sample or interpolate list? I have an A LIST artist who wants to use the song Sorry."  (Chapman Decl. at ¶ 5, Ex. 2 at p. 27.)

After a lengthy exchange, Ms. Mannis-Gardner submitted an official request for approval to license the Composition for use in the Infringing Work.  (Chapman Decl. at ¶ 5, Ex. 2 at p. 26; Frontera Decl., ¶ 14, Ex. 13; *id.* at ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 122:5-15.))  That request was passed along to Ms. Chapman, who instructed Gelfand to deny it.  (UF 14, Chapman Decl. at ¶ 5.)  As a result, on July 16, 2018, a Gelfand representative e-mailed Ms. Mannis-Gardner unequivocally stating that "the request has not been approved."  (Chapman Decl. at ¶ 5, Ex. 2 at p. 25.)  That same day, Ms. Mannis-Gardner forwarded the denial to Mr. Berkman. (UF 15, *Id.*; Frontera Decl., ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 123:22-124:22.))

In spite of this denial, Ms. Maraj and her representatives continued to create the Infringing Work, including its interpolation of the Composition, and seek clearance from Ms. Chapman.  On July 18, 2018, Mr. Berkman e-mailed Ms. Mannis-Gardner asking if they could "figure out a way to get to [Ms. Chapman] direct" to clear the song.  (UF 16, Frontera Decl., ¶ 15, Ex. 14;  *id.* at ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 126:7-131:18.))  Ms. Mannis-Gardner reiterated: "Tracy doesn't approve samples or interpolations and the songs out there are not with consent. I am unfamiliar with Tracy's Mmgt or legal counsel. Im (sic) sorry."  (*Id.*)

Nevertheless, Ms. Maraj and her representatives persisted.  On July 27, 2018,

1  Gee Roberson, Ms. Maraj's personal manager, contacted Todd Gelfand of Gelfand

2  requesting that he connect Ms. Chapman with Ms. Maraj to discuss an "idea [of Ms.

3  Maraj's] that is one of the most personal for her that was inspired by [Ms.

4  Chapman's] art that [Ms. Maraj] would like the opportunity to touchbase (sic) with

5  [Ms. Chapman] about." (UF 16, Chapman Decl., ¶ 6, Ex. 3 at pp. 31-32; Frontera

6  Decl. at ¶ 4.)

7      Days after Mr. Roberson's email, on August 1, 2018, Ms. Maraj personally

8  attempted to reach Ms. Chapman through Twitter, tweeting out to her more than 10

9  million followers: "Tracy Chapman, can you please hit me . . . omg for the love of

10 #Queen." (UF 17, Frontera Decl., ¶ 9, Ex. 8 at p. 83 (Suppl. Resp. to RFA No.

11 18).)

12      After being made aware of the fact that Ms. Maraj's representatives had once

13 again sought her clearance approval despite her previous denial, Ms. Chapman

14 instructed her attorney to inform Mr. Roberson that the use was denied. (UF 18, 19,

15 Chapman Decl. at ¶ 6.) On August 2, 2018, Ms. Chapman's attorney wrote:

16
17 I have spoken to Ms. Chapman and while she appreciates the positive
   feelings of your client, you should know that she carefully protects her
18 copyrights and in the normal course of business does not approve
   these kinds of requests. We hope that with this confirmation, your
19 client will move on with the project without the requested sample.
   Thank you and your client for understanding.
20
21 (UF 20, Chapman Decl., ¶ 6, Ex. 3 at p. 31.) Mr. Roberson confirmed that he had

22 been "made aware of the denied use via our email on Aug 2nd and the album is in

23 stores without the requested sample." (Frontera Decl., ¶ 26, Ex. 25 at p. 222.)

24 **D.    Ms. Maraj Continues to Create and Distributes the Infringing Work Despite the Denials**

25      In the face of Ms. Chapman's repeated denials of authorization to use the

26 Composition in the Infringing Work, Ms. Maraj developed a plan to release it to the

27 public. On August 3, 2018, Ms. Maraj, from her verified Instagram account, sent a

28 private direct message to Mr. Taylor, a popular New York disc jockey for hit radio

station Hot 97 FM, confirming that she would not be releasing the Infringing Work on the Album, but asking him to premiere the Infringing Work on his radio show. Ms. Maraj wrote:

CONFIDENTIAL

(UF 25, Frontera Decl., ¶ 16, Ex. 15 at p. 147 (emphasis added); *id.* at ¶ 17, Ex. 16 (Deposition of Aston George Taylor ("Taylor Dep.") at 159:7-162:18.))   In response, the same day, Mr. Taylor stated, "I will make a movie!!!!!"  (UF 26, Frontera Decl., ¶ 16, Ex. 15 at p. 147.)  Mr. Taylor admitted his response meant he would play the song, say he liked it, and make it exciting.  (UF 26, Frontera Decl., ¶ 17, Ex. 16 ("Taylor Dep.") at 162:25-163:7.)

Having confirmed that Mr. Taylor would premiere the Infringing Work the week her Album released, Ms. Maraj continued to finalize the Infringing Work with Nas.  The same day Ms. Maraj coordinated the release of the Infringing Work with Mr. Taylor, she texted Nas: "CONFIDENTIAL" (Frontera Decl., ¶ 18, Ex. 17 at p. 182;  *id.* at ¶ 7, Ex. 6 (Maraj Dep. at 55:5-24; 56:15-19.))   After some additional discussion, Ms. Maraj sent Nas a link to download the CONFIDENTIAL of the Infringing Work.  (UF 22, Frontera Decl., ¶ 18, Ex. 17 at p. 182;  *id.* at ¶ 7, Ex. 6 (Maraj Dep. at 56:10-24.))  Ms. Maraj and Nas then exchanged a number of texts discussing changes to the verses of the Infringing Work, which still included the Composition.  (Frontera Decl., ¶ 18, Ex. 17 at p. 184-85.)  Ms. Maraj told Nas: "CONFIDENTIAL (*Id.*)

On August 5, 2020, Ms. Maraj informed Nas that the Infringing Work was CONFIDENTIAL (UF 23, Frontera Decl., ¶ 18, Ex. 17 at p. 186;  *id.* at ¶ 7, Ex. 6 (Maraj Dep. at 59:12-60:2.))  On August 7, 2018, Nas asked Ms. Maraj if she was "CONFIDENTIAL (Frontera Decl., ¶

1   18, Ex. 17 at p. 187.)  Ms. Maraj responded, **CONFIDENTIAL**

2   

3   (UF 24, *Id.*)  Nas responded, **CONFIDENTIAL**

4   (*Id.*)

5        On August 10, 2018, Ms. Maraj released the Album without the Infringing

6   Work.  (Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 19.)  The same day she released the

7   Album, Ms. Maraj followed up with Mr. Taylor via direct message on August 10,

8   2018 stating: **CONFIDENTIAL**

9   (UF 27, Frontera Decl., ¶ 16, Ex. 15 at p. 148.)  Mr. Taylor then provided his phone

10  number and stated, **CONFIDENTIAL**

11  (UF 28, Frontera Decl., ¶ 16, Ex. 15 at p. 148.)  Ms. Maraj confirmed, **CONFIDENTIAL**

12  (UF 29, Frontera Decl., ¶ 16, Ex. 15 at p. 148.)

13       That same day, Ms. Maraj's lead recording engineer, Aubry Delaine ("Mr.

14  Delaine") texted David Castro at Chris Athens Masters, Inc. ("Chris Athens"), the

15  company that mastered Ms. Maraj's songs for the Album.  (UF 30, Frontera Decl. ¶

16  28, at Ex. 27.)  Mr. Delaine informed Mr. Castro that he would send a version of the

17  Infringing Work and asked that Chris Athens master the song and return both clean

18  and explicit versions.  (Frontera Decl. ¶ 19, Ex. 27.)  Chris Athens mastered the

19  Infringing Work and sent Mr. Delaine links to download both a clean and an

20  explicit version of the Infringing Work the same day.  (UF 30, 31, 32, Frontera

21  Decl., ¶ 19, Ex. 18 pp. ; *id.* at ¶ 20, Ex. 19 (Deposition of Aubry Delaine ("Delaine

22  Dep.") at 206:16-208:4.))  The links only allowed for one download each.  (UF 33,

23  Frontera Decl., ¶ 19, Ex. 18 pp.;  *id.* at ¶ 20, Ex. 19 (Delaine Dep. at 206:16-

24  208:4.))  Mr. Delaine testified that he never "sen[t] out any [unreleased] recordings

25  of Ms. Maraj's to a third party without [] receiving an instruction from Ms. Maraj to

26  send out that recording[.]"  (UF 34, Frontera Decl., ¶ 20, Ex. 19 (Delaine Dep. at

27  203:16-23.))

28       On August 11, 2018, Mr. Taylor posted on his Instagram and Twitter

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

accounts promoting the debut of the Infringing Work on his show that night:

- "Shhhhhhh!!!!   TONIGHT   7PM!!!   NICKY   GAVE   ME SOMETHING!!! @nickiminaj ft @nas !!! (NOT ON HER ALBUM!) GONNA STOP THE CITY TONIGHT!!!!!!!!!!!!!!"  (UF 35, Frontera Decl., ¶ 21, Ex. 20; *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 167:18-168:23).)

- "Shhhhhhh!!!!   TONIGHT   7PM!!!   NICKI   GAVE   ME SOMETHING!!! @nickiminaj ft @nas !!! (NOT ON HER ALBUM!) GONNA STOP THE CITY TONIGHT!!!!!!!!!!!!!!"  (UF 35, Frontera Decl., ¶ 22, Ex. 21; *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 170:1-171:12).)

Mr. Taylor received the Infringing Work via text sometime between (i) August 10, 2018 when Ms. Maraj told him she would text it to him and (ii) his first social media post promoting the show early afternoon the next day.  (UF 36, Frontera Decl., ¶ 17, Ex. 16, (Taylor Dep. at 164:22-165:14; *id.* at 169:5-18; *id.* at 158:11-22 (confirming that he received the Infringing Work via text).))  The name of the file that Mr. Taylor received, "01 Sorry - 72518 - master.mp3" indicates that he received a mastered version of the Infringing Work.  (UF 37, Frontera Decl., ¶ 23, Ex. 22 (Mr. Taylor emailing the file to one of his interns, DJ Heavy rotation); *id.* at ¶ 17, Ex. 16, (Taylor Dep. at 172:25, 174:22-176:21.))

On August 11, 2018 at 7 PM EST, Mr. Taylor broadcast his radio show on Hot 97 FM.  (UF 38, Frontera Decl., ¶ 17, Ex. 16, (Taylor Dep. at 166:9-13, 173:17-23.))  Mr. Taylor played the Infringing Work during the broadcast.  (UF 39, *Id.*)  Hot 97 also subsequently posted the broadcast on its website.  (Frontera Decl., ¶ 24, Ex. 23.)  Additionally, Hot 97 posted a link on its Instagram to listen to the Infringing Work with a caption stating "If you missed it…hear it again".  (Frontera Decl., ¶ 25, Ex. 24.)

In the following months, numerous copies of the Infringing Work were posted on the Internet.  (Frontera Decl., ¶ 29.)  As a result, Ms. Chapman was forced to incur significant expenses monitoring these improper postings and issuing DMCA takedown notices.  (*Id.*)  To this day, copies of the Infringing Work remain

on the Internet despite various efforts by Ms. Chapman to have them taken down. (*Id*.)

## III.   LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986) (citations omitted).  Put differently, "[t]he district court should grant summary judgment where the only reasonable conclusion to be drawn from the record supports the moving party."  *Gregory v. United States*, 178 F.3d 1294 (6th Cir. 1999); *Miksad v. Dialog Info. Servs., Inc.*, 900 F.2d 263 (9th Cir. 1990).  Once the moving party has met this standard, the burden shifts to the party opposing summary judgment to demonstrate a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The opposing party must do so with specific facts.  *Matsushita*, 475 U.S. at 586.

## IV.   MS. MARAJ'S INFRINGING WILLFUL CONDUCT IS NOT DISPUTED AND IS THEREFORE SUBJECT TO SUMMARY JUDGMENT

Ms. Chapman seeks partial summary judgment as to Ms. Maraj's liability for copyright infringement.  Ms. Maraj committed copyright infringement when she created a derivative work (*i.e.*, the Infringing Work) without authorization and when she distributed it.  Moreover, Ms. Maraj's actions as to both creation and distribution were willful.

Ms. Chapman is entitled to summary adjudication on the issue of liability for copyright infringement because Ms. Maraj does not contest her use of the Composition in the Infringing Work and the undisputed facts establish that Ms. Maraj or one of her agents acting at her direction distributed the Infringing Work.

(*See, supra,* §§ II.B, II.D.)  Further, the Court should summarily adjudicate the fact that Ms. Maraj's infringement "was committed willfully" within the meaning of 17 U.S.C.A. § 504(c)(2) because Ms. Maraj knew she needed clearance, was affirmatively denied clearance numerous times, yet acted anyway.  This is the very definition of willful conduct.

To establish copyright infringement, a plaintiff must demonstrate: (1) that she owns a valid copyright; and (2) that defendant copied protected aspects of the work. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116-17 (9th Cir. 2018) (*citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, (1991)).  "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights" under 17 U.S.C. § 106.  *See A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001) (*quoting S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir. 1989)).  These exclusive rights include the right to reproduce, distribute, publicly display, perform, or create derivative works of the copyrighted work.  17 U.S.C. § 106.

A plaintiff need not demonstrate the defendant's intent to infringe the copyright in order to demonstrate copyright infringement.  *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.,* 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006); *see also Edu. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999) (copyright infringement "is a strict liability tort").

Here, Ms. Chapman is able to meet her burden.

### A.   Ms. Chapman Owns a Valid Copyright in the Composition

A certificate of registration validly obtained from the Copyright Office within five years of first publication of a work constitutes *prima facie* evidence of the originality of the work and of the facts stated therein, including ownership.  *See* 17 U.S.C. § 410(c).  In this case, Ms. Chapman is entitled to this statutory presumption because she registered her copyright of the song with the Copyright Office within five years of publication. *Marisa Christina, Inc. v. Bernard Chaus, Inc.,* 808 F.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

11

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

Supp. 356, 357 (S.D.N.Y. 1992).

It is undisputed that Ms. Chapman has always maintained rights to the Composition.   (UF 1-3.)   Ms. Chapman wrote the Composition in 1982, and obtained a copyright registration for the work (and other musical compositions) – PAu000556755 – from the United States Copyright Office on October 20, 1983. (UF 1-2, Frontera Decl., ¶ 6, Ex. 5; Chapman Decl. ¶ 2.)   Although Ms. Chapman entered into a co-publishing agreement with SBK through which SBK obtained a partial assignment of the copyright in the Composition, SBK's rights in the Composition transferred back to Ms. Chapman, on May 15, 2016.   (Chapman Decl., ¶ 4, Ex. 1.)   Accordingly, Ms. Chapman is  the sole owner of the copyright in the Composition.   (UF 3, Chapman Decl., ¶ 4, Ex. 1.)

Ms. Maraj does not—and cannot—dispute Ms. Chapman's ownership. Therefore, Ms. Chapman is entitled to summary adjudication as to ownership.

**B.**     **<u>Ms. Maraj Willfully Created an Unauthorized Derivative Work</u>**

The Copyright Act bestows on the owner of a copyright certain exclusive rights, including the right to create and regulate derivative works. 17 U.S.C. §§ 106(1)-(3), 17 U.S.C. § 602(a).  Ms. Maraj violated this exclusive right by creating a derivative work of Ms. Chapman's copyrighted work without authorization. Moreover, Ms. Maraj's violation was willful under the law.

1.     <u>It is Undisputed That Ms. Maraj Created an Unauthorized<br>Derivative Work, <i>i.e.</i>, the Infringing Work</u>

To prove direct copyright infringement, a plaintiff must demonstrate both ownership and "that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc.*, 239 F.3d at 1013.  In addition, direct infringement requires the plaintiff to show causation, or "volitional conduct", by the defendant.  *See Fox Broad. Co., Inc. v. Dish Network L.L.C.,* 747 F.3d 1060, 1067 (9th Cir. 2013).  The word "volition" in this context does not mean an "act of willing or choosing" or an "act of deciding," but rather

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

"simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." *Perfect 10, Inc. v. Giganews, Inc.,* 847 F.3d 657, 666 (9th Cir. 2017) (quoting *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995)); *see also* 4 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u>, § 13.08[C][1] (2016).

Here, it is undisputed that Ms. Maraj created an unauthorized derivative work of the Composition when she created the Infringing Work.  Indeed, Ms. Maraj *admitted* in her responses to Ms. Chapman's requests for admissions ("RFA Responses") and deposition that the Infringing Work uses a majority of the Composition's lyrics and its vocal melody.  (UF 6-8, Frontera Decl., ¶ 9, Ex. 8 at p. 81 (Suppl. Resp. to RFA No. 8) ("Admit that the Infringing Work uses a majority of the Composition's lyrics." "…ADMIT.").)  In other words, Ms. Maraj *admits* that she created a derivative work of the Composition that is substantially similar, if not strikingly similar, to the original.  (UF 6-8, Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶¶ 19, 20 (admitting that the Infringing Work was a "musical interpolation . . . that incorporated music and lyrics from the Composition" ).)  Ms. Maraj further admitted in her RFA Responses that she began recording the Infringing Work *before* requesting a license from Ms. Chapman for use of the Composition.  (UF 10, Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 20.)   These facts are undisputed.  This is copyright infringement.

Based on prior discussions, Ms. Chapman anticipates that Ms. Maraj may argue that although she created an unauthorized derivative work when she created the Infringing Work, such creation (and infringement) was innocent.   But Ms. Maraj's position is a red herring; intent is irrelevant to the issue of copyright infringement.  *UMG Recordings, Inc.,* 446 F. Supp. 2d at 1172; *Educ. Testing Serv.,* 95 F. Supp. 2d at 1087 (copyright infringement "is a strict liability tort").   Ms. Maraj's actions speak for themselves.   She directly infringed on Ms. Chapman's

Composition.  For this reason, Ms. Chapman is entitled to summary adjudication on copyright infringement based on Ms. Maraj's creation of an unauthorized derivative work.

2.  <u>Ms. Maraj's Actions in Creating an Unauthorized Derivative Work Were Willful As a Matter of Law</u>

To prove willfulness, "the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."  *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012), *abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc.,* 874 F.3d 1064, 1067 (9th Cir. 2017).  The determination of willfulness is ordinarily a question of fact for the jury.  *Hearst Corp. v. Stark*, 639 F. Supp. 970, 980 (N.D. Cal. Jun. 30, 1986).  However, where the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment.  *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335-36 (9th Cir. 1990); *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 936 (N.D. Cal. 1996).

Ms. Maraj's actions are exactly the type of willful infringement that can be decided on summary judgment.  By definition "[i]nfringement is willful if a record reflects that a defendant was warned they needed a license or permission but declined to do so and went ahead anyway."  *Broadcast Music, Inc. v. McDade & Sons, Inc.,* 928 F. Supp. 2d 1120, 1134 (D. Ariz. Mar. 6, 2013); *Sega Enters. Ltd.*, 948 F.Supp. at 936 (granting summary judgment as to willfulness and finding that there were knowing actions of infringement).   Under these conditions, it is appropriate to conclude that Ms. Maraj willfully infringed Ms. Chapman's copyright.

Here, the undisputed facts illustrate that Ms. Maraj's copyright infringement was willful.  *First*, Ms. Maraj admitted in her RFA Responses and deposition that her copying of the Composition was unauthorized, conceding that she (i) recorded

the Infringing Work before requesting a license from Ms. Chapman (UF 6-8, Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 20); (ii) intended to include the Infringing Work on the Album (Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 19); and (iii) knew she needed a license to use the Composition in the Infringing Work in order to include the Infringing Work on the Album (UF 9, Frontera Decl., ¶ 9, Ex. 8 at p. 80 (Suppl. Resp. to RFA No. 5).)  Ms. Maraj's actions in the face of her knowledge that she needed a license is precisely the type of willful conduct contemplated by *Broadcast Music, Inc.*, 928 F. Supp. 2d at 1134.

*Second*, it also is undisputed that Ms. Maraj never received the requested – and required – permission to use the Composition from Ms. Chapman.  Instead, Ms. Maraj and her representatives were ***unequivocally informed*** that the Composition was not available for sampling on multiple occasions, and that Ms. Chapman was not granting the requested permission.  (*See, supra*, § II.C; *see also* UF 12, 14-15, 19, Frontera Decl., ¶ 11, Ex. 10 at p. 99; *id.* at ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 111:9-24); *id.* at ¶ 15, Ex. 14; Chapman Decl., ¶ 6, Ex. 3.)  Ms. Maraj's creation of the Infringing Work without Ms. Chapman's permission despite acknowledging that she knew she needed Ms. Chapman's authorization establishes willful infringement. *See Broadcast Music, Inc.*, 928 F. Supp. 2d at 1134.

*Third*, to the extent that Ms. Maraj argues that she did not willfully infringe Ms. Chapman's copyright because she allegedly created the Infringing Work *for the purpose of* obtaining permission from Ms. Chapman to use it on her Album, that argument is unsupported by the facts or law.  Indeed, the fact that Ms. Maraj and Nas continued working on the Infringing Work *after* Ms. Maraj knew that Ms. Chapman had not cleared—and would not clear—the license request and Ms. Maraj confirmed to Mr. Taylor that she would not be using the Infringing Work on her Album demonstrates that Ms. Maraj's post-hoc justification for the reason she created the Infringing Work (*i.e.*, to obtain Ms. Chapman's permission to use the Composition) is unsupportable.  (*See, supra*, § II.D; *see also* Frontera Decl., ¶ 18,

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

15

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

Ex. 17;  *id.* at ¶ 16, Ex. 15 at p. 147.)  Further, not only did Ms. Maraj continue working on the Infringing Work after her requests to license the Composition were denied, but she went a step further by asking Mr. Taylor to premiere the Infringing Work on the radio the week her Album was released to the public.  (UF 25, Frontera Decl., ¶ 16, Ex. 15 at p. 147.)

Given these undisputed facts, no reasonable juror could conclude that Ms. Maraj did not act willfully.  Therefore, summary judgment is appropriate as to Ms. Maraj's willfulness in creating the unauthorized derivative work using the Composition.

### C.   Ms. Maraj Willfully Distributed the Infringing Work

In addition to violating Ms. Chapman's copyright by creating an infringing derivative work, Ms. Maraj committed a second act of infringement by willfully distributing the Infringing Work.

#### 1.   The Undisputed Facts Establish that Ms. Maraj Distributed the Infringing Work

As discussed above, 17 U.S.C. § 106(3) grants a copyright holder the exclusive right to distribute its copyrighted work.  Ms. Chapman is the undisputed copyright holder.  (UF 1-3.)  A common method of distribution is through licensing agreements, which permit the copyright holder to place restrictions upon the distribution of its products. "A licensee infringes the owner's copyright if its use exceeds the scope of its license." *S.O.S., Inc,* 886 F.2d at 1087 (*citing Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 20 (2nd Cir. 1976)).

Moreover, even if Ms. Maraj did not distribute the Infringing Work herself, she is still liable for distribution and considered the distributor if the distribution happened at her direction.  The law is clear, "[a]n agent acting within his apparent or ostensible authority binds the principal where the principal has intentionally or negligently allowed others to believe the agent has authority." *Brave New Films 501(c)(4) v. Weiner*, 626 F.Supp.2d 1013, 1016 (N.D. Cal. 2009); see also *Holley v.*

*Crank*, 400 F.3d 667, 673 (9th Cir. 2004) ("Principals are liable for the torts of their agents committed within the scope of their agency.").   Further, the existence of agency may be decided on summary judgment when there is only one conclusion that may be drawn.   *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 481 (9th. Cir. 2000) (affirming grant of summary judgment on agency).

Here, the undisputed evidence demonstrates that Ms. Maraj distributed the Infringing Work without a license or other form of consent.   After being told on numerous occasions she did not have permission to use the Composition in the Infringing Work, Ms. Maraj distributed the track anyway.   (*See, supra*, § II.D; *see also* UF 12, 14, 19, 25-36, Frontera Decl., ¶ 11, Ex. 10; *id.* at ¶ 12, Ex. 11 (Mannis-Gardner Dep. at 111:9-24);   *id.* at ¶ 15, Ex. 14; Chapman Decl., ¶ 6, Ex. 3.)   Just a week before her Album was set to release, Ms. Maraj privately messaged Mr. Taylor:



CONFIDENTIAL

(UF 25, Frontera Decl., ¶ 16, Ex. 15 at p. 147 (emphasis added).)   Mr. Taylor responded indicating that he would play the track.   (Uf 26, Frontera Decl., ¶ 16, Ex. 15 at p. 147;   *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 162:25-163:7).)

Ms. Maraj followed up with Mr. Taylor several days later (the day her Album released) telling him that the track featured her and Nas, *i.e.* the Infringing Work, and asking him for his number so she could send it over for Mr. Taylor to publicly broadcast.   (UF 27, Frontera Decl., ¶ 16, Ex. 15 at p. 148.)[2]   Mr. Taylor provided his number and Ms. Maraj confirmed she would text the Infringing Work to him.   (UF 28, 29,  Frontera Decl., ¶ 16, Ex. 15 at p. 148.)

---

[2] No other track that Maraj was working on for the Album featured Nas. (Delaine Dep. at 205:8-12.)

On August 11, 2018, Mr. Taylor posted to his Instagram and Twitter accounts promoting the Infringing Work and confirming he received it from Ms. Maraj:

- "Shhhhhhh!!!!   TONIGHT   7PM!!!   ***NICKY   GAVE   ME SOMETHING***!!! @nickiminaj ft @nas !!! (NOT ON HER ALBUM!) GONNA STOP THE CITY TONIGHT!!!!!!!!!!!!!!" (UF 35, Frontera Decl., ¶ 21, Ex. 20; *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 167:18-168:23.) (emphasis added).)

Then, the same day at 7 PM EST, Mr. Taylor broadcast his radio show on Hot 97 FM and played the Infringing Work.   (UF 38, 39, Frontera Decl., ¶ 17, Ex. 16 (Taylor Dep. at 166:9-13).)

The chain of distribution is clear:

- Ms. Maraj asked Mr. Taylor to premiere the Infringing Work the week her Album released (UF 25, Frontera Decl., ¶ 16, Ex. 15 at p. 147);

- Ms. Maraj confirmed with Mr. Taylor the day her album released that Mr. Taylor was going to play the Infringing Work on his show (UF 27, *id.*);

- Ms. Maraj asked Taylor for his number to send the Infringing Work to him (UF 27, Frontera Decl., ¶ 16, Ex. 15 at p. 148);

- Ms. Maraj's recording engineer requested that the Infringing Work be mastered and a "clean" version be sent back to him (UF 30, Frontera Decl. Frontera Decl., ¶ 28, at Ex. 27);

- Chris Athens sent Mr. Delaine a clean version that day (UF 32, Frontera Decl., ¶ 19, Ex. 18 at pp. 189-90; Frontera Decl., ¶ 20, Ex. 19 (Delaine Dep. at 206:16-208:4)); and

- Between the time of Mr. Taylor's and Ms. Maraj's last message and the next afternoon, Mr. Taylor received the Infringing Work via text (UF 36, Frontera Decl., ¶ 17, Ex. 16 (Taylor Dep. at 164:22-165:8; *id,*

1    at 169:5-18; *id.* at 158:11-22).)

2       Each of these facts is indisputable based on the documentary evidence. And

3    from these facts, the only reasonable conclusion is that Ms. Maraj or someone

4    acting at her direction distributed the Infringing Work to Mr. Taylor. Indeed, Ms.

5    Maraj's recording engineer confirmed that unreleased recordings such as the

6    Infringing Work are maintained in the strictest confidence and that he ***never*** sends

7    any unreleased recordings out to anyone without instructions from Ms. Maraj

8    directly. (UF 34, Frontera Decl., ¶ 20, Ex. 19 (Delaine Dep. at 200:23-202:6,

9    203:16-23; *id.* at 204:17-21).)

10      Thus, the only possible conclusion based on the undisputed facts and

11   evidence adduced in discovery is that Ms. Maraj, or someone acting at her

12   direction, distributed the Infringing Work to Mr. Taylor for public consumption.

13          2.    The Undisputed Evidence Establishes that Ms. Maraj's
                  Distribution was Willful

14

15      Ms. Maraj's conduct with regard to distribution exemplifies the type of

16   willful conduct appropriately decided on summary judgment. The law is clear.

17   When an individual knows their conduct infringes on another's copyright and acts,

18   that conduct is willful. *Columbia Pictures Television v. Krypton Bd. of*

19   *Birmingham, Inc.*, 106 F.3d 284, 293 (9th Cir. 1997); *BWP Media USA, Inc. v. P3R,*

20   *LLC,* 2014 WL 3191160, at *4 (C.D. Cal. Jul. 3, 2014); *Basic Books, Inc. v. Kinko's*

21   *Graphics Corp.,* 758 F. Supp. 1522, 1543 (S.D.N.Y. 1991)*; accord Peer Int'l Corp.*

22   *v. Pausa Records, Inc.,* 909 F.2d 1332, 1335 (9th Cir. 1990); *Warner Bros. Entm't*

23   *Inc. v. Duhy*, No. CV 09-5798-GHK (FMOx), 2009 WL 5177956, at *1 (C.D. Cal.

24   Nov. 30, 2009)(finding willfulness in a default judgment where plaintiff pled

25   defendant's willfulness in its complaint and buttressed this assertion with evidence

26   of defendant's knowledge of the unlawfulness of their actions).

27      *First*, as discussed above, it is undisputed that Ms. Maraj knew she was not

28   permitted to distribute the Infringing Work without permission. (UF 9, Frontera

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

19

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

Decl., ¶ 9, Ex. 8 at p. 80 (Supp. Resp. to RFA No. 5) (Ms. Maraj admitted "that [she] needed a License to use the Composition in the Infringing Work in order to include the Infringing Work on [her] album Queen."); *id.* at p. 82 (Suppl. Resp. to RFA No. 14).)

*Second*, the undisputed evidence establishes that Ms. Maraj intended to distribute the Infringing Work to Mr. Taylor and either Ms. Maraj or someone acting at her direction did in fact distribute the Infringing Work to Mr. Taylor. It cannot be disputed that Ms. Maraj told Mr. Taylor she wanted him to world premiere the Infringing Work the week her Album dropped. (UF 25, Frontera Decl., ¶ 16, Ex. 15 at p. 147.) It further cannot be disputed that Ms. Maraj told Mr. Taylor she would text him the Infringing Work less than 24 hours before he received it via text. (UF 27-29, Frontera Decl., ¶ 16, Ex. 15 at p. 148.) Nor can it be disputed that the day Ms. Maraj told Mr. Taylor that she would send him the Infringing Work, Ms. Maraj's sound engineer sent the song to Chris Athens to be mastered and received a "clean" mastered version of the Infringing Work in return. (UF 30-33, Frontera Decl., ¶ 28, Ex. 27; *id.* at ¶ 19, Ex. 18.) Mr. Taylor then posted on social media that he got something from Ms. Maraj and testified that he received the Infringing Work via text. (UF 35, Frontera Decl., ¶ 17, Ex. 16 (Taylor Dep. at 164:22-165:8; *id.* at 169:5-18; *id.* at 158:11-22) (confirming that Taylor received the Infringing Work via text).) Further, Mr. Delaine testified that he has never "sen[t] out any [unreleased] recordings of Ms. Maraj's to a third party without [] receiving an instruction from Ms. Maraj to send out that recording[.]" (UF 34, Frontera Decl., ¶ 20, Ex. 19 (Delaine Dep. at 203:16-23).)

As a result, any reasonable trier of fact would conclude that Ms. Maraj was aware of the unlawfulness of the Infringing Work, and nevertheless willfully distributed it. Ms. Chapman is entitled to summary judgment on this additional prong of copyright infringement.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

20

MOTION FOR PARTIAL SUMMARY
JUDGMENT OF PLAINTIFF TRACY CHAPMAN

1

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, Ms. Chapman respectfully requests that the Court grant her motion in its entirety and enter judgment in her favor as to the issue of liability for Copyright Infringement, holding that: (1) Ms. Maraj committed copyright infringement by creating the Infringing Work, (2) the creation of the Infringing Work was willful, (3) Ms. Maraj committed copyright infringement by distributing the Infringing Work, and (4) the distribution was willful.

Dated:  August 17, 2020

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP


By:  /s/ John M. Gatti
     John M. Gatti
     *Attorney for Plaintiff*
     TRACY CHAPMAN

**[REDACTED]** EXHIBIT B

1
2
3
4
5
6
7
8

MANATT, PHELPS & PHILLIPS, LLP
JOHN M. GATTI (State Bar No. 138492)
E-mail: jgatti@manatt.com
LAUREN J. FRIED (State Bar No. 309005)
E-mail: lfried@manatt.com
NICHOLAS FRONTERA (State Bar No. 307479)
E-mail: nfrontera@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Tel.:  (310) 312-4000; Fax:  (310) 312-4224

*Attorneys for Plaintiff*
TRACY CHAPMAN

9

10

11

12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRACY CHAPMAN,

Plaintiff,

vs.

ONIKA TANYA MARAJ p/k/a
NICKI MINAJ and DOES 1-10,

Defendants.

No. 2:18-cv-09088-VAP

Honorable Virginia A. Phillips

**[REDACTED] PLAINTIFF'S
SEPARATE STATEMENT OF
UNDISPUTED FACTS IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

| | |
|---|---|
| Hearing Date: | September 14, 2020 |
| Hearing Time: | 2:00 p.m. |
| Final Pretrial Conf.: | October 5, 2020 |
| Trial Date: | October 13, 2020 |

[Filed Concurrently with: 1. Motion for
Summary Judgment; 2. Appendix Of
Evidence; 3. [Proposed] Order]

Plaintiff Tracy Chapman hereby submits this Separate Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment.

## PLAINTIFF'S UNDISPUTED FACTS

**ISSUE 1:   Defendant Onika Tanya Maraj ("Maraj") infringed on Plaintiff Tracy Chapman's ("Chapman") copyright in the track *Baby Can I Hold You* (the "Composition") when she created an unauthorized derivative work entitled *Sorry* utilizing the Composition ("Infringing Work").**

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 1. | Ms. Chapman wrote *Baby Can I Hold You* (the "Composition") in 1982. | Declaration of Tracy Chapman ("Chapman Decl.") at ¶ 2.[1] |
| 2. | On October 20, 1983, Ms. Chapman obtained a copyright registration for the Composition, from the United States Copyright Office. | Declaration of Nicholas Frontera ("Frontera Decl."), ¶ 5, Ex. 4; *id.* at ¶ 27, Ex. 26; Chapman Decl. at ¶ 2. |
| 3. | Ms. Chapman is the sole owner of the copyright in the Composition. | Frontera Decl. ¶ 6, Ex. 5; *id.* at ¶ 27, Ex. 26; Chapman Decl. at ¶¶ 3-4. |
| 4. | In 2017, Ms. Maraj began recording a track entitled *Sorry* (the "Infringing Work"). | Frontera Decl., ¶ 7, Ex. 6 (Deposition of Onika Tanya Maraj ("Maraj Dep.") at 50:25-51:3). |
| 5. | The Infringing Work features Nasir bin Olu Dara Jones p/k/a Nas ("Nas"). | Frontera Decl., ¶ 7, Ex. 6 (Maraj Dep. at 52:11-12). |
| 6. | Ms. Maraj admits that the Infringing Work incorporates music and lyrics from the Composition. | Frontera Decl., ¶ 8, Ex. 7 at p. 71 ¶¶ 19, 20; *id.* at ¶ 9, Ex. 8 at p. 81 (Suppl. Responses to RFA Nos. 8 and 10); *see also id.* at ¶ 10, Ex. 9 (containing side by side comparison of the Composition and the Infringing Work). |

---

[1] The Declarations of Tracy Chapman and Nicholas Frontera can be found in the Appendix of Evidence at pp. 6 and pp. 34 respectively.

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 7. | Ms. Maraj admits that the Infringing Work incorporates a majority of the Composition's lyrics. | Frontera Decl., ¶ 8, Ex. 7 at p. 71 ¶¶ 19, 20; *id.* at ¶ 9, Ex. 8 at p. 81 (Suppl. Responses to RFA Nos. 8 and 10); *see also id.* at ¶ 10, Ex. 9 (containing side by side comparison of the Composition and the Infringing Work). |
| 8. | Ms. Maraj admits that the Infringing Work incorporates part of the vocal melody from the Composition. | Frontera Decl., ¶ 8, Ex. 7 at p. 71 ¶¶ 19, 20; *id.* at ¶ 9, Ex. 8 at p. 81 (Suppl. Responses to RFA No. 11); *see also id.* at ¶ 10, Ex. 9 (containing side by side comparison of the Composition and the Infringing Work). |

**ISSUE 2:  Maraj's conduct in creating the Infringing Work was willful because she knew she needed Chapman's consent to create the Infringing Work, knew she did not have consent, and continued to work on the Infringing Work despite knowing she did not have Ms. Chapman's consent.**

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 9. | Ms. Maraj "knew that [she] needed a License to use the Composition in the Infringing Work in order to include the Infringing Work on [her] album Queen." | Frontera Decl., ¶ 9, Ex. 8 at p. 80 (Suppl. Response to RFA No. 5). |
| 10. | Ms. Maraj began recording the Infringing Work, without first seeking Ms. Chapman's authorization to do so. | Frontera Decl., ¶ 8, Ex. 7 at p. 71, ¶ 20. |
| 11. | On May 23, 2018, Ms. Maraj's representative began the process of obtaining clearance to use the Composition in the Infringing Work. | Frontera Decl., ¶ 11, Ex. 10 at p. 99; *id.* at ¶ 10, Ex. 11 (Deposition of Deborah Mannis-Gardner ("Mannis-Gardner Dep.") at 107:11-108:8, 132:10-11, 133:9-14). |
| 12. | On May 23, 2018, Ms. Maraj's | Frontera Decl., ¶ 11, Ex. 10 at p. |

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| | representative was informed that the Composition was not available for sampling. | 99; *id.* at, ¶ 10, Ex. 11 (Mannis-Gardner Dep. at 109:10-110:14). |
| 13. | Ms. Maraj, again through her representatives, requested Ms. Chapman's authorization to use the Composition in the Infringing Work. | Chapman Decl., ¶ 5, Ex. 2 at p. 27; Frontera Decl., ¶ 13, Ex. 12 at p. 140; *id.* at ¶ 14, Ex. 13; *id.* at ¶ 10, Ex. 11 (Mannis-Gardner Dep. at 112:19-114:3; 117:2-119:17, 120:20-121:12, 122:5-15; 126:7-131:18). |
| 14. | Ms. Chapman instructed her representative to deny Ms. Maraj's request to use Ms. Chapman's Composition in the Infringing Work. | Chapman Decl., ¶ 5. |
| 15. | Ms. Chapman's denial was relayed to Ms. Maraj through her representatives. | Chapman Decl., ¶ 5, Ex. 2 at p. 25; Frontera Decl., ¶ 15, Ex. 14; *id.* at ¶ 10, Ex. 11 (Mannis-Gardner Dep. at 123:22-124:22; 126:7-131:18). |
| 16. | Ms. Maraj, through her representatives, made another request for authorization from Ms. Chapman for use of the Composition in the Infringing Work. | Chapman Decl., ¶ 6, Ex. 3 at p. pp. 31-32; Frontera Decl. at ¶ 4. |
| 17. | Ms. Maraj also made a personal attempt to reach out to Ms. Chapman on Twitter. | Frontera Decl., ¶ 9, Ex. 8 at p. 83 (Suppl. Resp. to RFA No. 18). |
| 18. | Ms. Chapman was made aware of Ms. Maraj's requests. | Chapman Decl., ¶ 6. |
| 19. | Ms. Chapman again denied the requests. | Chapman Decl., ¶ 6. |
| 20. | Ms. Chapman's denial was communicated to Ms. Maraj's representatives again on August 2, 2018. | Chapman Decl., ¶ 6, Ex. 3 at p. 31; Frontera Decl. at ¶ 4; *id.* at ¶ 26, Ex. 25 at p. 222. |
| 21. | On August 3, 2018, Ms. Maraj confirmed to Aston George | Frontera Decl., ¶ 16, Ex. 15 at p. 13. |

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| | Taylor that the Infringing Work would not be on her Album. | |
| 22. | Ms. Maraj and Nas continued working on the Infringing Work after August 3, 2018. | Frontera Decl., ¶ 18, Ex. 17 at pp. 182-87; *id.* at ¶ 7, Ex. 6 (Maraj Dep. at 55:5-24, 56:15-19; 56:10-24). |
| 23. | On August 5, 2018, Ms. Maraj informed N_____ringing as **CONFIDENTIAL** ____ | Frontera Decl., ¶ 18, Ex. 17 at p. 187; *id.* at ¶ 7, Ex. 6 (Maraj Dep. at 59:12-60:2). |
| 24. | On August 5, 2018, Ms. Maraj confirmed to Nas that, **CONFIDENTIAL** | Frontera Decl., ¶ 18, Ex. 17 at p. 187. |

**ISSUE 3:  Maraj infringed on Chapman's copyright when she (or others acting on her direct orders) distributed the Infringing Work.**

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 25. | On August 3, 2018, Ms. Maraj, sent Aston George Taylor a direct message from her verified Instagram account asking him to world premiere the Infringing Work on his radio show the week her album *Queen* was released. | Frontera Decl., ¶ 16, Ex. 15 at p. 147; *id.* at ¶ 17, Ex. 16 (Deposition of Aston George Taylor ("Taylor Dep.") at 159:1-162:24). |
| 26. | Mr. Taylor indicated he would play the Infringing Work on his show. | Frontera Decl., ¶ 16, Ex. 15 at p. 147; *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 162:25-163:7). |
| 27. | On August 10, 2018, Ms. Maraj messaged Mr. Taylor: | Frontera Decl., ¶ 16, Ex. 15 at p. 148. |

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| | CONFIDENTIAL ███████████████ | |
| 28. | Mr. Taylor provided his phone number and confirmed he would play the Infringing Work. | Frontera Decl., ¶ 16, Ex. 15 at p. 148. |
| 29. | ███ Maraj confirmed, CONFIDENTIAL | Frontera Decl., ¶ 16, Ex. 15 at p. 148. |
| 30. | On August 10, 2018, Ms. Maraj's lead recording engineer, Aubry Delaine, reached out to the company that mastered Ms. Maraj's songs for the Album, Chris Athens Masters, Inc., to ask that they master the Infringing Work and return clean and explicit versions. | Frontera Decl., ¶ 28, Ex. 27. |
| 31. | Chris Athens Masters, Inc. mastered the Infringing Work on August 10, 2018. | Frontera Decl., ¶ 19, Ex. 18 at p. 189-90; *id.* at ¶ 28, Ex. 27; *id.* at ¶ 20, Ex. 19 (Deposition of Aubry Delaine ("Delaine Dep.") at 206:16-208:4). |
| 32. | On August 10, 2018, David Castro of Chris Athens Masters, Inc., sent Mr. Delaine links to download a clean and an explicit version of the Infringing Work. | Frontera Decl., ¶ 19, Ex. 18 at p. 189-90; *id.* at ¶ 20, Ex. 19 (Delaine Dep. at 206:16-208:4). |
| 33. | The links only allowed for one download each. | Frontera Decl., ¶ 19, Ex. 18 at p. 189-90; *id.* at ¶ 20, Ex. 19 (Delaine Dep. at 206:16-208:4). |
| 34. | Mr. Delaine never sends unreleased recordings of Ms. Maraj's work without receiving instructions from Ms. Maraj. | Frontera Decl., ¶ 20, Ex. 19 (Delaine Dep. at 203:16-23). |
| 35. | On August 11, 2018, Mr. Taylor posted on his Instagram and Twitter accounts promoting the debut of the Infringing Work on his show that night. | Frontera Decl., ¶ 21, Ex. 20; *id.* at ¶ 22, Ex. 21; *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 167:18-168:23; 170:1-171:12). |
| 36. | Mr. Taylor received the | Frontera Decl., ¶ 17, Ex. 16 |

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| | Infringing Work via text sometime b_____) Ms. Maraj telling him _CONFIDENTIAL_ on August 10, 2018, an _____ first social media post promoting the show early afternoon the next day. | (Taylor Dep. at 164:22-165:14, 169:5-18, 158:11-22). |
| 37. | The version of the Infringing Work Mr. Taylor received was a mastered version entitled "01 Sorry - 72518 - master.mp3". | Frontera Decl., ¶ 23, Ex. 22; *id.* at ¶ 17, Ex. 16 (Taylor Dep. at 172:13-25, 174:22-176:21). |
| 38. | On August 11, 2018 at 7 PM EST, Mr. Taylor broadcast his radio show on Hot 97 FM. | Frontera Decl., ¶ 17, Ex. 16 (Taylor Dep. at 166:9-13, 173:17-23). |
| 39. | Mr. Taylor played the Infringing Work during the broadcast. | Frontera Decl., ¶ 17, Ex. 16 (Taylor Dep. at 166:9-13, 173:17-23). |

**ISSUE 4:   Maraj's conduct in distributing the Infringing Work was willful because she knew she needed Chapman's consent to distribute the Infringing Work, and knew she did not have that consent.**

Issue No. 4, incorporates the Statements of Undisputed Facts Nos. 1-39.

Dated:  August 17, 2020

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP
John M. Gatti
Lauren J. Fried
Nicholas Frontera

By:  /s/ John M. Gatti

John M. Gatti
*Attorneys for Plaintiff*
TRACY CHAPMAN

326714122.1

**[REDACTED]** EXHIBIT C

CERTIFIED COPY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TRACY CHAPMAN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:18-CV-09088-VAP-SS |
| | ) | |
| ONIKA TANYA MARAJ P/K/A | ) | |
| NICKI MINAJ AND DOES 1-10, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

**VIDEOTAPED DEPOSITION OF ONIKA TANYA MARAJ**

**Taken on September 23, 2019**



**Court Reporting • Video • Trial Presentation**

LA 310.230.9700 • SF 415.445.0105

els@elitigationservices.com • www.elitigationservices.com

045

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 9

1    Maura Gierl, for the plaintiff.                          10:27:01

2            MR. ROSS:  Pete Ross, for Onika Maraj.           10:27:04

3            MR. LAURITSEN:  Eric Lauritsen, for Onika        10:27:08

4    Maraj.                                                   10:27:10

5            MS. LaPOLT:  Dina LaPolt, for Onika Maraj.       10:27:12

6            MS. PRICE:  Danielle Price, for Onika            10:27:16

7    Maraj.                                                   10:27:16

8            MR. BRUCE:  Tommy Bruce, for Onika Maraj.        10:27:17

9            THE VIDEO OPERATOR:  Thank you.  The court       10:27:22

10   reporter today is Lori Byrd with eLitigation            10:27:23

11   Services, Inc.                                           10:27:25

12           Will the reporter please swear in the           10:27:26

13   witness and we can begin.                               10:27:26

14   -----------------------------------------               10:27:26

15        ONIKA TANYA MARAJ, p/k/a NICKI MINAJ,              10:27:26

16           called as a witness in this case,               10:27:26

17            having been first duly sworn                    10:27:26

18         upon her oath, testified as follows:              10:27:26

19                    EXAMINATION                             10:27:26

20   BY MR. JACOBS:                                           10:27:39

21       Q.  Good morning, Ms. Maraj.                         10:27:39

22       A.  Good morning.                                    10:27:42

23       Q.  Can you please state your full name for the    10:27:42

24   record.                                                  10:27:44

25       A.  Onika Tanya Maraj.                               10:27:45

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 22

| | | | |
|---|---|---|---|
| 1 | | song getting done. | 10:42:57 |
| 2 | Q. | Anything else? | 10:43:00 |
| 3 | A. | No. | 10:43:02 |
| 4 | Q. | Did you look for any communications you had | 10:43:20 |
| 5 | | with a disc jockey named "Flex"? | 10:43:24 |
| 6 | A. | Yes. | 10:43:31 |
| 7 | Q. | And did you have any? | 10:43:32 |
| 8 | A. | No. | 10:43:37 |
| 9 | Q. | Who is Flex? | 10:43:43 |
| 10 | A. | A DJ. | 10:43:46 |
| 11 | Q. | Do you know his full name? | 10:43:47 |
| 12 | A. | No. | 10:43:49 |
| 13 | Q. | Where is he a DJ? | 10:43:50 |
| 14 | A. | In New York. | 10:43:51 |
| 15 | Q. | Do you know what radio station? | 10:43:54 |
| 16 | A. | Hot 97. | 10:43:58 |
| 17 | | (REPORTER REQUESTED CLARIFICATION) | 10:44:00 |
| 18 | | THE WITNESS:  Hot 97. | 10:44:01 |
| 19 | BY MR. JACOBS: | | 10:44:02 |
| 20 | Q. | How long have you known him for? | 10:44:03 |
| 21 | A. | I think about, maybe over 10 years. | 10:44:04 |
| 22 | Q. | Have you ever texted with Flex? | 10:44:27 |
| 23 | A. | Yes. | 10:44:28 |
| 24 | Q. | When was the last time you texted him? | 10:44:29 |
| 25 | A. | About a day or two ago. | 10:44:31 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 24

1    spoke about the case on the phone, but we spoke        10:45:46

2    about the case on social media prior to that.         10:45:49

3        Q.   When was that?                                10:45:52

4        A.   I don't remember the date.                    10:45:53

5        Q.   Do you recall generally what the discussion   10:45:56

6    was over social media you referenced?                  10:45:58

7        A.   Yes.  It was about him saying that he was     10:46:02

8    about to play a song that was, like, a -- an           10:46:04

9    exclusive song.  And I -- that was on Twitter.         10:46:09

10            And I went on Instagram and said:  Only       10:46:14

11   play the songs that are official album cuts from my    10:46:17

12   album, because my album had just come out.  And that   10:46:20

13   was it.                                                10:46:25

14       Q.   Did you have any other communication with     10:46:27

15   him around that same time in any other way?            10:46:28

16       A.   Not that I can recall.                        10:46:34

17       Q.   You don't remember being on the phone with    10:46:37

18   him around that time?                                  10:46:39

19       A.   No.                                           10:46:42

20       Q.   And you don't remember exchanging any text    10:46:42

21   messages -- text messages with him around that time?   10:46:45

22       A.   No.                                           10:46:48

23       Q.   Do you recall being on the phone with him     10:46:51

24   between that time and the time you just reached out    10:46:54

25   to him regarding this document you referenced?         10:46:56

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 28

| | | |
|---|---|---|
| 1 | will send someone to hear all of your music to see | 10:52:43 |
| 2 | if there's anything that should -- you know, that | 10:52:47 |
| 3 | there's something that maybe there's a sample in the | 10:52:51 |
| 4 | music that you didn't know about or something like | 10:52:53 |
| 5 | that. | 10:52:55 |
| 6 | So they'll send someone to your recording | 10:52:56 |
| 7 | studio, in this case, that will listen to the music. | 10:52:59 |
| 8 | And I forgot the name of the person's | 10:53:05 |
| 9 | occupation. But it's -- deals with ... I think | 10:53:07 |
| 10 | there's a person that I deal with, his name is | 10:53:17 |
| 11 | Joshua Berkman. He is the person that we usually | 10:53:19 |
| 12 | use as the middle man, because he's like the A&R for | 10:53:24 |
| 13 | my projects in the past. And he usually goes about | 10:53:29 |
| 14 | finding the person hiring -- I think it's a | 10:53:35 |
| 15 | musicologist. | 10:53:38 |
| 16 | Q.   Does Joshua Berkman work for your record | 10:53:46 |
| 17 | label? | 10:53:49 |
| 18 | A.   Yes. | 10:53:50 |
| 19 | Q.   And what's the label? | 10:53:50 |
| 20 | A.   Republic Records. | 10:53:52 |
| 21 | Q.   Are you in direct communication -- | 10:54:17 |
| 22 | withdrawn. | 10:54:19 |
| 23 | Do you talk to Josh about -- Joshua Berkman | 10:54:20 |
| 24 | about his efforts to clear songs for you? | 10:54:23 |
| 25 | A.   Yes. | 10:54:27 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 37

| | | |
|---|---|---|
| 1 | Q.   Before you got to his studio, did you have | 11:05:36 |
| 2 | an understanding that -- that there was an interest | 11:05:39 |
| 3 | in doing a version of the Tracy Chapman composition? | 11:05:44 |
| 4 | A.   No. | 11:05:50 |
| 5 | Q.   So what happened next after you went back | 11:05:57 |
| 6 | to L.A., in relation to your recording vocals for | 11:05:59 |
| 7 | the song? | 11:06:04 |
| 8 | A.   I recorded -- oh. | 11:06:07 |
| 9 | I pulled up the Shelly Thunder song.  I | 11:06:11 |
| 10 | pulled that up to hear it on YouTube.  And I then | 11:06:14 |
| 11 | recorded it in my studio, singing the hook -- | 11:06:23 |
| 12 | singing the chorus of the song. | 11:06:29 |
| 13 | Q.   When you say your studio, which studio is | 11:06:31 |
| 14 | that? | 11:06:34 |
| 15 | A.   Glenwood. | 11:06:35 |
| 16 | Q.   And where is that located? | 11:06:36 |
| 17 | A.   I believe it's in Glenwood, California. | 11:06:37 |
| 18 | Q.   When you went to look at the Shelly Thunder | 11:06:45 |
| 19 | video, did you notice any references to Tracy | 11:06:47 |
| 20 | Chapman? | 11:06:50 |
| 21 | A.   Not one. | 11:06:52 |
| 22 | Q.   Do you recall when you recorded the vocals | 11:07:01 |
| 23 | for your song "Sorry"? | 11:07:05 |
| 24 | A.   I don't recall what month that was. | 11:07:09 |
| 25 | Q.   It was in 2018, though? | 11:07:12 |

050

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 38

| | | |
|---|---|---|
| 1 | A.   Actually, if my album came out in 2018, I | 11:07:20 |
| 2 | believe I recorded the song in 2017.  Because it was | 11:07:25 |
| 3 | not originally for my album, it was for his album. | 11:07:31 |
| 4 | So I think that it was a lot sooner than | 11:07:36 |
| 5 | when my album came out that I actually cut those | 11:07:39 |
| 6 | vocals. | 11:07:42 |
| 7 | Q.   Did the song go out on Nas's album? | 11:07:47 |
| 8 | A.   No. | 11:07:50 |
| 9 | Q.   Do you know why not? | 11:07:51 |
| 10 | A.   I don't know.  I don't know. | 11:07:55 |
| 11 | Q.   Did you ever have a conversation with | 11:08:07 |
| 12 | anybody about releasing your song "Sorry" on the | 11:08:09 |
| 13 | album "Queen"? | 11:08:15 |
| 14 | A.   Did I have a conversation with anyone? | 11:08:17 |
| 15 | Q.   Yes. | 11:08:19 |
| 16 | A.   Yes. | 11:08:20 |
| 17 | Q.   Who did you discuss that with? | 11:08:20 |
| 18 | A.   Everyone that I think I would have come in | 11:08:23 |
| 19 | contact with about my album. | 11:08:25 |
| 20 | Q.   And did you want to put it on your album | 11:08:29 |
| 21 | "Queen"? | 11:08:31 |
| 22 | A.   Yes. | 11:08:33 |
| 23 | Q.   And how did it come about that it didn't go | 11:08:35 |
| 24 | on -- withdrawn. | 11:08:41 |
| 25 | How did it come about that you got Nas's | 11:08:42 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 61

| | | |
|---|---|---|
| 1 | through your recording process? | 11:43:55 |
| 2 | A.   Yes. | 11:43:58 |
| 3 | Q.   Are the different takes maintained at the | 11:44:27 |
| 4 | studio where you recorded, or are they somewhere | 11:44:29 |
| 5 | else? | 11:44:36 |
| 6 | A.   The takes are on whatever the -- whatever | 11:44:38 |
| 7 | device we record on. | 11:44:41 |
| 8 | Q.   Do you recall what device you recorded | 11:44:44 |
| 9 | "Sorry" on? | 11:44:45 |
| 10 | A.   No. | 11:44:47 |
| 11 | Q.   Who performs on "Sorry"? | 11:45:04 |
| 12 | A.   Myself and Nas. | 11:45:07 |
| 13 | Q.   Are there any musicians? | 11:45:14 |
| 14 | A.   Not that I know of. | 11:45:16 |
| | | |
| | | |
| | | |
| | | |
| | | 11:45:52 |
| 20 | Q.   At the time you recorded it, you intended | 11:45:54 |
| 21 | it to go out on his album -- | 11:45:58 |
| 22 | A.   Yes. | 11:46:00 |
| 23 | Q.   -- is that correct? | 11:46:00 |
| 24 | Did you record an explicit version of | 11:46:33 |
| 25 | "Sorry"? | 11:46:36 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 62

| | | | |
|---|---|---|---|
| 1 | A. | The original version is explicit. | 11:46:38 |
| 2 | Q. | Is there a clean version of the song? | 11:46:52 |
| 3 | A. | I'm not sure. | 11:46:55 |
| 4 | Q. | Do you know somebody named Chris Athens? | 11:47:05 |
| 5 | A. | The name sounds familiar, but I'm not sure. | 11:47:09 |
| 6 | Q. | Do you know of a company called Chris | 11:47:13 |
| 7 | Athens Masters? | | 11:47:14 |
| 8 | A. | Not off the top of my head. | 11:47:18 |
| 9 | Q. | Do you know somebody named Curt Bradley? | 11:47:24 |
| 10 | A. | No. | 11:47:28 |
| 11 | Q. | Do you know somebody named David Castro? | 11:47:29 |
| 12 | A. | No. | 11:47:32 |
| 13 | Q. | Dave Huffman? | 11:47:34 |
| 14 | A. | No. | 11:47:37 |
| 15 | | MR. ROSS:  Let's take a break. | 11:47:50 |
| 16 | | MR. JACOBS:  Do you want to take a break? | 11:47:51 |
| 17 | | MR. ROSS:  Yes, please. | 11:47:53 |
| 18 | | MR. JACOBS:  Sure. | 11:47:54 |
| 19 | | THE VIDEO OPERATOR:  Here marks the end of | 11:47:56 |
| 20 | tape number 1 in the video deposition of Ms. Maraj. | | 11:47:57 |
| 21 | And we're off the record at 11:48 A.M. | | 11:48:00 |
| 22 | | (RECESS TAKEN FROM 11:48 TO 11:59 A.M.) | 11:48:50 |
| 23 | | THE VIDEO OPERATOR:  Here marks the | 11:59:50 |
| 24 | beginning of tape number 2 in the video deposition | | 11:59:51 |
| 25 | of Ms. Maraj.  And we're back on record at | | 11:59:54 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 63

| | | |
|---|---|---|
| 1 | 11:59 A.M. | 11:59:57 |
| 2 | BY MR. JACOBS: | 12:00:00 |
| 3 | Q.   Ms. Maraj, do you know somebody named Kenny | 12:00:02 |
| 4 | Meiselas? | 12:00:05 |
| 5 | A.   Yes. | 12:00:07 |
| 6 | Q.   And who is he? | 12:00:08 |
| 7 | A.   He was my attorney. | 12:00:09 |
| 8 | Q.   He no longer is your attorney? | 12:00:10 |
| 9 | A.   That's correct. | 12:00:12 |
| 10 | Q.   When did he stop being your attorney? | 12:00:13 |
| 11 | A.   I'm not sure of the exact date.  Sometime | 12:00:15 |
| 12 | this year. | 12:00:17 |
| 13 | Q.   Before summer?  Or since summer? | 12:00:22 |
| 14 | A.   I don't remember. | 12:00:24 |
| 15 | Q.   Do you know somebody named Stuart Prager? | 12:00:25 |
| 16 | A.   I'm not sure. | 12:00:28 |
| 17 | Q.   Have you heard the name before? | 12:00:36 |
| 18 | A.   I'm not sure. | 12:00:38 |
| 19 | Q.   Are you aware of any efforts by Kenny | 12:00:49 |
| 20 | Meiselas to clear the use of the Tracy Chapman | 12:00:50 |
| 21 | composition "Sorry"? | 12:00:56 |
| 22 | A.   I'm not sure. | 12:01:00 |
| 23 | Q.   You're not sure, meaning you don't have any | 12:01:01 |
| 24 | recollection of any effort? | 12:01:04 |
| 25 | A.   Could you repeat the question? | 12:01:06 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 64

| | | |
|---|---|---|
| 1 | Q.   When you say you're not sure, does that | 12:01:07 |
| 2 | mean you have no recollection of him making any such | 12:01:08 |
| 3 | effort? | 12:01:11 |
| 4 | A.   Right. | 12:01:12 |
| 5 | MR. JACOBS:  I'd like to mark as | 12:02:19 |
| 6 | Plaintiff's Exhibit 102 a text chain.  It was | 12:02:20 |
| 7 | produced by the defendant with Bates number | 12:02:29 |
| 8 | MINAJ000032 through 37. | 12:02:34 |
| 9 | (DEPOSITION EXHIBIT 102 MARKED FOR | 12:02:50 |
| 10 | IDENTIFICATION) | 12:02:52 |
| 11 | BY MR. JACOBS: | 12:02:59 |
| 12 | Q.   Ms. Maraj, if you could take a minute and | 12:03:01 |
| 13 | look at Plaintiff's Exhibit 102 and let me know | 12:03:02 |
| 14 | after you've done so, I'd appreciate it. | 12:03:06 |
| 15 | A.   (Perusing document) | 12:03:09 |
| 16 | Q.   Do you recognize Plaintiff's Exhibit 102? | 12:03:25 |
| 17 | A.   Yes. | 12:03:28 |
| 18 | Q.   What is it? | 12:03:28 |
| 19 | A.   A text. | 12:03:29 |
| 20 | Q.   A text between whom? | 12:03:30 |
| 21 | A.   Myself and Nas. | 12:03:32 |
| 22 | Q.   Are you -- are your texts in the darker | 12:03:36 |
| 23 | blue, or the lighter shade? | 12:03:42 |
| 24 | A.   Blue. | 12:03:45 |
| 25 | | |

055

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 65

| | | | |
|---|---|---|---|
| 1 | | "Tell that lady clear the damned | 12:04:06 |
| 2 | | song." | 12:04:10 |
| 3 | | Do you see that? | 12:04:11 |
| 4 | A. | Yes. | 12:04:12 |
| 5 | Q. | Do you have an understanding of who he's | 12:04:12 |
| 6 | referring to? | | 12:04:14 |
| 7 | A. | Yes. | 12:04:14 |
| 8 | Q. | Who's he referring to? | 12:04:16 |
| 9 | A. | I believe he's referring to Tracy Chapman. | 12:04:18 |
| 10 | Q. | And that's your response immediately | 12:04:30 |
| 11 | following it: | | 12:04:32 |
| 12 | | "SMH.  By the way, did you ever | 12:04:33 |
| 13 | | approve a mix?" | 12:04:35 |
| 14 | A. | Yes. | 12:04:40 |
| 15 | Q. | When you say "did you ever approve a mix" | 12:04:47 |
| 16 | to Nas, what are you referring to? | | 12:04:50 |
| 17 | A. | A mix of the song. | 12:04:53 |
| 18 | Q. | A mix of the song "Sorry"? | 12:04:54 |
| 19 | A. | Yes. | 12:04:55 |
| 20 | Q. | The next page refers -- withdrawn. | 12:05:16 |
| 21 | | The next page appears to reflect a mix -- | 12:05:19 |
| 22 | or that you sent him a mix. | | 12:05:23 |
| 23 | | Is that correct? | 12:05:25 |
| 24 | A. | Yes. | 12:05:26 |
| 25 | Q. | Did this mix contain the rap verse that you | 12:05:39 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 66

| | | |
|---|---|---|
| 1 | wrote and recorded? | 12:05:42 |
| 2 | A.   Yes. | 12:05:44 |
| 3 | Q.   To your knowledge, had Nas heard that | 12:06:06 |
| 4 | version prior to this date? | 12:06:09 |
| 5 | A.   I'm not sure. | 12:06:11 |
| 6 | Q.   The reference -- withdrawn. | 12:06:27 |
| 7 | Do you see the reference to "Queensbridge" | 12:06:30 |
| 8 | on page 2 of Plaintiff's Exhibit 102? | 12:06:32 |
| 9 | A.   Yes. | 12:06:35 |
| 10 | Q.   Do you know what that's a reference to? | 12:06:35 |
| 11 | A.   I'm not sure.  It looks like it may have | 12:06:44 |
| 12 | been the password. | 12:06:46 |
| 13 | Q.   On the next page, am I correct that you | 12:07:22 |
| 14 | wrote: | 12:07:25 |
| 15 | "We'll go in and make the changes | 12:07:27 |
| 16 | if you want, then we can go from | 12:07:30 |
| 17 | there"? | 12:07:32 |
| 18 | A.   Yes. | 12:07:35 |
| 19 | Q.   Did you, in fact, make changes to your mix | 12:07:36 |
| 20 | based on the comments he made? | 12:07:39 |
| 21 | A.   I don't think so. | 12:07:44 |
| 22 | Q.   Why didn't you? | 12:07:52 |
| 23 | A.   I'm not sure. | 12:07:53 |
| 24 | Q.   On the following page, am I correct that | 12:08:11 |
| 25 | you're saying: | 12:08:13 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 67

| | | |
|---|---|---|
| 1 | "I'm in the booth.  I'll hit you | 12:08:15 |
| 2 | tomorrow"? | 12:08:18 |
| 3 | A.   Yes. | 12:08:20 |
| 4 | Q.   Do you recall what you were in the booth | 12:08:20 |
| 5 | for? | 12:08:22 |
| 6 | A.   No. | 12:08:22 |
| 7 | Q.   Below that there's a reference to -- | 12:08:37 |
| 8 | withdrawn. | 12:08:42 |
| 9 | Below that, am I correct that Nas says: | 12:08:42 |
| 10 | I'll go in the lab Sunday or | 12:08:45 |
| 11 | Monday and adlib the hook? | 12:08:48 |
| 12 | MR. ROSS:  That's not what the document | 12:08:53 |
| 13 | says.  You misread it. | 12:08:54 |
| 14 | BY MR. JACOBS: | 12:09:01 |
| 15 | Q.   Do you see the text below the one you sent | 12:09:02 |
| 16 | where it says: | 12:09:05 |
| 17 | "I'm in the booth, I'll hit you | 12:09:05 |
| 18 | tomorrow." | 12:09:08 |
| 19 | It goes on to say: | 12:09:09 |
| 20 | "Good morning.  I'll go in the lab | 12:09:11 |
| 21 | Sunday night or Monday and adlib | 12:09:15 |
| 22 | the hook.  Just see if we like it. | 12:09:17 |
| 23 | If it's not [sic] all good"? | 12:09:20 |
| 24 | A.   "If not, it's all good"?  Yes. | 12:09:22 |
| 25 | Q.   And is that something that Nas wrote to | 12:09:24 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj



Page 68

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj



Page 69

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 77

1     Q.    Why didn't you call him at the time?      12:24:50

2     A.    Because I communicated on here.  That's   12:24:52

3   what would have been my text.                     12:24:57

4           "You can only play official album         12:24:58

5   material."                                         12:25:00

6           And that's what I said to him on Instagram. 12:25:02

7     Q.    And what do you mean by:                   12:25:05

8           "You can only play official album          12:25:06

9           material, sir"?                            12:25:09

10    A.    Meaning that I want him to play album      12:25:11

11  songs, songs that are on my album.                 12:25:13

12    Q.    Did you have an understanding when you saw 12:25:23

13  his post what he was referring to in terms of what 12:25:25

14  song he was planning to play?                      12:25:31

15    A.    It was confusing, because it -- it's       12:25:35

16  obvious that I did a song with Nas from my album.  12:25:38

17          So when I saw this and he said:  "Nicki    12:25:44

18  Minaj feature Nas, not on her album," I could only 12:25:47

19  guess that he was going to try to play the song that 12:25:52

20  I had with Nas.                                    12:25:56

21          Because he put a -- he put up a photo with 12:25:57

22  me and Nas, and said:  "Nicki Minaj feature Nas, and 12:25:59

23  it's not on her album."                            12:26:06

24    Q.    Are there any songs on Queen that feature  12:26:08

25  Nas?                                               12:26:11

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 78

1      A.   No.                                          12:26:11

2      Q.   So just so I'm clear, when you saw this      12:26:13

3   post, did you have an understanding that this was    12:26:19

4   "Sorry" he was referring to?                         12:26:22

5      A.   I didn't understand that.  But it was one    12:26:25

6   of my guesses.                                       12:26:28

7           And the other thing is, I didn't know if he  12:26:30

8   was just, like, joking, either.                      12:26:32

9           I didn't know if he really had music, or if  12:26:38

10  he was just playing my album.  Because my album had  12:26:40

11  just come out.  So it was a bit weird.               12:26:43

12          But he's a very funny person.  So I          12:26:46

13  didn't -- so I wasn't sure if he was kidding, if he  12:26:52

14  was serious, and what he was going to play, because  12:26:56

15  he didn't say the song name or anything.             12:26:58

16          So I was, like, maybe he's just doing this   12:27:01

17  for people to enjoy a show.  I wasn't sure.          12:27:03

18     Q.   Do you have an understanding about how he    12:27:15

19  got a recording of "Sorry"?                          12:27:19

20     A.   No.                                          12:27:20

21     Q.   So he didn't tell you how he got a copy of   12:27:23

22  it?                                                  12:27:25

23     A.   No.                                          12:27:26

24     Q.   Do you have an understanding about how       12:27:39

25  anybody affiliated with that radio station may have  12:27:41

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 79

| | | |
|---|---|---|
| 1 | gotten a copy of a recording of "Sorry"? | 12:27:43 |
| 2 | A. Probably the same way everyone gets music | 12:27:45 |
| 3 | that's unreleased. You just have -- I mean, songs | 12:27:48 |
| 4 | just leak. People get songs through e-mails, texts. | 12:27:54 |
| 5 | You could mistakenly send a song to the | 12:27:59 |
| 6 | wrong phone number. Someone can have it that way. | 12:28:01 |
| 7 | A billion different reasons how these songs | 12:28:04 |
| 8 | leak, because they're going back and forth between | 12:28:08 |
| 9 | so many different people, being mixed, being | 12:28:10 |
| 10 | mastered, being sent to people for approval, | 12:28:14 |
| 11 | lawyers, labels. | 12:28:16 |
| 12 | I have no clue. Songs get leaked every | 12:28:18 |
| 13 | day. | 12:28:21 |
| 14 | In fact, my song got leaked last week. Two | 12:28:21 |
| 15 | songs got leaked last week. I have no clue how. | 12:28:24 |
| 16 | Q. With respect to "Sorry" specifically, do | 12:28:28 |
| 17 | you know of anybody who leaked it to anybody? | 12:28:31 |
| 18 | A. No. | 12:28:33 |
| 19 | Q. So your reference to the possibility of | 12:28:35 |
| 20 | leaks, you have no knowledge that that actually | 12:28:38 |
| 21 | happened with "Sorry"? | 12:28:40 |
| 22 | A. It's clear that it happened, because how | 12:28:41 |
| 23 | would he have gotten the song? | 12:28:43 |
| 24 | How would anybody have a song unless it | 12:28:45 |
| 25 | leaked? | 12:28:47 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 80

1    Q.   But you know of nobody who actually leaked        12:28:48

2    it?                                                    12:28:50

3    A.   Correct.                                          12:28:51

4    Q.   Did you undertake any investigation to            12:28:55

5    determine if the song was leaked?                      12:28:58

6    A.   An investigation?  What do you mean?              12:29:00

7    Q.   Did you have anybody look into whether the        12:29:02

8    song was leaked?                                       12:29:05

9    A.   Yes.  Everyone looked into it, to my              12:29:06

10   knowledge.  Everyone on the label and management       12:29:08

11   looked into it.                                        12:29:10

12   Q.   So when you say "everybody in management,"        12:29:11

13   who are you referring to?                              12:29:14

14   A.   Do you want me to name the people at the          12:29:19

15   management company?                                    12:29:20

16   Q.   The people that you believe were involved         12:29:21

17   in investigating whether there was a leak, yes.        12:29:23

18   A.   I don't know if this is an investigation.         12:29:25

19   I just know that they were made aware my song was --   12:29:27

20   an unreleased song was played on the radio.  And we    12:29:30

21   discussed how did the song come out, how was the       12:29:33

22   song played if it's not on my album.                   12:29:36

23   Q.   Do you know of any steps taken by anybody          12:29:38

24   at management or the label to determine if, in fact,   12:29:40

25   there was a leak of the song?                          12:29:43

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 81

```
 1    A.   Well, normally, what they do -- I don't      12:29:46
 2  know specifically with this song.                   12:29:48
 3           Normally, they just try to go online and   12:29:50
 4  see what was the first source of the song coming     12:29:52
 5  out.                                                 12:29:54
 6           So whether it was like a blog who leaked   12:29:55
 7  it; whether it was someone's -- a personal person's  12:29:57
 8  Instagram page who may have leaked the song.         12:30:03
 9           They'll go and see if they can Google what 12:30:07
10  radio station played the song first.                 12:30:09
11           So I mean, it wasn't anything specifically 12:30:11
12  different with this song, to my knowledge.           12:30:13
13    Q.   Let me ask you one more time, and then I'll  12:30:18
14  move on:                                             12:30:20
15           Are you aware, with respect to "Sorry," in 12:30:21
16  particular, of any steps taken by anybody to         12:30:24
17  investigate whether there was a leak, and by whom?   12:30:26
18    A.   Could you repeat the question?               12:30:34
19    Q.   Sure.                                         12:30:35
20           Are you aware with respect to "Sorry," in  12:30:36
21  particular, of any steps taken by anybody to         12:30:39
22  investigate whether there was a leak, and by whom?   12:30:41
23    A.   Because of this, I believe that steps were   12:30:48
24  taken on both ends to find out how this radio        12:30:51
25  station obtained the song.                           12:30:55
```

eLitigation Services, Inc. - els@els-team.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 82

1          So I don't know specifically what we did on    12:30:57

2    our end, but we know that this was an issue.    12:30:59

3      Q.    When you say "steps were taken on both    12:31:05

4    ends," you mean in your team, and on the radio's    12:31:07

5    side?                                             12:31:13

6      A.    No.  On Tracy Chapman's side.            12:31:13

7      Q.    And other than what you've told me already    12:31:24

8    regarding what you think may have happened on your    12:31:27

9    side, was there anything else that you're aware of    12:31:28

10   that was done on your side to investigate any leaks?    12:31:31

11     A.    Other than what the leaks department does    12:31:34

12   at a record company, no.                          12:31:36

13          And I don't know what steps they actually    12:31:38

14   take, but I know that they investigate in their own    12:31:40

15   way.                                              12:31:42

16     Q.    Did you ask Nas if he gave the song to    12:32:14

17   anybody?                                          12:32:17

18     A.    I don't remember asking him that.        12:32:19

19     Q.    Do you know anybody else at Hot 97, other    12:32:30

20   than Nas -- sorry, withdrawn.                     12:32:33

21          Do you know anybody at Hot 97, other than    12:32:36

22   Flex?                                             12:32:39

23     A.    Yes.                                      12:32:44

24     Q.    Who?                                      12:32:44

25     A.    People that work at the station.         12:32:45

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Onika Tanya Maraj

Page 92

```
 1   STATE OF _____ )
                              )
 2   COUNTY OF _____ )

 3

 4

 5                 DEPONENT'S DECLARATION

 6

 7          I certify under penalty of perjury that

 8   the foregoing is true and correct, with addition of

 9   correction page, if any corrections are made.

10

11

12

13   Executed at {city>>>}_____on

14   {date>>>}_____.

15

16

17

18                 _____

19                 ONIKA TANYA MARAJ

20                 (Signature of Deponent)

21

22

23

24

25
```

067

**[REDACTED]** EXHIBIT D

CONFIDENTIAL

EXHIBIT
102
MARAJ

PENGAD 800-631-6989

MINAJ000032

182

CONFIDENTIAL



MINAJ000033

183

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

**[REDACTED]** EXHIBIT E

CERTIFIED COPY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TRACY CHAPMAN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:18-CV-09088-VAP-SS |
| | ) | |
| ONIKA TANYA MARAJ P/K/A | ) | |
| NICKI MINAJ AND DOES 1-10, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## DEPOSITION OF ASTON GEORGE TAYLOR
## Taken on February 11, 2020



**Court Reporting • Video • Trial Presentation**

LA 310.230.9700 • SF 415.445.0105
els@elitigationservices.com • www.elitigationservices.com

151

Page 1

            UNITED STATES DISTRICT COURT

          CENTRAL DISTRICT OF CALIFORNIA


TRACY CHAPMAN,               )
                             )
       Plaintiff,            )
                             ) Civil Action No:
                             ) 2:18-cv-09088-VAP-SS
     -v-                     )
                             )
ONIKA TANYA MARAJ p/k/a      )
NICKI MINAJ                  )
and DOES 1-19,               )
                             )
       Defendants.           )
                             )
------------------------ )


            VIDEOTAPED DEPOSITION OF

             ASTON GEORGE TAYLOR

        TAKEN ON TUESDAY, FEBRUARY 11, 2020










          BY:  DARBY GINSBERG, RPR

Aston George Taylor

Page 2

```
 1           UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA

 3

 4   TRACY CHAPMAN,            )
                              )
 5        Plaintiff,          )
                              ) Civil Action No:
 6                            ) 2:18-cv-09088-VAP-SS
          -v-                 )
 7                            )
     ONIKA TANYA MARAJ p/k/a  )
 8   NICKI MINAJ              )
     and DOES 1-19,           )
 9                            )
          Defendants.         )
10                            )
     ----------------------- )
11

12

13        DEPOSITION of ASTON GEORGE TAYLOR,

14   taken on behalf of the Plaintiff, at 7 Times

15   Square, New York, New York, commencing at

16   9:41 a.m. and ending at 4:01 p.m., Tuesday,

17   February 11, 2020, before Darby Ginsberg,

18   Registered Professional Reporter and Notary

19   Public of the State of New York, pursuant to

20   Notice.

21

22

23

24

25
```

Aston George Taylor

```
                                                                Page 3
 1
 2     APPEARANCES:
 3
 4     For the Plaintiff, TRACY CHAPMAN
 5            MANATT, PHELPS & PHILLIPS, LLP
              BY:  JOHN M. GATTI, ESQ.
 6            11355 West Olympic Boulevard
              Los Angeles, California 90064
 7            310.312.4169
              jgatti@manatt.com
 8
 9     For the Defendants, ONIKA TANYA MARAJ p/k/a
       NICKI MINAJ and DOES 1-19
10
              BROWNE GEORGE ROSS, LLP
11            BY:  JEFFREY A. MITCHELL, ESQ.
              BRETT D. KATZ, ESQ.
12            5 Penn Plaza, 24th Floor
              New York, New York 10001
13            212.413.2604
              jmitchell@bgrfirm.com
14            bkatz@bgrfirm.com
15
       For the Witness
16
              DAVIS WRIGHT TREMAINE, LLP
17            BY:  ELIZABETH A. McNAMARA, ESQ.
              ADAM LAZIER, ESQ.
18            1251 Avenue of the Americas
              21st Floor
19            New York, New York 10020-1104
              212.489.8230
20            lizmcnamara@dwt.com
              adamlazier@dwt.com
21
22     ALSO PRESENT:
23     MICHAEL SPAZIANI, Legal Video Specialist
       PIO FERRO
24
25
```

Aston George Taylor

Page 4

1                    INDEX OF EXAMINATION

2

   WITNESS:

3

   ASTON GEORGE TAYLOR

4

5       EXAMINATION                      PAGE

6           BY MR. GATTI              7

7           BY MR. MITCHELL        226

8           BY MR. GATTI           313

9           BY MR. MITCHELL        321

10          BY MR. GATTI           323

11

12                   E X H I B I T S

13     NUMBER          DESCRIPTION            PAGE

14     Exhibit 127    subpoena               16

15     Exhibit 128    subpoena to produce

16                    documents              38

17     Exhibit 129    document Bates

18                    numbered Flex 000013

19                    through 000015      100

20     Exhibit 130    one-page document

21                    Bates numbered Flex

22                    000002              160

23     Exhibit 131    document Bates numbered

24                    Flex 000001         175

25     Exhibit 132    Instagram post      179

Aston George Taylor

Page 5

1                  I N D E X (CONT.)

2     NUMBER          DESCRIPTION              PAGE

3     Exhibit 133     one-page document Bates

4                     stamped Flex 00003       182

5     Exhibit 134     document Bates stamped

6                     Flex 4                   186

7     Exhibit 135     document Bates stamped

8                     Flex 000005              190

9     Exhibit 136     one-page document Flex

10                    Bates stamp 6            198

11    Exhibit 137     printout Bates stamped

12                    MS1                      205

13    Exhibit 138     printout of Hot 97

14                    app page                 209

15    Exhibit 139     document Bates stamped

16                    Flex 7                   212

17    Exhibit 140     document Flex Bates

18                    stamped 8                222

19

20

21

22

23

24

25

Page 6

```
 1              NEW YORK, NEW YORK,
 2         TUESDAY, FEBRUARY 11, 2020
 3               AT 9:41 A.M.
 4          ASTON GEORGE TAYLOR,
 5          having been duly sworn,
 6   was examined and testified as follows:
 7            (Reporter's opening statement)
 8          THE VIDEOGRAPHER:  Good morning.
 9     My name is Michael Spaziani.  I am a
10     certified legal video specialist
11     working with eLitigation Services.  I
12     am neither a relative nor employee of
13     any of the parties and have no
14     financial interest in the outcome of
15     this action.
16          Today's date is February 11,
17     2020, and the current time is 9:41.
18     This is the videotaped deposition of
19     Aston George Taylor.  The case number
20     is Civil Action Number 2:18-cv-09008-
21     VAP-SS, and the entitled case matter is
22     Tracy Chapman versus Onika Tanya Maraj.
23     This deposition is being taken on
24     behalf of the plaintiff.  We are now on
25     the record.
```

Aston George Taylor

Page 96

1    7:00 but I just do that for people to tune

2    in and listen.  So it would happen in --

3    you know, somewhere in there.

4        Q.    Okay.  And I think we established

5    earlier that you did, in fact, at some

6    point receive a copy of the song Sorry,

7    correct?

8        A.    Yes.

9        Q.    That's yes?

10       A.    Yes.

11       Q.    Okay.  And, again, I am not going

12   to go over things again, but can you tell

13   me, to the best of your recollection, if

14   you know --

15       A.    Uh-huh.

16       Q.    -- the form that you received it

17   in?  Was it a direct message?  Was it a

18   text?  Was it an email?  Do you have any

19   recollection?

20       A.    It was text.

21       Q.    Okay.  To your phone?

22       A.    I think so.

23       Q.    Okay.  Do you only have one cell

24   phone?

25       A.    Yes.

Page 100

1           MR. GATTI:   Let me mark as the

2       next exhibit, which will be 129.   It is

3       three pages of documents Bates numbered

4       Flex 000013 through 000015.   We will

5       mark this as 129.

6           (Exhibit 129, document Bates

7       numbered Flex 000013 through 000015,

8       marked for Identification.)

9       Q.    I am going to ask you,

10   Mr. Taylor, if you could just take just a

11   quick glance at the three pages and ask you

12   some questions about it.

13       A.    Uh-huh.

14       Q.    First off, those numbers I have

15   referred to, I will represent to you that

16   these are documents that have been produced

17   by you in connection with the subpoena that

18   was served on you.

19       A.    Uh-huh.

20       Q.    Do you -- taking a look at these,

21   do you recall or do you recognize these

22   documents?

23       A.    Yeah.

24   CONFIDEN

Aston George Taylor

Page 101



Page 102



Aston George Taylor

Page 103





Page 132



Page 133



Aston George Taylor

Page 155

1    in a little different section.  This was

2    really to whoever was following me.

3    Whoever was following me.

4        Q.   Do you know if Ms. Minaj was

5    following you at that time?

6        A.   You know something?  This is when

7    you said, I don't -- I don't know.  I don't

8    think -- I don't know.  I don't know.

9        Q.   Did you have -- as of August 11,

10   2018, you -- at or about 7:00 p.m. or

11   thereafter, you broadcast the song Sorry

12   and premiered it --

13       A.   Uh-huh.

14       Q.   -- as you testified to.  You

15   don't need to go over that, but did you

16   have any communications with Ms. Minaj

17   after August 11th?

18       A.   After August 11th?

19       Q.   After premiered.

20       A.   I know she came to the show at

21   some point or I went to Queen Radio.  I

22   went to her -- I don't know which one

23   happened first.

24       Q.   After you premiered the song

25   Sorry on August 11, 2018, on your show, did

Aston George Taylor

Page 160

1   don't know if I am using the right word.

2        Q.    Did the song Sorry, after you

3   broadcast it, was linked to Hot 97's

4   website, correct?

5        A.    I don't know.  I'm not sure.

6        Q.    Are you aware that the song

7   was -- went viral on the Internet?

8        A.    I --

9             MR. MITCHELL:  Object to the form

10       of the question.

11            THE WITNESS:  I'm not sure.

12       Q.    Are you aware of any response to

13   your show, good or bad?  The show that --

14   the show that premiered Sorry.

15       A.    I do a lot, so, you know, it's

16   not -- it's -- I don't remember.  I don't

17   remember.  I don't at the time.

18            MR. GATTI:  Let me mark as the

19       next exhibit, which will be 130.  The

20       document is a one-page document Bates

21       numbered Flex 000002.

22            (Plaintiff's Exhibit 130,

23       one-page document Bates numbered Flex

24       000002, marked for Identification.)

25       Q.    I just want to -- as you are

Aston George Taylor

Page 161

1    looking at it, I just wanted to ask you if

2    you recognize this document.

3         A.    Yes.  My Tweet.

4         Q.    Okay.  I was going to say, this

5    is a Tweet from Funk Flex; is that correct?

6         A.    Correct.  Yes.

7         Q.    Do you recall after you see it,

8    that you Tweeted this message?

9         A.    Well, it was actually a repost

10   from my Instagram.  So as I put on my

11   Instagram, it went through my Twitter at

12   the same time.

13        Q.    And just for the record, it says,

14   "Shhh!!!!  TONIGHT 7:00 p.m.!!!  Nicki gave

15   me something!!!  @ Nicki Minaj featuring ft

16   @Nas.  (Not on her album).  Going to stop

17   the city tonight."  With many exclamation

18   points, and it's a reference to Instagram

19   at the bottom.

20              Is that a -- what you were

21   saying, that was a --

22        A.    Post.  So there is probably a

23   picture associated with it on the Gram.

24        Q.    Okay.  And it was reTweeted, as

25   it says, 1,030 times.  You don't have any

Aston George Taylor

Page 171

1    your possession, correct?

2         A.    When I posted this?

3         Q.    Yeah.

4         A.    Yes.

5         Q.    Okay.  Do you recall when in the

6    time period between Ms. Minaj asking for

7    your -- for you to text your mobile number

8    to her on August 10th and 1:55 p.m. on

9    August 11th, when you actually received

10   possession of the song Sorry?

11        A.    From -- you are saying if I -- if

12   she --

13        Q.    I am saying -- no, I am just

14   saying:  Between the time that Ms. Minaj --

15        A.    I'm not sure.  I'm not sure on

16   that.  But I definitely -- somewhere in

17   between before this because I definitely

18   Tweet this after I got it.

19        Q.    Okay.  So I am correct; so

20   between the time on August 10th that

21   Ms. Minaj direct messaged you asking for

22   your -- your cell phone number and you

23   provided it to her, and 1:55 p.m. on August

24   11, 2018, you came into possession of the

25   song Sorry, correct?

Page 182

1            Let me mark as Exhibit 133, it's

2        a document Flex 00003 Bates number.

3        One-page document.

4            (Exhibit 133, one-page document

5        Bates stamped Flex 00003, marked for

6        Identification.)

7            THE WITNESS:  Uh-huh.

8        Q.   Just after looking at this

9   document, again, is that your Twitter

10  account name and picture in the top left

11  corner?

12       A.   Yes.

13       Q.   Okay.  And this one is now at --

14  timestamped 2:34 on August 11, 2018?

15       A.   Uh-huh.

16       Q.   Which was approximately about

17  40 minutes after your previous Twitter post

18  we talked about; is that correct?

19       A.   Uh-huh.  Yes.

20       Q.   Do you -- can you tell me why

21  there is an -- it's another post of the

22  same -- of the prior posting?

23       A.   It's the same thing?  I mean, I

24  might Twitter.  Okay.  So sometimes the way

25  that Facebook is, you may see a couple of

Aston George Taylor

Page 183

1    Tweets more than once.  Sometimes it just

2    does it.  I mean, I would have wanted it to

3    go out more than once.

4         Q.    And I will show you the post in

5    the prior exhibit, and the post in this

6    exhibit appear to be exactly the same

7    instead of spelling Nicki with a "Y" in the

8    previous post, and I can show you your

9    spelling?

10        A.    Might be an "I"?

11        Q.    Yes, when you say Nicki gave me

12   something, now it's spelled with an "I."

13        A.    It's not spelled with an I.

14             MS. McNAMARA:  This is with an

15        "I" too.

16             MR. GATTI:  The other one.

17             MS. McNAMARA:  Oh, the other one

18        is a "Y."  I am sorry.

19             THE WITNESS:  I am not sure.  I

20        might have corrected it.

21             MS. McNAMARA:  Oh.

22             THE WITNESS:  I don't know.

23        Q.    Again, you are the only one

24   controlling these submissions, these

25   postings?

Aston George Taylor

Page 194

1    my section, so I would have had to have

2    sent it to the guy running the board.  I

3    would have had to send it to the guy who

4    has my computer.

5         Q.    Who are those individuals?  Who

6    ran the board?

7         A.    I'm not sure who was running it

8    that day, but I probably sent it to Tat,

9    and he probably sent it to whoever -- if he

10   wasn't, he would send it to whoever is

11   running it.  I mean, it will take it

12   through like three or four people.

13        Q.    And who had your computer you

14   said?

15        A.    A guy HR.

16        Q.    Who is that?

17        A.    Former intern.

18        Q.    What's his name?

19        A.    HR.  It really is the letter "H"

20   and letter "R."

21        Q.    Do you know him by any other name

22   other than HR?

23        A.    I just know him as --

24        Q.    Was he hired by the station or

25   directly by you?

Aston George Taylor

Page 210

1          app page, marked for Identification.)

2          Q.    For the record, it's Exhibit 9,

3     number 9.  Just looking at this, do you

4     have any recollection of what this is?

5          A.    It looks like it's a Hot 97 app;

6     is that correct.

7          Q.    That is a printout of the Hot 97

8     app page.

9          A.    Uh-huh.

10          Q.    And there is a reference to your

11     show.

12          A.    Uh-huh.

13          Q.    And it says, halfway through --

14     down it says, "Funk Flex mix premier of

15     Nicki Minaj and Nas."

16          A.    Yep.

17          Q.    And it shows an air date of

18     Saturday, August 11, 2018, at 7:00 p.m.

19     Eastern Time; is that --

20          A.    Pow.

21          Q.    -- accurate to your reflection as

22     to when the premier occurred?

23          A.    Yeah.

24          Q.    Do you know if through this app

25     Sorry was posted on the Hot 97 app?  Can

173

Page 212

1  accessed through the link, through the app?

2       A.    I think the mix, meaning that it

3  may be within nine or ten records, but

4  it's -- it's there, you know.

5       Q.    Uh-huh?

6       A.    It would be -- it's never

7  usually -- I don't think -- it never goes

8  to a song.  It goes to a mix or it probably

9  take -- if I played that song for seven

10  minutes, it probably has a 30-minute mix of

11  songs I played before and after.  I think.

12  That's usually.

13       Q.    I understand.  Thanks.

14            After you received a copy of the

15  song Sorry, did you send it to anyone else?

16       A.    When I -- well, the board

17  operator on my computer, HR and Tat.

18       Q.    Okay.  Anybody else you recall

19  sending this out to?

20       A.    I don't recall sending it to

21  anyone.

22            (Exhibit 139, document Bates

23       stamped Flex 7, marked for

24       Identification.)

25            MR. GATTI:  Let me mark as 139,

Page 213

1          Flex document number 7.  It's a

2          one-page document.  It has a reference

3          to some redacting.  It is a -- from DJ

4          HR to Funk dated August 11, 2018, at

5          4:48 p.m. Eastern Time.

6          Q.    So DJ HR,

7     DJheavyrotation@GMail.com.  Do you see

8     that?

9          A.    Same person, yes.

10         Q.    So that's the HR person who you

11    were referring to?

12         A.    Uh-huh.

13         Q.    You had at the bottom there what

14    appears to be a message, an email from you,

15    DJ Funk Flex@GMail.com wrote, "Don't email

16    to anyone," and then there is an attachment

17    to a document, which is entitled

18    Sorry72518master.  Mp3; do you see that?

19         A.    Yes.

20         Q.    And it's signed or at least at

21    the end it says Funk Flex?  Do you recall

22    sending this email to DJ HR?

23         A.    Yep.  I remember.

24         Q.    And was it sent on or about

25    August 11 at 2:43 p.m. on 2018?

Aston George Taylor

Page 214

1     A.    I am not sure of the time, but I
2   sent it.
3     Q.    Do you have any reason to doubt
4   it was sent at that time?
5     A.    No.
6     Q.    Okay.  Did you and DJ HR have any
7   discussions about sending it to him?
8     A.    No.
9     Q.    What was the purpose for you
10  sending it to DJ HR?
11    A.    So he could put it in my
12  computer.
13    Q.    And was that in preparation for
14  the show broadcast?
15    A.    It plays out of my computer in
16  the mix booth.
17    Q.    You said, "Don't email to
18  anyone."  What did you mean by that?
19    A.    That, you know, I just don't want
20  any -- I don't want the other stations to
21  get it.
22    Q.    How did you know that anybody you
23  were getting this recording of Sorry from
24  wasn't already talking to another station?
25    A.    That's why I got to get it on

Page 315

```
 1      A.    No.

 2      Q.    Okay.

 3      A.    Uh-uh.

 4      Q.    Were you ever contacted by anyone

 5   regarding an investigation into how Sorry

 6   was leaked to you?

 7      A.    No.

 8      Q.    You said that it was your

 9   understanding that Nas didn't want the --

10   you had heard, I think you said, that Nas

11   didn't want the song Sorry to come out?

12      A.    Well, I just know that I heard

13   that he didn't want -- I heard that he just

14   didn't want to be rapping with her.  It

15   wasn't a particular song.

16      Q.    Who did you hear that from?  Do

17   you recall?

18      A.    I mean, you know, these rappers,

19   just, you know, people, people who are in

20   the business that, you know, look, it made

21   him look mushy.  Regardless, it's his

22   image.

23      Q.    Okay.  With respect to these

24   interns and bloggers that work with you, is

25   it -- do you recall if any one of those
```

328

1          I declare under penalty of perjury

2     under the laws of New York that the

3     foregoing is true and correct.

4          Dated this 18th day of February, 2019

5

6

7     _____

8              DARBY L. GINSBERG

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Aston George Taylor

Page 325

1    February 11, 2020

2

3                    ERRATA

4

5    PAGE/LINE      CHANGE/REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 326

1

2

3

4

5

6

7

8                    ASTON GEORGE TAYLOR

9

10

11

12   Subscribed and sworn to

13   before me this      day

14   of            2020

15   _____

16

17

18

19

20

21

22

23

24

25

**[REDACTED]** EXHIBIT F

CONFIDENTIAL

FLEX 000013



CONFIDENTIAL

FLEX 000015

**EXHIBIT G**

1   MANATT, PHELPS & PHILLIPS, LLP
2   ROBERT A. JACOBS (State Bar No. 160350)
    E-mail: rjacobs@manatt.com
3   MAURA K. GIERL (State Bar No. 287430)
    E-mail: mgierl@manatt.com
4   11355 West Olympic Boulevard
    Los Angeles, California 90064-1614
5   Telephone: (310) 312-4000
    Facsimile: (310) 312-4224
6

7   *Attorneys for Plaintiff*
    TRACY CHAPMAN
8

9                UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

12  TRACY CHAPMAN,                    No. 2:18-cv-09088 VAP (SSx)

13              Plaintiff,            **STIPULATION AND**
                                      **CONFIDENTIALITY AND**
14        vs.                         **PROTECTIVE ORDER**
                                      [Discovery Document: Referred to
15  ONIKA TANYA MARAJ p/k/a           Magistrate Judge Suzanne H. Segal].
    NICKI MINAJ and DOES 1-10,
16
17              Defendants.
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Tracy Chapman ( "Plaintiff") and Defendant Onika Tanya Maraj p/k/a Nicki Minaj ("Defendant") (collectively with Plaintiff, "Parties"), by and through their respective counsel of record, hereby stipulate and request that the Court issue a Protective Order pursuant to Fed. R. Civ. P. 26(c) to protect the confidentiality of certain documents, information, and things that may be disclosed during discovery or other proceedings in this action as follows:

## 1. PURPOSES AND LIMITATIONS.

Disclosure and discovery activity in this action are anticipated to involve the production of confidential, proprietary, or private information, including trade secrets and confidential financial information, for which special protection from disclosure to the public and from the use for any purpose other than the prosecution and defense of this litigation would be warranted. Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosure or responses to discovery, and that the protection it affords extends only to the limited information or items that are entitled under the applicable legal principles to treatment as confidential. The Parties further acknowledge, as set forth in Section 12, below (FILING PROTECTED MATERIAL), that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

Good Cause Statement: This Action is likely to involve confidential intellectual property and other valuable commercial, financial, and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

STIPULATION AND
CONFIDENTIALITY
AND PROTECTIVE ORDER

business practices, or other confidential intellectual property or commercial information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law.  Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter.  It is the intent of the parties that information will not be designated as confidential for tactical reasons, and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

**2. DEFINITIONS.**

2.1. <u>Action</u>:  the above-captioned pending federal lawsuit.

2.2. <u>Party or Parties</u>:  the above-named Parties to this litigation, all predecessors or successors thereof, all past or present divisions, business units, subsidiaries or affiliates, and any of their officers, directors, employees, and/or agents.

2.3. <u>Non-Party or Non-Parties</u>:  any natural person, partnership, corporation, association, other legal entity, including, but not limited to, their past or present divisions, business units, subsidiaries or affiliates, and any of their officers, directors, employees, and/or agents, who are not named as a Party to this Action.

2.4. <u>Disclosure or Discovery Material</u>:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including,

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

2

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this Action.

2.5.  Confidential Information:  the term "Confidential Information" shall refer to information (regardless of how generated, stored or maintained) or tangible things that qualify for protection under standards developed under Federal Rules of Civil Procedure Rule 26(c), including, but not limited to the following:  trade secrets; other confidential and proprietary technical, research, or development information; commercial, financial, marketing, budgeting and/or accounting information; information about existing and potential customers or clients, marketing studies, performance, and projections; business strategies, decisions and/or negotiations; personnel compensation, evaluations and other employment information; personal information; confidential information about the musical compositions and/or sound recordings at issue in this action; confidential and proprietary information about affiliates, parents, subsidiaries and/or individuals/entities with whom the Parties to this action have or have had business relationships; and other information, including, but not limited to certain confidential contracts and/or agreements, the disclosure of which would be detrimental to that Party and/or the conduct of that Party's business or the business of that Party's customers or clients.

2.6.  Confidential Information – Attorneys' Eyes Only:  the term "Confidential Information – Attorneys' Eyes Only" shall refer to Confidential Information for which there is a reasonable and good faith basis to believe that such information, if disclosed to a Party, would be likely to cause actual and material harm to the designating party, including, but not limited to, disclosure of trade secrets or other highly sensitive, non-public information.  "Confidential Information – Attorneys' Eyes Only" is included within the meaning of "Confidential Information" as used in this Order, and all provisions of this Order that apply to "Confidential Information" also shall apply to "Confidential

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

Information – Attorneys' Eyes Only", with such additional protections that are expressly afforded to "Confidential Information – Attorneys' Eyes Only".

2.7. <u>Producing Party and Designating Party</u>:  the Party (and its Counsel) that is supplying information to any other Party or any non-party that is supplying information to any Party.

2.8. <u>Receiving Party and Non-Designating Party</u>:  the Party (and its Counsel) who is receiving information from any other Party or non-party.

2.9. <u>Expert</u>:  a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, and who is not a past or a current employee of a Party or of a competitor of a Party and who, at the time of retention, is not anticipated to become an employee of a Party or a competitor of a Party. This definition includes a professional jury or trial consultant retained in connection with this Action.

2.10. <u>Counsel</u>:  the lawyers of record for each of the Parties in this Action.

2.11. <u>Professional Vendors</u>:  persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstratives; organizing; storing; retrieving data in any form or medium), and their employees and subcontractors.

2.12. <u>Protected Material</u>:  any Disclosure or Discovery Material that is designated as "Confidential" or "Confidential – Attorneys' Eyes Only" pursuant to this Stipulated Protective Order.

**3.      SCOPE.**

The protections conferred by this Stipulated Protective Order cover not only Protected Material (as defined above), but also any information copied, derived, or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by parties or counsel to or in court or in other settings that might reveal Protected Material.  The protections

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

4

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

conferred by this Stipulated Protective Order do not cover the following information:  (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.

Any use of Protected Material at trial shall be governed by the orders of the trial judge.  This Order does not govern the use of Protected Material at trial.

**4.      DURATION.**

Even after final disposition of this Action, the confidentiality obligations imposed by this Stipulated Protective Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this Action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this Action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

**5.      DESIGNATING PROTECTED MATERIAL.**

5.1      <u>Exercise of Restraint and Care in Designating Materials for Protection</u>.

Each Party or non-party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.  A Designating Party must take care to designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

5

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

1    swept unjustifiably within the ambit of this Order.

2         Mass, indiscriminate, routinized designations are prohibited.  Designations

3    that are shown to be clearly unjustified, or that have been made for an improper

4    purpose (e.g., to unnecessarily encumber or retard the case development process, or

5    to impose unnecessary expenses and burdens on other parties), will expose the

6    Designating Party to sanctions.

7         If it comes to a Party's or a Non-Party's attention that information or items

8    that it designated for protection do not qualify for protection at all, then that Party

9    or Non-Party must promptly notify all other parties that it is withdrawing the

10   mistaken designation.

11        5.2    <u>Manner and Timing of Designations</u>.  It shall be the duty of the

12   Designating Party seeking protection of Protected Material to indicate to the other

13   Party and its Counsel which materials are to be considered "Confidential

14   Information" or "Confidential Information – Attorneys' Eyes Only".  Upon the

15   entry of this Stipulated Protective Order, all documents produced in this proceeding

16   that the Producing Party reasonably believes contain "Confidential Information" or

17   "Confidential Information – Attorneys' Eyes Only" may be designated as

18   "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY",

19   respectively.  In addition, all portions of pleadings, answers to interrogatories,

20   answers to requests for admissions, responses to requests for production of

21   documents, expert reports, declarations, and deposition testimony and deposition

22   exhibits that rely upon or reference documents and/or information designated as

23   "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY"

24   pursuant to this Stipulated Protective Order shall be subject to this Order as set

25   forth below.

26        (a)    Designation of Protected Material in conformity with this

27   Stipulated Protective Order requires:

28        (i)    For documents and things, at the time of their production.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

6

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

However, in the event a Producing Party elects to produce documents and things for inspection, no designation need be made prior to the inspection for "Confidential Information". For purposes of inspection, all documents shall be considered "CONFIDENTIAL" unless otherwise previously designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY". Upon a request for copying, the Producing Party shall designate such documents and things as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to the provisions of this Protective Order;

(ii)     For answers to interrogatories, answers to requests for admissions, responses to requests for production of documents, and expert reports, at the time they are provided to the other Parties;

(iii)     For declarations and pleadings, at the time of their filing; and

(iv)     For deposition testimony and/or deposition exhibits, at the time of the testimony or within thirty (30) business days after the Designating Party receives the transcript of the deposition. Until such time period expires, the deposition testimony and/or deposition exhibits shall be treated as "Confidential Information" unless otherwise specified in writing or on the record of the deposition.

(b)     The designation of "Confidential Information" and "Confidential Information – Attorneys' Eyes Only" shall be made in the following manner:

(i)     For documents produced in response to a discovery request, by placing a legend of "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" on each page of such documents, or, if not practicable or if doing so might damage the document, image or other things, as otherwise agreed by the Parties and/or Non-Party;

(ii)     For tangible objects, by placing a label or tag with a

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

7

STIPULATION AND
CONFIDENTIALITY
AND PROTECTIVE ORDER

legend of "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" on the object or the container for the object, or if not practicable, as otherwise agreed by the Parties and/or non-party;

(iii)   For answers to interrogatories, answers to requests for admissions, responses to requests for production of documents, expert reports and declarations, by placing a legend of "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" on the face of such responses, declarations or reports;

(iv)   For pleadings, by placing a legend of "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" on the face of such pleading; and

(v)   For deposition testimony and/or exhibits, following designation pursuant to paragraph 5.2(a)(iv) above, all copies of deposition transcripts that contain information or material designated as "Confidential Information" or "Confidential Information – Attorneys' Eyes Only" shall include the legend "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" on the cover thereof.  All labels, legends and tags, as above stated, shall be in a place or manner that avoids any interference with the legibility of the material.

5.3   Inadvertent Failures to Designate.  If corrected within a reasonable time, a Producing Party does not waive the right to designate material as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" by inadvertently failing to designate it as such before producing the same to the Receiving Party.  After being notified of the inadvertent failure, the Receiving Party must take reasonable steps to retrieve the information if the party disclosed it before being notified, and to have any person who received the material sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

8

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

5.4 <u>Right to Re-Designate</u>.  A Designating Party retains the right subsequently to re-designate materials and to require such documents to be treated in accordance with such designations from that time forward by providing written notice to all other Parties.

## 6.   CHALLENGING CONFIDENTIALITY DESIGNATIONS.

6.1 <u>Timing of Challenges</u>.  Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable substantial unfairness, unnecessary economic burdens, or a later significant disruption or delay of the litigation, a party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.  Accordingly, any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.

6.2 <u>Meet and Confer</u>.  A Party that elects to initiate a challenge to a Designating Party's confidentiality designation must do so in good faith and must begin the process by conferring directly (as required by Local Civil Rule 37-1), with counsel for the Designating Party.  In conferring, the challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.

6.3 <u>Judicial Intervention</u>.  The burden of persuasion in any challenge proceeding shall be on the Designating Party.  Until the Court rules on the challenge, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation.  Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the challenging party to sanctions.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

9

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

**7. ACCESS TO AND USE OF PROTECTED MATERIAL.**

7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to categories of persons and under the conditions described in this Stipulated Protective Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 13, below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated CONFIDENTIAL only to:

(a) the Receiving Party's Counsel of record in this Action, as well as employees of said Counsel (including, without limitation, any paralegal, clerical, or other assistant that such attorneys hire and assign to this matter) to whom it is reasonably necessary to disclose the information for this litigation, and all of whom are bound by the provisions of this Stipulated Protective Order;

(b) the current and former officers, directors, and employees of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Court and its personnel;

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

10

STIPULATION AND
CONFIDENTIALITY
AND PROTECTIVE ORDER

(e)    court reporters, their staffs, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f)    professional jury or trial consultants and mock jurors, to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g)    during their depositions, witnesses in the action to whom disclosure is reasonably necessary.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order;

(h)    the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(i)    any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the Parties engaged in settlement discussions.

7.3    Disclosure of "CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items.  Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may only disclose any information or item designated CONFIDENTIAL – ATTORNEYS' EYES ONLY to:

(a)    the Receiving Party's Counsel of record in this Action, as well as employees of said Counsel (including, without limitation, any paralegal, clerical, or other assistant that such attorneys hire and assign to this matter) to whom it is reasonably necessary to disclose the information for this litigation, and all of whom are bound by the provisions of this Stipulated Protective Order;

(b)    Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

11

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

"Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) the Court and its personnel;

(d) court reporters, their staffs, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(e) professional jury or trial consultants and mock jurors, to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order;

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h) any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the Parties engaged in settlement discussions.

## 8. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION.

If a Party is served with a subpoena or an order issued in other litigation that would compel disclosure of any information or items designated in this action as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY", the Receiving Party must:

(a) promptly notify the Designating Party, in writing (by electronic mail, if possible) immediately and in no event more than three court days after

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

12

STIPULATION AND
CONFIDENTIALITY
AND PROTECTIVE ORDER

receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order;

(b)     promptly notify the Party who caused the subpoena or order to issue in the other litigation that some or all the material covered by the subpoena or order is the subject of this Stipulated Protective Order, and deliver a copy of this Stipulated Protective Order promptly to the Party in the other action that caused the subpoena or order to issue; and

(c)     cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

The purpose of imposing these duties is to alert the interested parties to the existence of this Stipulated Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.  The Designating Party shall bear the burdens and the expenses of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

## 9.     A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION.

(a)     The terms of this Stipulated Protective Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY".  Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Stipulated Protective Order.  Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)     In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

13

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(i)     promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(ii)     promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(iii)     make the information requested available for inspection by the Non-Party, if requested.

(c)     If the Non-Party fails to seek a protective order from this Court within 14 calendar days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request.  If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Court.  Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

**10.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL.**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached here as Exhibit A.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

14

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

## 11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the Court.

## 12. FILING PROTECTED MATERIAL.

Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5.

## 13. FINAL DISPOSITION.

Unless otherwise ordered or agreed in writing by the Producing Party, within 60 days after the final termination of this action, each Receiving Party must either return all Protected Material to the Producing Party, or destroy all such Protected Material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries or any other form of reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and that affirms that the Receiving Party has not

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

15

STIPULATION AND
CONFIDENTIALITY
AND PROTECTIVE ORDER

1  retained any copies, abstracts, compilations, summaries or other forms of

2  reproducing or capturing any of the Protected Material.

3        Notwithstanding this provision, Counsel are entitled to retain an archival

4  copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence

5  or attorney work product, even if such materials contain Protected Material.  Any

6  such archival copies that contain or constitute Protected Materials remain subject to

7  this Protective Order as set forth in Section 4, above (DURATION).

8  **14.  MISCELLANEOUS.**

9        14.1   <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any

10  person to seek its modification by the Court in the future.

11        14.2   <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this

12  Protective Order no Party waives any right it otherwise would have to object to

13  disclosing or producing any information or item on any ground not addressed in

14  this Stipulated Protective Order.  Similarly, no Party waives any right to object on

15  any ground to use in evidence of any of the material covered by this Protective

16  Order.

17        14.3   This Stipulated Protective Order shall survive the final conclusion of

18  the Action, and the Court shall have jurisdiction to enforce this Stipulated

19  Protective Order beyond the conclusion of this Action.

20        IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD

21  Dated:      July 9, 2019

22  BROWNE GEORGE ROSS LLP      MANATT, PHELPS & PHILLIPS, LLP

23

24  By:  /s/ Peter W. Ross      By:  /s/ Robert A. Jacobs

25

26

27

28

16

Peter W. Ross
pross@bgrfirm.com
Eric C. Lauritsen
elauritsen@bgrfirm.com
2121 Avenue of the Stars,
Ste. 2800
Los Angeles, CA 90067
Phone: (310) 274-7100
Fax: (310) 275-5697

*Attorneys for Defendant*
Onika Tanya Maraj p/k/a Nicki
Minaj

Robert A. Jacobs
rjacobs@manatt.com
Maura K. Gierl
mgierl@manatt.com
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone:    (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Plaintiff*
TRACY CHAPMAN

## LOCAL CIVIL RULE 5-4.3.4(a)(2)(i) CERTIFICATION

The filer of this document attests that all other signatories listed above on whose behalf this filing is submitted concur in the filing's content and have authorized the filing.

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.**

_____/S/_____
Hon. Suzanne H. Segal
United States District Court Magistrate Judge

Date: 7/10/19

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

17

STIPULATION AND
CONFIDENTIALITY
AND  PROTECTIVE ORDER

**<u>EXHIBIT A</u>**

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of perjury

that I have read in its entirety and understand the Stipulated Protective Order that

was issued by the United States District Court for the Central District of California

on _____ [date] in the case of *Chapman v. Maraj*, Case No. 2:18-cv-09088-VAP -

SS. I agree to comply with and to be bound by all the terms of this Stipulated

Protective Order and I understand and acknowledge that failure to so comply could

expose me to sanctions and punishment in the nature of contempt. I solemnly

promise that I will not disclose in any manner any information or item that is

subject to this Stipulated Protective Order to any person or entity except in strict

compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court

for the Central District of California for the purpose of enforcing the terms of this

Stipulated Protective Order, even if such enforcement proceedings occur after

termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and

telephone number] as my California agent for service of process in connection with

this action or any proceedings related to enforcement of this Stipulated Protective

Order.

Date: _____

City and State where sworn and signed:

_____

Printed name: _____

Signature: _____

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

STIPULATION AND
CONFIDENTIALITY
AND PROTECTIVE ORDER