1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BROWNE GEORGE ROSS LLP
Peter W. Ross (State Bar No. 109741)
  pross@bgrfirm.com
Eric C. Lauritsen (State Bar No. 301219)
  elauritsen@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Defendant Onika Tanya
Maraj p/k/a Nicki Minaj

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| TRACY CHAPMAN,<br><br>        Plaintiff,<br><br>    vs.<br><br>ONIKA TANYA MARAJ p/k/a NICKI MINAJ and DOES 1-10,<br><br>        Defendants. | Case No. 2:18-cv-9088-VAP-SS<br><br>**DEFENDANT MARAJ'S NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Filed Concurrently with Separate Statement of Undisputed Facts; Declaration of Eric C. Lauritsen; and Proposed Order in Support Thereof]*<br><br>Judge:   Hon. Virginia A. Phillips<br>Date:     September 14, 2020<br>Time:    2:00 pm<br>Crtrm.:  8A<br><br>Date Filed:     October 22, 2018<br>Disc. Cutoff:  July 29, 2020<br>FPC:        October 5, 2020<br>Trial Date:    October 13, 2020 |

1342123.1

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on September 14, 2020 at 2:00 pm, or as soon

3   thereafter as the matter may be heard, in Courtroom 8A of the above-titled Court,

4   located at 350 West First Street, Los Angeles, CA 90012, the Honorable Virginia

5   Phillips, judge presiding, defendant Onika Tanya Maraj, professionally known as

6   "Nicki Minaj" ("Minaj") will, and hereby does, move this Court to enter partial

7   summary judgment in her favor.

8       This motion is made pursuant to Rule 56 of the Federal Rules of Civil

9   Procedure on the grounds that there is no genuine dispute of material fact and Minaj

10  is entitled to judgment as a matter of law as to one of the theories asserted by plaintiff

11  in support of her claim of copyright infringement.  Specifically, Minaj's activities in

12  connection with the making of the recording at issue were non-infringing as a matter

13  of law.

14      The motion is based on this notice of motion, the accompanying memorandum

15  of points and authorities, the separately filed statement of undisputed facts,

16  declaration of Eric C. Lauritsen and exhibits, and proposed judgment, as well as any

17  other evidence and argument considered by the Court at the time of the hearing.

18      This motion is made following a Rule 7-3 conference of counsel that occurred

19  on July 29, 2020.

20  DATED:  August 17, 2020    BROWNE GEORGE ROSS LLP
21      Peter W. Ross
    Eric C. Lauritsen
22
23
24  By:  _____
25      Peter W. Ross
26  Attorneys for Defendant Onika Tanya Maraj
    p/k/a Nicki Minaj
27
28

# **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................1

I.      INTRODUCTION ...................................................................................1

II.     STATEMENT OF FACTS ......................................................................2

III.    STANDARDS THAT GOVERN THIS MOTION...................................4

IV.     CREATION OF THE DEMO RECORDING WAS A NON-
        INFRINGING "FAIR USE" ...................................................................5

        A.     The Law of Fair Use ...................................................................5

        B.     Factors One and Four Weigh Heavily Here in Favor of Finding
               Fair Use ......................................................................................6

               1.     The Purpose and Character of the Use ...........................6

               2.     The Effect of the Use on the Potential Market for or Value
                      of the Copyrighted Work ...............................................7

        C.     The Second and Third Fair Use Factors are of Little Relevance
               Here ............................................................................................8

V.      CONCLUSION .......................................................................................8

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### <u>CASES</u>

4

5

*Boston Scientific Corp. v. Cordis Corp.*,
   422 F. Supp. 2d 1102 (N.D. Cal. 2006)....................................................4

6

*Bryant v. Maffucci*,
   923 F.2d 979 (2d Cir. 1991) ....................................................................5

7

8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................5

9

10

*Continental Airlines v. Goodyear Tire & Rubber Co.*,
   819 F.2d 1519 (9th Cir. 1987) ................................................................4

11

12

*Equals Three, LLC v. Jukin Media, Inc.*,
   139 F. Supp. 3d 1094 (C.D. Cal. 2015)...................................................7

13

14

*Leadsinger, Inc. v. BMG Music Pub.*,
   512 F.3d 522 (9th Cir. 2008) ...................................................................5

15

16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................5

17

18

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) .................................................................5

19

20

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .................................................................7

21

### <u>FEDERAL STATUTES</u>

22

17 U.S.C. § 107....................................................................................5, 7

23

24

17 U.S.C. § 107(2)..................................................................................8

25

17 U.S.C. § 107(3)..................................................................................8

26

17 U.S.C. § 107(4)..................................................................................7

27

Copyright Act ....................................................................................2, 6

28

-ii-
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1

<u>**TABLE OF AUTHORITIES**</u>
**(Continued)**

2

<u>Page</u>

3

<u>**RULES**</u>

4

Federal Rules of Civil Procedure Rule 56 ..................................................................4

5

Federal Rules of Civil Procedure Rule 56(a) ...........................................................4

6

<u>**CONSTITUTIONAL PROVISIONS**</u>

7

8

U.S. Constitution, Art. I., sec. 8, cl. 8.....................................................................8

9

*United States Const., Art. I, Sec. 8, Clause 8* ........................................................6, 7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Court's decision on this motion will have a significant impact on the music recording industry, one way or the other.  Right now, the recording industry works in a way that is straightforward, flexible, and practical.  A recording artist works out a new arrangement of an existing song, or maybe transforms it from "rock" (for example, the Eagles' *Boys of Summer*) to "pop punk" (as did the Artaris with their version of that same song).  Or maybe the recording artist creates a "scat jazz" version of the George Gershwin classic *Summertime*, as did Billy Stewart.  Or perhaps the recording artist puts the song into a medley.  Such free-flowing creativity is important to all recording artists but particularly in hip hop.  With that category of music, a recording artist typically goes into the studio and experiments with dozens of different "beats" or snippets of melodies, before hitting upon a pleasing combination.

And in the process of creation, no one approaches the original songwriter (the "rights holder") for a license *to experiment*.  The musicians just experiment.  If something works, and the recording artist wants to release the song commercially, *then* the record label, managers, and attorneys get involved and seek the required permission.  If it is granted, the recording is commercially released.  If permission is denied, the recording is discarded; no one is harmed; and the experimentation begins anew.  Recording artists require this freedom to experiment, and rights holders appreciate the protocol as well.  Often, the rights holder does not want to simply approve a use in the abstract – i.e., "any hip hop version of your song".  The rights holder wants to hear the actual version before giving her permission.

The plaintiff here, Tracy Chapman, wants to turn this process on its head.  She alleges that defendant Onika Maraj, professionally known as Nicki Minaj, infringed Chapman's copyright in *Baby Can I Hold You,* merely by recording a hip hop version *in the studio* – a version that was used solely to seek Chapman's

permission to release the song commercially (the "demo version").  (Chapman alleges that Minaj also infringed Chapman's copyright by leaking the demo version to a New York radio host, who broadcast the recording on his show.  This motion, however, does not address those separate allegations.  The motion is concerned solely with the recording of the demo version.)  For those reasons expressed below, the creation of the demo version alone should be considered fair use, and this Court should grant Minaj summary judgment against the claim that it infringed Chapman's copyright.

## II.     STATEMENT OF FACTS

Minaj is a world famous recording artist and entertainer.  SUF 1.  In 2017, a fellow artist, known professionally as "Nas," asked Minaj to record vocals for a new track, on which he was working.  SUF 2.  Nas told Minaj that the new track would incorporate lyrics and melodic elements from a pre-existing composition entitled *Sorry* – a song that Minaj knew well and believed to have been written and performed by an artist known as "Shelly Thunder".  And indeed, years earlier, Thunder had released a well-received reggae version of the song.  SUF 3.  At the time of her conversation with Nas, Minaj of course could not possibly have known whether the proposed collaboration with him would lead to commercial success.  SUF 4.  She agreed, however, to work with him and see where the project went.  SUF 5.

Minaj understood that her recording with Nas was not to be a true "cover" of *Sorry*; the new track would include new lyrics and melodies, that would intertwine with the original ones.[1]  Consequently, Minaj also understood that, at some point, if she or Nas desired to release the song commercially, her management would have to seek the necessary clearances.  SUF 6.  However, in accordance with well-established industry practices, no effort was to be made to obtain clearances until the

---

[1] "Covers," which do not alter the basic melody or fundamental character of pre-existing compositions, are subject to compulsory licenses under the Copyright Act.

song was recorded and a decision had been made to include the song, if possible, on Minaj's new album *Queen*.  SUF 7.  Here is Minaj's testimony on the subject:

> "Q:  Did you discuss Shelly Thunder in relation to your song 'Sorry'?
>
> A:  With people in general, yes.
>
> Q:  And do you recall any specific conversation with anybody?
>
> A:  I remember – I don't remember who I was speaking to, but I remember it was about this.  And I remember saying that this whole time – like, for the last, I don't know, 20-plus years or however long this song was out, that I always thought Shelly Thunder was the original composer of the song.  I never knew that she re-made someone else's song.  So going into it, I just thought that, okay, I'm redoing the Shelly Thunder song for my album *and we have to get approval from Shelly Thunder*." (emphasis added)

(*Id.*)

Proceeding in this fashion – creating a demo recording first and seeking clearances second – has many advantages.  It allows for ready experimentation with different beats and melodies; it avoids the expense of seeking and paying for clearances for songs the artist would never use; and it enables her to provide an actual specimen of the song to the rights holder for approval.  In fact, rights holders commonly request specimens before giving approval.  SUF 8.  Notably, plaintiff Tracy Chapman herself has been known to make such requests; for example, in an email she sent to her business manager regarding a request to reprint some of her lyrics in a Swedish textbook, she states, "To give this proper consideration, I would need to see the table of contents for the book and a copy of the chapter that includes the song lyrics."  SUF 9.  Prospective licensees anticipate these needs, so the

1  licensees almost always include their proposed derivative works with their initial

2  licensing requests.  SUF 10.

3      Eventually, Minaj's *Sorry* remake was selected for inclusion on her album

4  *Queen.*  Minaj's representatives then sought the necessary approvals.  SUF 11.

5  These efforts led to Chapman.  (Thunder's *Sorry* was, as matters turned out, a cover

6  of Chapman's *Baby Can I Hold You*.)  SUF 12.  Chapman repeatedly rebuffed

7  clearance requests from Minaj's team.  SUF 13.  As a result, Minaj herself joined in

8  the efforts, posting a tweet stating, "Tracy Chapman, can you please hit me. ♀ omg

9  for the love of #Queen."  SUF 14.  Chapman did not change her mind.  SUF 15.

10  *Sorry* was scrapped, and Minaj released *Queen* without it.  SUF 16.

11      The following day, a New York radio host somehow obtained a copy of the

12  unreleased demo recording of Minaj's *Sorry* and played it on the radio.  Chapman

13  filed the present suit shortly thereafter.  She alleges that Minaj infringed Chapman's

14  copyright in *Baby Can I Hold You*, both (i) by leaking the demo recording to the

15  New York radio host and (ii) by recording the demo in the first place.  The instant

16  motion challenges the legal viability of the second claim only.

17  **III.   STANDARDS THAT GOVERN THIS MOTION**

18      Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a party may

19  move for summary judgment on a claim or defense, or merely *part* of a claim or

20  defense.  *See Boston Scientific Corp. v. Cordis Corp.*, 422 F. Supp. 2d 1102, 1106

21  (N.D. Cal. 2006) ("[I]nherent in Rule 56 is authority of the District Court to grant

22  partial summary judgment, *i.e.*, on a particular claim or a particular affirmative

23  defense . . .");  *Continental Airlines v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519

24  (9th Cir. 1987) (affirming award of partial summary judgment).  Summary judgment

25  should be granted if there is "no genuine dispute as to any material fact and the

26  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When the

27  moving party satisfies its burden of demonstrating the absence of a genuine issue of

28  fact for trial, the opposing party must "do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, it must "come forward with enough evidence to support a jury verdict in its favor." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The fair use of a copyrighted work is considered non-infringing. 17 U.S.C. § 107. Fair use is a mixed question of law and fact, and it is usually adjudicated either at trial or, where no material facts are in dispute, at summary judgment. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008).

## IV. CREATION OF THE DEMO RECORDING WAS A NON-INFRINGING "FAIR USE"

### A. The Law of Fair Use

The fair use statute, 17 U.S.C. section 107, provides in pertinent part:

> . . . the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)   the nature of the copyrighted work;
>
> (3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)   the effect of the use upon the potential market for or value of the copyrighted work.

The courts have emphasized that factors one and four are the most important. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012) ("The relative importance of factor one . . . and factor four . . . has dominated the case law").

/ / /

/ / /

/ / /

B.      **Factors One and Four Weigh Heavily Here in Favor of Finding
Fair Use**

1.      **The Purpose and Character of the Use**

The first of the two important factors is the "purpose and character of the
use." Here, the use is: putting together a demo recording that both (i) experiments
with the performer's artistic vision and (ii) fixes that vision in a concrete form that
can be submitted to the rights holder for approval.

At deposition, Minaj described the process of artistic experimentation:

> "Q: And how did it come to be that you were recording
> 'Sorry'? How did the song come together?
> A: I was in New York, and I went to the studio where Nas
> records, and he played a beat. And he said, 'I want to cut
> this song with you. I want us to re-make the 'Sorry'
> song.' And I asked him to – to give me an idea of how he
> heard it being done. And he referenced it with his voice.
> And I said, 'Okay. Well, when I go back to L.A., I'll cut it
> and I'll, you know, let you know if I like it and, you know,
> we'll take it from there.' And he agreed."

The whole purpose of the Copyright Act is to "promote the Progress of Science and
useful Arts, by securing for limited Times to Authors and Inventors the exclusive
Right to their respective Writings and Discoveries." *United States Const., Art. I,
Sec. 8, Clause 8.* We are "promoting" the "Arts". We are encouraging creativity
for the public good. To do so, we ought to interpret "fair use" in a way that
encourages artistic expression. For this reason, in the privacy of their homes or
studios, artists should be free to experiment with copyrighted musical works and
come up with new interpretations, arrangements, versions, that may be of interest to
the public at large. Indeed, creativity would be stifled, were artists required seek
and pay for a license before even experimenting with a work, to determine whether

1   some new and interesting version could be cobbled together.  Particularly in hip

2   hop, an artist may experiment with dozens of different beats and melodies before

3   hitting upon a pleasing combination.  A young and upcoming artist may not even

4   have the resources to negotiate and pay for licenses to experiment with songs he

5   may never use.

6       Moreover, as noted above, a second purpose of the demo recording was to

7   facilitate the approval process.  Most rights holders request a demo.  (SUF 8.)  They

8   want to see or hear exactly how the work will be used.  (*Id.*)  Indeed, as testified by

9   Deborah Mannis Gardner, an experienced music industry executive, it is standard

10  practice to include a demo recording with a license request.  (SUF 10.)  According

11  to Mannis Gardner, the demo is included "*99 percent of the time*."  (*Id.*, emphasis

12  added).  Even Chapman must recognize the utility of this practice.  She herself has

13  requested to review a demo before giving approval.  (SUF 9.)

14      The courts have recognized that the utility of a purpose is an important factor

15  in evaluating whether it constitutes "fair use".  *See Perfect 10, Inc. v. Amazon.com,*

16  *Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007) (considering utilitarian value of

17  defendant's purposes in creating allegedly infringing work in finding a defendant's

18  use to be fair).  That factor weighs heavily in favor of finding fair use here.

19          **2.      The Effect of the Use on the Potential Market for or Value of**

20                  **the Copyrighted Work**

21      The other important factor in evaluating fair use under section 107, the fourth

22  factor, is "the effect of the use upon the market for or value of the copyrighted

23  work."  17 U.S.C. § 107(4).  Of course, the creation of a derivative work for the

24  limited, private purposes of artistic experimentation or securing the copyright

25  owner's consent for broader distribution has precisely zero impact on the

26  commercial market for the original work.  *See generally Equals Three, LLC v. Jukin*

27  *Media, Inc.*, 139 F. Supp. 3d 1094, 1107 (C.D. Cal. 2015) ("The only kind of harm

28  [with which the fourth fair use factor is concerned] is market substitution—i.e.

1  where the new work diminishes demand for the original work by acting as a

2  substitute for it").  Thus, this factor as well weighs heavily in favor of finding fair

3  use.

4       **C.     The Second and Third "Fair Use" Factors are of Little Relevance

5            Here**

6       The second and third factors are "the nature of the copyrighted work," and

7  "the amount and substantiality of the portion used in relation to the copyrighted

8  work as a whole."  17 U.S.C. §§ 107(2) and (3).  Neither factor, however, is of any

9  significance here.  The work is a musical composition, and much of it was used.

10  These facts neither add to, nor detract from, the real inquiry:  do we want to

11  encourage experimentation and musical expression, and does a demo recording

12  actually facilitate, not hinder, the licensing process?

13  **V.    CONCLUSION**

14       At bottom, and to be frank, the notion that Minaj's use of Chapman's work

15  for the purposes described herein would constitute a violation of Chapman's

16  rights—or, relatedly, that it would be necessary to obtain a license from her in

17  advance of these uses—should send a shiver down the spine of those concerned with

18  the entertainment industry.  Such a rule would impose a financial and administrative

19  burden so early in the creative process that all but the most well-funded creators

20  would be forced to abandon their visions at the outset.  The resulting deprivation to

21  the public of the benefit of the art that would not be created could hardly be what the

22  framers had in mind when they drafted a constitutional provision designed "to

23  promote the progress of science and useful arts."  U.S. Constitution, Art. I., sec. 8,

24  cl. 8.  Fortunately, for the reasons described above, such a rule is not legally

25  justified.  Minaj respectfully requests that the Court enter summary judgment in her

26  favor as to Chapman's theory that the making of the *Sorry* recording violated her

27  copyright in *Baby Can I Hold You*.

28

1  DATED:  August 17, 2020          BROWNE GEORGE ROSS LLP

2                                        Peter W. Ross
                                         Eric C. Lauritsen
3

4

5                                   By:  _____

6                                           Peter W. Ross
                                    Attorneys for Defendant Onika Tanya Maraj
7                                   p/k/a Nicki Minaj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28