MANATT, PHELPS & PHILLIPS, LLP
JOHN M. GATTI (State Bar No. 138492)
E-mail: jgatti@manatt.com
LAUREN J. FRIED (State Bar No. 309005)
E-mail: lfried@manatt.com
NICHOLAS FRONTERA (State Bar No. 307479)
E-mail: nfrontera@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Tel.: (310) 312-4000; Fax: (310) 312-4224

*Attorneys for Plaintiff*
TRACY CHAPMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY CHAPMAN,<br><br>Plaintiff,<br><br>vs.<br><br>ONIKA TANYA MARAJ p/k/a NICKI MINAJ and DOES 1-10,<br><br>Defendants. | No. 2:18-cv-09088-VAP<br><br>Honorable Virginia A. Phillips<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: September 14, 2020<br>Hearing Time: 2:00 p.m.<br><br>Final Pretrial Conf.: October 5, 2020<br>Trial Date: October 13, 2020<br><br>[Filed concurrently with: (1) Frontera Declaration ISO Plaintiff's Opposition and Exhibits; (2) Plaintiff's Responses to Defendant's Statement of Uncontroverted Facts; and (3) Plaintiff's Objections To Defendant's Evidence ISO Her Motion for Summary Judgment] |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1
II. FACTS OMITTED FROM DEFENDANT'S MOTION ........ 3
III. LEGAL STANDARD ........ 5
IV. ARGUMENT ........ 6
  A. The Category of Uses Ms. Maraj Proposes Are Not Fair Uses As A Matter of Law ........ 6
  B. The Undisputed Evidence Establishes That Ms. Maraj Did Not Create The Infringing Work Solely For The Purpose of Obtaining Clearance ........ 8
  C. The Fair Use Factors Further Support Denial of Ms. Maraj's Motion ........ 11
    1. Factor 1: The Purpose of Creating The Infringing Work Was Commercial and Non-Transformative ........ 12
    2. Factors 2 and 3: The Composition Is An Original Expressive Work And The Infringing Work Copies The Majority of It ........ 13
    3. Factor 4: Ms. Chapman is Entitled To A Presumption That The Infringing Work Had An Effect On the Market for The Composition ........ 14
V. CONCLUSION ........ 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abend v. MCA, Inc.*,
863 F.2d 1465 (9th Cir. 1988) .......... 13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 11, 12, 13

*Celotex Corp. v. Cattrett*,
477 U.S. 317 (1986) .......... 5

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
371 F. Supp. 3d 708 (C.D. Cal. 2019) .......... 15

*Equals Three, LLC v. Jukin Media, Inc.*,
139 F. Supp. 3d 1094 (C.D. Cal. 2015) .......... 15

*Fahmy v. Jay-Z*,
908 F.3d 383 (9th Cir. 2018) .......... 1, 6

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932) .......... 7

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) .......... 14

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) .......... 5

*Leisek v. Brightwood Corp.*,
278 F.3d 895 (9th Cir. 2002) .......... 5

*Lewis v. Cont'l Bank Corp.*,
494 U.S. 472 (1990) .......... 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .......... 5

*Pub. Serv. Co. of Colorado v. Shoshone-Bannock Tribes*,
30 F.3d 1203 (9th Cir. 1994) .......... 9

*Stewart v. Abend*,
495 U.S. 207 (1990) .......... 7

## TABLE OF AUTHORITIES (Continued)

**Page**

*Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973) .......... 7

*Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110 (9th Cir. 2000) .......... 14, 15

## STATUTES

17 U.S.C.A. § 106 .......... 6, 7

17 U.S.C. § 107 .......... 12, 15

17 U.S.C. § 504 .......... 8

## RULES

Fed. R. Civ. P. 56(c) .......... 5

## OTHER AUTHORITIES

Moore's Federal Practice, § 56.1 1[5][a] .......... 5

4 Nimmer on Copyright § 13.05[A][2][a] .......... 13

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case is the textbook example of willful copyright infringement. An artist prepares a derivative work, ***admittedly*** copying the original work of another without permission. The copyright holder unequivocally denies the artist's post-hoc requests for permission to use the original work. Then, the artist continues preparing the illegal derivative work and ultimately arranges for it to be released to the public. Each of these facts is confirmed by incontrovertible evidence in this case. Together, these facts establish that defendant Onika Tanya Maraj p/k/a Nicki Minaj ("Ms. Maraj") willfully infringed Plaintiff Tracy Chapman's ("Ms. Chapman") exclusive rights to prepare and distribute derivative works of her original work *Baby Can I Hold You* (the "Composition") through Ms. Maraj's preparation of the derivative work "*Sorry*" (the "Infringing Work").

However, in her Motion, Ms. Maraj deceptively omits this uncontroverted evidence and asks the Court to ignore evidence that, even after Ms. Chapman unequivocally denied Ms. Maraj's licensing request, Ms. Maraj continued working on and ultimately distributed the Infringing Work. Instead, Ms. Maraj asks the Court to consider the hypothetical example of an artist whose sole purpose in creating an unlicensed derivative work is to experiment privately and submit the work to the copyright holder for approval. Ms. Maraj asks the Court to protect that artist by deeming that use a "fair use" and accuses Ms. Chapman of "want[ing] to turn [the creative] process on its head" by seeking to enforce her rights through this litigation. The undisputed facts establish that Ms. Maraj ***is not*** the strawman artist she sets up, and this Court need not engage in her false narrative.

Moreover, Ms. Maraj's grandstanding regarding what this case means to copyright law indicates a fundamental misunderstanding of copyright law and the role of fair use within it. The Copyright Act gives a copyright holder the exclusive right to prohibit others from preparing a derivative work without permission. *Fahmy*

*v. Jay-Z*, 908 F.3d 383, 389, n. 10 (9th Cir. 2018). Ms. Maraj asks this Court to virtually extinguish this right by imposing a licensing scheme, whereby until a copyright holder affirmatively denies a licensing request to create a derivative work, or the artist commercially releases a derivative work without permission, the preparation of such a work is deemed a fair use. Notably, Ms. Maraj does not cite a ***single*** case supporting this proposition. In fact, none exist.

This is for good reason. The fair use statute is not concerned with insulating infringement. It is aimed at encouraging expression by protecting transformative uses of existing works. Here, there is no dispute that the Infringing Work was non-transformative and would have otherwise required a license. Nor is there a dispute that the Infringing Work was prepared to be included on Ms. Maraj's album. Instead, Ms. Maraj asks the Court to look to her alleged intent during the period she prepared the derivative work without Ms. Chapman's permission and deem that period a fair use. She asks this of the Court because Ms. Maraj purportedly intended to obtain Ms. Chapman's permission prior to releasing the work.

But Ms. Maraj's intent in creating an otherwise non-transformative work is irrelevant to the infringement determination. Copyright infringement is a strict liability offense. Intent becomes relevant under the Copyright Act only when calculating damages for copyright infringement. And it is through the wide range of damages available for copyright infringement that Congress chose to strike the proper balance between protecting copyright holders from willful disregard of their rights, such as that of Ms. Maraj in this case, and discouraging litigation over instances of "innocent infringement" such as some of the hypothetical examples Ms. Maraj gives in her Motion.

Both the law and the undisputed facts support a finding that, as a matter of law, Ms. Maraj's preparation of the Infringing Work was not a fair use and was instead willful infringement. Ms. Chapman respectfully requests that the Court deny Ms. Maraj's Motion and grant Ms. Chapman's Motion on this issue.

## II. FACTS OMITTED FROM DEFENDANT'S MOTION

Though Ms. Maraj omits many of them in her Motion, the undisputed facts establish Ms. Maraj's willful infringement of Ms. Chapman's copyright in the Composition. Ms. Maraj does not dispute that after being told by one of the top clearance agents that Ms. Chapman's works were generally not available for sampling and that any use required permission, Ms. Maraj made at least two separate requests to license the Composition for use in the Infringing Work and was denied each time. (PUF[1] 6- 8.) The last of these denials occurred on August 2, 2018, when Ms. Chapman's attorney sent Ms. Maraj's manager an email confirming that the use had been denied and unequivocally asking Ms. Maraj to move on without incorporating the Composition. (PUF 8.)

What Ms. Maraj deceptively leaves out of her Motion, and Plaintiff's undisputed facts establish, is that the very next day, Ms. Maraj took matters into her own hands. On August 3, 2018, Ms. Maraj, from her verified Instagram account, sent a private direct message to Aston George Taylor ("Mr. Taylor"), a popular New York disc jockey for hit radio station Hot 97 FM, confirming that she would not be releasing the Infringing Work on the Album, but asking him to premiere the Infringing Work on his radio show. Ms. Maraj wrote:

> ***Hey. I got a record I want you to world premier. The week album drops. U will be the only one with it. I'll have Jean hit u to explain. Keep it on the low. Wait til u see who's on it. Not going on album either. No one will get it.***

(PUF 9 (emphasis added).) Mr. Taylor confirmed he would play the Infringing Work on his show. (PUF 11.)

At the same time Ms. Maraj was confirming with Mr. Taylor that the Infringing Work would premiere on his show, and not be on her upcoming Album, Ms. Maraj continued working on the Infringing Work with fellow rapper Nasir bin Olu Dara

[1] Plaintiff's Statement of Undisputed Facts ("PUF") are provided in response to Defendant's purported uncontroverted facts and can be found in the document filed simultaneously with this Opposition.

Jones p/k/a Nas ("Nas"), who also featured on the Infringing Work. On August 3, 2018, Ms. Maraj texted Nas: "By the way, did you ever approve a mix [of Sorry]?" (PUF 13.) After some additional discussion, Ms. Maraj sent Nas a link to download the "latest mix" of the Infringing Work. (PUF 14.) Ms. Maraj and Nas then exchanged a number of texts discussing changes to the verses of the Infringing Work, which still included the Composition. (PUF 15.) Ms. Maraj told Nas: "Well go in & make the changes if you want then we can go from there." (PUF 16.)

On August 10, 2018, Ms. Maraj released the Album without the Infringing Work. (PUF 17.) The same day she released the Album, Ms. Maraj followed up with Mr. Taylor to confirm that he would play the Infringing Work on his radio show and get his number so she could text him the Infringing Work. (PUF 17-18.) Also that same day, Ms. Maraj's lead recording engineer, Aubry Delaine ("Mr. Delaine") requested that Ms. Maraj's mastering engineer master the Infringing Work and return a clean copy. (PUF 19.) Ms. Maraj's mastering engineer did so that night. (PUF 20.)

Within 24 hours, Mr. Taylor received the Infringing Work via text. (PUF 21 (confirming that he received the Infringing Work via text).) On August 11, 2018, he publicly broadcast it on his number one rated radio show to a huge audience of Ms. Maraj's core targeted consumer market. (PUF 22-23; Frontera Decl., ¶ 12, Ex. 10, (Taylor Dep. at 103:1-24[2].)) Days later, on August 14, 2018, Ms. Maraj was interviewed by Mr. Taylor on his radio show to discuss her Album. (PUF 24.) Numerous copies of the Infringing Work were then reposted to the internet causing Ms. Chapman to incur significant expenses monitoring these improper postings and issuing DMCA takedown notices. (Frontera Decl., ¶ 20.) To this day, copies of the Infringing Work remain on the Internet despite various efforts by Ms. Chapman to have them taken down. (*Id.*)

---

[2] Page references are to the consecutively numbered pages in the Declaration of Nicholas Frontera in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Frontera Decl.").

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. Ms. Maraj bears the initial burden of demonstrating the absence of genuine issues of fact considered material in light of the substantive principles entitling her to judgment as a matter of law. *Leisek v. Brightwood Corp.*, 278 F.3d 895 (9th Cir. 2002), *citing Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). If Ms. Maraj meets her burden, Ms. Chapman then must go beyond the pleadings and "set forth specific facts" that show a genuine issue for trial. *See Leisek*, 278 F.3d at 898, *citing Celotex Corp.*, 477 U.S. at 323-24.

In determining whether a material, factual dispute exists, the Court views the record in the light most favorable to Ms. Chapman. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986) ("evidence of nonmovant is to be believed and all reasonable inferences to be drawn in his favor"). The Court may not resolve factual disputes or make credibility determinations. *See* Moore's Federal Practice, § 56.1 1[5][a]. If a rational trier of fact may resolve disputes raised on summary judgment in favor of the nonmoving party, then summary judgment must be denied. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Finally, although fair use is a mixed question of law and fact, a court may resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008).

Here, Ms. Maraj has not met her burden. In fact, the undisputed facts establish that Ms. Maraj's creation of the Infringing Work was not a fair use.

## IV. ARGUMENT

### A. The Category of Uses Ms. Maraj Proposes Are Not Fair Uses As A Matter of Law.

Ms. Maraj's Motion represents a fundamental misunderstanding of copyright law and the role that fair use plays within it. It is black letter copyright law that a copyright holder possesses an exclusive right "to prepare derivative works based upon the copyrighted work." 17 U.S.C.A. § 106. "A logical extension of the exclusive right to 'prepare' derivative works is the right to prohibit others from doing so without permission." *Fahmy*, 908 F.3d at 389 n. 10. Without citing to ***any*** relevant authority, Ms. Maraj asks this Court to virtually eviscerate this right to prohibit others from "preparing" derivative works without permission.

In Ms. Maraj's view, even where an artist knows she needs a license to prepare a derivative work and intends to commercially release that work, liability for "preparing" the work should only attach ***after*** a copyright holder has affirmatively denied permission to use the work. To that end, Ms. Maraj argues, without reliance on ***any*** authority, that this Court should hold that the creation of a "demo version" of a work, "a version that [is] used solely to seek [a copyright holder's] permission to release the song commercially" constitutes a fair use. (Motion at 1-2.) Notably, despite arguing that "demo versions" are created 99 percent of the time when seeking clearance (a claim Ms. Chapman disputes), Ms. Maraj does not point to a ***single*** case holding that such a use constitutes a fair use. To Ms. Chapman's knowledge, none exist.

That is for good reason.

To begin, as discussed below, "demo versions" do not bare any resemblance to the illustrative examples of fair uses included in the fair use statute. But more importantly, accepting Ms. Maraj's theory would require this Court to hold that in virtually ***every*** instance that a license is required under copyright law for the preparation of a derivative work, liability for ***preparing*** that work does not attach

unless and until the copyright holder affirmatively denies the use and the defendant persists in preparing the work, or the defendant distributes the work without having obtained permission (a separate exclusive right granted to copyright holders). That is not the law.

Considering a similar issue under the 1909 Act, the Court of Federal Claims held:

> A licensing system would be purely voluntary with the copyright proprietor. We consider it entirely beyond judicial power, under the 1909 Act, to order an owner to institute such a system if he does not wish to. ***We think it equally outside a court's present competence to turn the determination of "fair use" on the owner's willingness to license***–to hold that photocopying (without royalty payments) is not "fair use" if the owner is willing to license at reasonable rates but becomes a "fair use" if the owner is adamant and refuses all permission (or seeks to charge excessive fees).

*Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1360 (Ct. Cl. 1973), *aff'd*, 420 U.S. 376 (1975) (emphasis added). Had Congress intended to insulate preparation of a derivative work from a finding of infringement until a copyright holder grants or denies a license, it could have imposed such a licensing system under the Act. But it did not. Similarly, if Congress intended that prior to seeking and obtaining clearance—a predicate step in the creation of virtually every work that will eventually require a license—the preparation of such a work without being granted permission should be considered a fair use, it could have indicated as much when illustrating examples of fair uses in the statute. It did not do this either.

Instead, Congress granted a copyright holder the exclusive right to control the ***preparation*** of derivative works and exclude others from doing so. 17 U.S.C.A. § 106. Indeed, the Supreme Court has held that this right allows a copyright holder to "arbitrarily to refuse to license one who seeks to exploit the work." *Stewart v. Abend*, 495 U.S. 207, 229 (1990) (citing *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)). Therefore, regardless of Ms. Chapman's prior practices regarding allowing

uses of her works—which Ms. Maraj misrepresents (*see* Responses to SUF Nos. 9-10)—Ms. Chapman is entitled to object to use of her work without her permission.

Congress also enacted a system of statutory damages for copyright infringement that ranges from a $200 minimum per work for "innocent infringement" to a $150,000 maximum per work for willful infringement. 17 U.S.C. § 504. That system serves the purpose of disincentivizing litigation over some of the more innocent infringements—cases where an infringer truly does not know she is violating a copyright.

The practical effect of this system is that in instances where a defendant truly creates a work *solely* for clearance purposes and then permanently destroys it immediately after clearance is denied and the work is never seen again, there is little risk of litigation because the incentives do not exist. On the other hand, in cases such as this of clearly willful infringement, where a defendant like Ms. Maraj trounces on the rights of another artist by ignoring denials and devising a plan to release an infringing work regardless, the Copyright Act provides for the proper remedies for a plaintiff to enforce her rights.

Ms. Maraj's Motion asks this Court to rewrite well-established law without any authority to support her radical request. This Court should hold that, as a matter of law, the fact that a work was created for the purpose of obtaining clearance does not itself render the use a fair use.

### B. <u>The Undisputed Evidence Establishes That Ms. Maraj Did Not Create The Infringing Work Solely For The Purpose of Obtaining Clearance.</u>

If the Court is not inclined to hold that the use proposed by Ms. Maraj categorically falls outside the fair use statute, the Court may deny Ms. Maraj's Motion for an independent reason. Ms. Maraj's entire Motion is predicated on the demonstrably false premise that the Infringing Work "was used solely to seek Chapman's permission to release the song commercially." (Motion at 1-2.) However, in light of the undisputed documentary evidence discussed above, no good faith basis

exists for making this claim. Ms. Maraj may not ask the Court to make a determination on hypothetical facts that are not before it. *See Pub. Serv. Co. of Colorado v. Shoshone-Bannock Tribes*, 30 F.3d 1203, 1208 (9th Cir. 1994) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) ("Federal courts are confined to resolving 'real and substantial' controversies, 'admitting of specific relief through a decree of a conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'").

To begin, Ms. Maraj admits that when she created the Infringing Work, she hoped to use it on her upcoming album *Queen*. (PUF 4.) Ms. Maraj also knew that in order to use the Composition in the Infringing Work for her Album, Ms. Maraj needed to obtain a license from Ms. Chapman. (PUF 5.) The undisputed evidence establishes that between June 16th and August 2nd of 2018, Ms. Maraj made at least two requests to license the Composition for use in the Infringing Work. (PUF 6.) Ms. Chapman unequivocally denied both of those requests and on August 2, 2018, Ms. Chapman's attorney confirmed her denial and asked Ms. Maraj to move on without the sample of the Composition. (PUF 7-8.)

While Ms. Maraj claims that at that point, "[the Infringing Work] was scrapped" (Motion at 4), the undisputed evidence clearly shows otherwise. ***The day after the use was denied a second time,*** August 3, 2018, Ms. Maraj privately contacted a popular New York disc jockey, Mr. Taylor, confirmed that the Infringing Work would not be on the Album, and told him she wanted him to exclusively world premiere the Infringing Work on his radio show the week her Album was released. (PUF 9.) Mr. Taylor confirmed he would play the Infringing Work. (PUF 11.)

Ms. Maraj cannot reasonably dispute these facts. Nor can she dispute that beginning that very same day, and continuing for a few days after the final denial from Ms. Chapman, she continued to work on the Infringing Work, discussing changes with fellow featured rapper Nas. (PUF 8, 12-16.) Then, on August 10th, when her Album was released without the Infringing Work, Ms. Maraj contacted Mr. Taylor to confirm

he would play the Infringing Work that night on his top rated radio show. (PUF 17-18.) When he confirmed, Ms. Maraj asked him for his number and told him she would text. (*Id.*) Ms. Maraj's sound engineer, Aubry Delaine, then requested that Ms. Maraj's mastering engineer master the Infringing Work and return a "clean" version. (PUF 19.) This mastered version was the version needed to be played on the radio. (Frontera Decl., ¶ 19, Ex. 17 (Delaine Dep. at 184:1-11.)) A mastered "clean" version was returned, and, within 24 hours, Mr. Taylor received the Infringing Work via text. (PUF 20-21.) Mr. Taylor played the Infringing Work on his radio show on August 11, 2018, as he told Ms. Maraj he would. (PUF 22-23.)

Despite these incontrovertible facts, Ms. Maraj continues to feign ignorance as to how the Infringing Work was ultimately released. In her Motion, Ms. Maraj asserts, that "a New York radio host *somehow* obtained a copy of the unreleased demo recording of Minaj's Sorry and played it on the radio." (Motion at 4 (emphasis added).) ***Ms. Maraj fails to mention in her Motion that,*** in private Instagram messages, ***she asked that same radio host to play the Infringing Work[3] and told him she would send it to him*** the day before it was played—Instagram messages that Ms. Maraj did not produce herself in response to direct requests for the same, but that had to be obtained by subpoenaing Mr. Taylor. Ms. Maraj also fails to mention the fact that she continued working on the Infringing Work after Ms. Chapman unequivocally denied her a license (at least twice) and she confirmed the Infringing Work would not be on the Album. Lastly, Ms. Maraj cannot dispute that her own engineer had a master of the Infringing Work prepared hours before it was received by Mr. Taylor. (PUF 19-20.) Accordingly, Ms. Maraj's made-up facts regarding a radio host "somehow" obtaining a purported "demo version" of the Infringing Work and playing it on the radio are directly undermined by the indisputable documentary evidence establishing that Ms. Maraj or someone acting at her direction sent Mr. Taylor a mastered "clean"

[3] Ms. Maraj also lied under penalty of perjury about this very fact, denying that she "asked Taylor to play the Infringing Work on HOT 97 FM." (*See* Frontera Decl. ¶ 18, Ex. 16 (Suppl. Resp. to RFA No. 32).)

version of the Infringing Work after she asked him to premiere it. The Court need not entertain Ms. Maraj's false narrative. The evidence speaks for itself.

Even if the Court were inclined to find that there is a plausible argument that the creation of a "demo version" of a commercial work ***solely*** to obtain clearance could constitute a fair use in certain circumstances (it does not), those circumstances are not before the Court here. Ms. Maraj lied in discovery to cover up her infringement and now asks the Court to ignore undisputed facts to perpetuate her fantasy tale. Ms. Maraj's actions evidence willful copyright infringement, not fair use. For those reasons, the Court should deny Ms. Maraj's Motion.

### C. <u>The Fair Use Factors Further Support Denial of Ms. Maraj's Motion</u>

While Ms. Chapman contends that it is unnecessary for the Court to analyze the fair use factors in circumstances such as these, where the proposed use falls outside the purview of the statute and the undisputed facts undermine fair use, the fair use factors also weigh strongly against a finding of fair use.

In determining whether the use of a copyrighted work is fair, courts consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). The "four statutory factors [may not] be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 578.

Here, as a threshold issue, it is important to note that Ms. Maraj ***does not*** (and cannot in good faith) claim that the Infringing Work itself constitutes a fair use. Ms. Maraj has explicitly admitted that she "knew that [she] needed a License to use the

Composition in the Infringing Work in order to include the Infringing Work on [her] album Queen." (PUF 5.) Instead, Ms. Maraj claims that the process of preparing a "demo version" of the Infringing Work for the sole purpose of obtaining clearance (circumstances that indisputably did not occur here) should constitute a fair use.

1. *Factor 1: The Purpose of Creating The Infringing Work Was Commercial and Non-Transformative*

The first fair use factor asks the court to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. As the Supreme Court has made clear:

> This factor draws on Justice Story's formulation, "the nature and objects of the selections made." [Citation.] The enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like, see § 107. The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation, [citations] ("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."
>
> Although such transformative use is not absolutely necessary for a finding of fair use, [citations] the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, see, e.g., [citations], and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell*, 510 U.S. at 578-79 (citations omitted).

Here, as discussed above, Ms. Maraj does not even attempt to argue that "the use is for criticism, or comment, or news reporting, and the like". *Id.* Instead, Ms. Maraj admits she created the Infringing Work to include it on her Album, an indisputably for-profit commercial purpose. (PUF 4.) Moreover, Ms. Maraj's own clearance expert admitted that Ms. Chapman's permission was needed to include the

Composition on the Infringing Work. (Frontera Decl., ¶ 4, Ex. 2 (Mannis-Gardner Dep. at 31:21-32:3.) That Ms. Maraj—like any other artist preparing a derivative work—needed to obtain permission in order to prepare the Infringing Work for the commercial purpose she intended, does not somehow render her preparation of the Infringing Work prior to obtaining permission transformative or non-commercial.

Moreover, it is indisputable that Ms. Maraj continued working on the Infringing Work ***after*** the use had been unequivocally denied and ***after*** Ms. Maraj had confirmed to Mr. Taylor that the Infringing Work would not be included on her Album. (PUF 8, 10, 12.) Moreover, while she willfully continued working on the Infringing Work, Ms. Maraj devised and executed a plan to release the work in connection with her Album release. (PUF 9, 18.) This directly undermines any conceivable argument Ms. Maraj may have that the purpose of her use supports a finding of fair use. Instead, the undisputed evidence surrounding Ms. Maraj's intent establishes that Ms. Maraj's infringement was willful. This factor weighs heavily against a finding of fair use.

2. *Factors 2 and 3: The Composition Is An Original Expressive Work And The Infringing Work Copies The Majority of It.*

As Ms. Maraj admits in her Motion, the second and third fair use factors weigh against a finding of fair use. (Motion at 8:9.) Ms. Maraj would have the Court ignore these factors, claiming that "[n]either factor … is of any significance here." (Motion at 8:8-9.) However, the Supreme Court has clearly held that "[t]he four statutory factors are to be explored and weighed together . . . ." *Campbell*, 510 U.S. at 1166.

The second factor—"the nature of the copyrighted work"—weighs against a finding of fair use. Original song lyrics, such as the Composition, are a work of creative expression, as opposed to an informational work, which is precisely the sort of expression that the copyright law aims to protect. *See Abend v. MCA, Inc.*, 863 F.2d 1465, 1481 (9th Cir. 1988) (fictional short story is "a quintessentially creative product"); *see also Campbell*, 510 U.S. at 586 (concluding that musical composition

"Oh, Pretty Woman" fell "within the core of the copyright's protective purposes"); 4 Nimmer on Copyright § 13.05[A][2][a] ("[T]he more creative a work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense.").

Similarly, because Ms. Maraj admitted she used a substantial portion of the Composition (*see* Motion at 8; PUF 3), the third factor—"the amount and substantiality of the portion [of the Composition] used in relation to the copyrighted work as a whole"—also militates against a finding of fair use. *See Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110, 1118 (9th Cir. 2000) (copying an entire work "militates against a finding of fair use") (quoting *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986)). Thus the second and third factors weigh against fair use and provide another reason for the Court to deny Ms. Maraj's Motion.

3. *Factor 4: Ms. Chapman is Entitled To A Presumption That The Infringing Work Had An Effect On the Market for The Composition.*

The fourth fair use factor—"the effect of the use upon the potential market for or value of the copyrighted work"—also weighs strongly against a finding of fair use. In arguing the opposite, Ms. Maraj doubles down on her false narrative claiming: "[o]f course, the creation of a derivative work for the limited, private purposes of artistic experimentation or securing the copyright owner's consent for broader distribution has precisely zero impact on the commercial market for the original work." (Motion at 7.) This "of course" is not the case before the Court.

Here, it is indisputable that Ms. Maraj: (1) created the Infringing Work hoping to include it on her Album; (2) sought permission to use the Composition; (3) got denied; (4) continued preparing the Infringing Work after the denial; (5) asked a popular disc jockey to play it on the radio the week her Album released to a huge audience of Ms. Maraj's core targeted consumer market; (6) prepared the work to be

played on the radio by having her engineer master a clean version; and (7) the Infringing Work was played and went viral on the internet. (PUF 2, 4, 5-8, 9, 19-20.) Ms. Maraj did everything in her power to make sure the buying public heard the Infringing Work.

Ms. Maraj indisputably sought to release the Infringing Work for commercial gain. Because of that "the likelihood of market harm 'may be presumed.'" *Disney Enterprises, Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 721 (C.D. Cal. 2019). Ms. Maraj has failed entirely to rebut this presumption. Ms. Maraj's citation to (and modification of) the language of *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1107 (C.D. Cal. 2015) that, "[t]he only kind of harm [with which the fourth fair use factor is concerned] is market substitution—i.e. where the new work diminishes demand for the original work by acting as a substitute for it" misrepresents both the holding of that case[4] and the law. (Motion at 7-8 (brackets in original).) It is well established that:

> The [fair use] statute by its terms is not limited to market effect but includes also "the effect of the use on the *value* of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). As *Sony* states, "[e]ven copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have." *Sony*, 464 U.S. at 450, 104 S.Ct. 774. Those rewards need not be

[4] Ms. Maraj's modification of the quotation by adding "[with which the fourth fair use factor is concerned]" is not supported by the *Equals Three, LLC* court's holding. Instead the court was specifically discussing and limited its holding to "critical works" when it included the language Ms. Maraj quoted:

> This inquiry must include harm to the market for the original and harm to the market for derivative works. *Id.* However, the law does not recognize a derivative market for critical works. *Id.* at 592, 114 S.Ct. 1164. Market harm caused by effective criticism that suppresses demand is not cognizable. *Id.* at 591, 114 S.Ct. 1164. Instead, the only kind of harm cognizable is market substitution—i.e. where the new work diminishes demand for the original work by acting as a substitute for it. *Id.* at 591–92, 114 S.Ct. 1164. Thus, where a work is transformative, market harm may not so readily be inferred and there is no presumption of market harm.

*Equals Three, LLC.*, 139 F. Supp. 3d at 1107. It is undisputed here that the Infringing Work was not a "critical work," and thus, this holding is inapposite.

> limited to monetary rewards; compensation may take a variety of forms. *Id.* at 447 n. 28, 104 S.Ct. 774.

*Worldwide Church of God*, 227 F.3d at 1119.

Based on the undisputed facts, each of the fair use factors weigh against a finding of fair use. The Court should deny Ms. Maraj's Motion and determine that, as a matter of law, Ms. Maraj's use was not a fair use.

## V. CONCLUSION

For all of the foregoing reasons, Ms. Chapman respectfully requests that the Court deny Ms. Maraj's Motion and find as a matter of law that Ms. Maraj's preparation of the Infringing Work did not constitute a fair use.

Dated: August 24, 2020

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ John M. Gatti
John M. Gatti
*Attorney for Plaintiff*
TRACY CHAPMAN