BROWNE GEORGE ROSS LLP
Peter W. Ross (State Bar No. 109741)
　pross@bgrfirm.com
Eric C. Lauritsen (State Bar No. 301219)
　elauritsen@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorney for Defendant Onika Tanya
Maraj p/k/a Nicki Minaj

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| TRACY CHAPMAN,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ONIKA TANYA MARAJ p/k/a NICKI MINAJ and DOES 1-10,<br><br>　　　　Defendants. | Case No. 2:18-cv-9088-VAP-SS<br><br>**DEFENDANT ONIKA MARAJ'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:　Hon. Virginia A. Phillips<br>Date:　September 14, 2020<br>Time:　2:00 p.m.<br>Crtrm.:　8A<br><br>Date Filed:　　October 22, 2018<br>Disc. Cutoff:　July 29, 2020<br>FPC:　　　　　October 5, 2020<br>Trial Date:　　October 13. 2020 |

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...........................................................................................1

II.  THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT MARAJ *RECORDED* THE SONG WITH BENIGN INTENT ........................1

III. THE "FAIR USE" FACTORS FAVOR MARAJ.............................................3

    A.   The Purpose and Character of the Use ................................................3

    B.   The Effect of the Use on the Potential Market for or Value of the Copyrighted Work ................................................................................5

    C.   The Second and Third "Fair Use" Factors...........................................5

IV.  MARAJ HAS A PUBLISHED LEGAL CASE THAT SUPPORTS HER POSITION ..............................................................................................6

V.   MARAJ DOES NOT ASK THE COURT TO ELIMINATE AN AUTHOR'S RIGHT TO PREPARE DERIVATIVE WORKS ........................9

VI.  CONCLUSION ............................................................................................10

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Campbell v. Acuff–Rose Music, Inc.*,
  510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994 ................................... 8, 9

*Harper & Row*,
  471 U.S., 105 S.Ct. ............................................................................................ 8

*Mattel v. Walking Mountain Prods.*,
  353 F.3d 792 (9th Cir. 2003) ............................................................................. 6

*Monge v. Maya Magazines, Inc.*,
  688 F.3d 1164 (9th Cir. 2012) ........................................................................... 6

*N.A.D.A. Servs. Corp. v. Business Data of Virginia, Inc.*,
  651 F.Supp. 44 (E.D.Va.1986) .......................................................................... 8

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ........................................................................... 6

*Sundeman v. Seajay Soc'y, Inc.*,
  142 F.3d 194 (4th Cir. 1998) ......................................................................... 7, 9

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
  786 F.2d 1400 (9th Cir.1986) ............................................................................ 8

**FEDERAL STATUTES**

17 U.S.C. § 106 ........................................................................................................ 9

17 U.S.C. § 107 ............................................................................................... 1, 5, 9

17 U.S.C. § 107(2) .................................................................................................... 5

17 U.S.C. § 107(3) .................................................................................................... 5

17 U.S.C. § 107(4) .................................................................................................... 5

**CONSTITUTIONAL PROVISIONS**

*United States Const., Art. I, Sec. 8, Clause 8* ......................................................... 3

1648287.1                                    -ii-                        Case No. 2:18-cv-9088-VAP-SS
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES
## (Continued)

**Page**

**OTHER AUTHORITIES**

H.R.Rep. No. 94–1476, at 65 (1976), U.S. Code Cong. & Admin. News at 5659, 5679 ................................................................................................. 8

## I. INTRODUCTION

In her opposition to Maraj's motion for summary judgment, Chapman levels four general attacks on Maraj's contention that her activities in the studio constituted fair use:

- Maraj did not in fact have the benign intentions her motion describes, when she went into the studio to record *Sorry*, so she is not the "strawman" to whom her motion relates;

- The actual fair use factors set forth in 17 U.S.C. section 107 should not even be consulted, but if they are, they weigh in Chapman's favor and not Maraj's;

- There is no reported decision supporting Maraj's claim of "fair use;" and

- Maraj's position, if adopted, would "eviscerate" the derivative work right under the Copyright Act."

Chapman's contentions are each addressed below. As shown, they are unsupported by fact and law alike. They do not refute Maraj's showing in her moving papers. Maraj is entitled to the summary judgment she seeks.

## II. THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT MARAJ *RECORDED* THE SONG WITH BENIGN INTENT

As Maraj noted in her moving papers, Chapman has two prongs to her copyright claim: She alleges that Minaj infringed Chapman's copyright in *Baby Can I Hold You*, both (i) by leaking the demo recording to the New York radio host and (ii) by recording the demo in the first place. (Moving papers at 4:13-16.) As also noted in the moving papers, "The instant motion challenges the legal viability of the second claim only." (*Id.*) The primary thrust of Chapman's opposition is that her claims cannot be parsed in this manner for analysis. In fact, according to Chapman, Maraj's motion is "deceptive" for even attempting to do so. (Dkt. 67 at 1, 3.) As Chapman explains, the facts are "uncontroverted" that Maraj herself leaked the demo version to New York radio host "Flex". Moreover, that leak shows that Maraj did not record *Sorry* with benign intent. Factually and logically, these arguments do not hold up.

They do hold up factually, because, as demonstrated in Maraj's opposition to Chapman's cross-motion for summary judgment, the case against Maraj, on leaking the demo version to Flex, is not "open and shut." Disputed issues of material fact exist, as to whether Maraj, or one of many other "suspects," leaked the recording. These disputes will require a jury to resolve. Therefore, to the extent that Chapman is contending that "Maraj, *as a matter of law*, leaked the recording; therefore, she must also be held liable, *as a matter of law*, for making the recording in the first place, that argument is without merit.

Chapman's arguments do not hold up logically either, because it is perfectly plausible that, when recording *Sorry*, Maraj intended to release it publicly only after receiving permission to do so – even if later on, she changed her mind and decided to leak the recording. In fact, at this point, *the evidence is undisputed that, while in the studio, Maraj intended to release the song only if a proper license were obtained.* Maraj tells us so. (SUF 6 and 7.) And this testimony meshes with all the undisputed, objective facts. Maraj's team invested months of efforts to obtain Chapman's permission. Maraj got personally involved. Indeed, Maraj even considered delaying the release of her album *Queen*, beyond August 10, simply to have more time to negotiate with Chapman. (Dkt. 66-3 at ¶ 3.) Maraj publicly tweeted about that potential delay. (Dkt. 54-2 at 82:16-25)

Chapman, on the other hand, has zero evidence that, while recording *Sorry*, Maraj intended all along to leak the song to Flex. There is no triable issue of fact on this point. While in the studio, while recording *Sorry*, Maraj was making a demo version for the sole purposes of: (i) artistic experimentation and (ii) seeking permission from Chapman to release the song.

## III. THE "FAIR USE" FACTORS FAVOR MARAJ

Chapman argues that the "fair use" factors should not even be considered. Well, why not? This is a "fair use" issue. Further, given the undisputed evidence that, while in the studio recording *Sorry,* Maraj's intentions were benign, the "fair use" factors weigh heavily in favor of Maraj.

### A. The Purpose and Character of the Use

As noted in the moving papers, the first of the two important factors is the "purpose and character of the use." Here, the use is: putting together a demo recording that both (i) experiments with the performer's artistic vision and (ii) fixes that vision in a concrete form that can be submitted to the rights holder for approval.

First, as also noted in the moving papers, the whole purpose of the Copyright Act is to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *United States Const., Art. I, Sec. 8, Clause 8.* By finding fair use here, the Court would be "promoting" the "Arts". The Court would be encouraging creativity for the public good.

Moreover, as noted above, a second purpose of the demo recording was to facilitate the approval process. Most rights holders request a demo. (SUF 8.) They want to see or hear exactly how the work will be used. (*Id.*) Indeed, as testified by Deborah Mannis Gardner, an experienced music industry executive, it is standard practice to include a demo recording with a license request. (SUF 10.) According to Mannis Gardner, the demo is included "*99 percent of the time.*" (*Id.*, emphasis added). Even Chapman must recognize the utility of this practice. She herself has requested to review a demo before giving approval. (SUF 9.)

Against these powerful arguments, Chapman makes three arguments. First, she says that we must focus on the ultimate goal of the process – that the artist would like to release the work for commercial purposes – and given this circumstance, says Chapman, we must strictly ban unauthorized experimentation in

the studio.  (Dkt. 67 at 12:24-13:5.)  But isn't Chapman's position too blunt and pointlessly limiting?  Isn't there room for a more elegant solution, one that allows for experimentation in the studio and the creation of demos for the purpose of seeking a license, but which would bar the commercial release of *unauthorized* derivative works?

Chapman's second argument is that artists, working in the studio, can simply rely on the copyright holder to use discretion and not sue, even though mere experimentation in the studio is a copyright violation.  (Dkt. 67 at 8:9-16 ("The practical effect . . . is that in instances where a defendant truly creates a work *solely* for clearance purposes . . . , there is little risk of litigation because the incentives do not exist").)  Chapman clearly has overlooked the copyright lawsuits that abound over the re-posting by celebrities of photographs of themselves that they find on the internet.  These lawsuits are suddenly quite "vogue" and filed on a daily basis.  Further, we have the LA Printex, fabric-pattern cases.  In each instance, a whole cottage industry has arisen, where the same lawyers pursue hundreds of cases over "infringements" that produce no real damages but result in claims for $150,000 in statutory damages, plus attorneys' fees.  Relying on the "discretion" of the copyrighter holder, not to sue, is simply not an appealing alternative.

The final argument that Chapman makes is that, even if a hypothetical recording artist might be engaging in "fair use" by making a studio recording for purposes of experimentation and licensing, Maraj was not such an artist.  She, according to Chapman, continued her efforts to perfect the recording, even after Chapman denied Maraj's request to release the song.  (Dkt. 67 at 13:6-15.)  Yes, but Maraj continued her efforts in the studio only so long as she also continued her efforts to persuade Chapman to change her mind.  According to Chapman herself, the efforts to persuade her did not end until August 8, 2018.  (Dkt. 1 at ¶ 32.)  Indeed, Maraj even considered delaying the release of her album *Queen*, beyond August 10, simply to have more time to negotiate with Chapman.  (Dkt. 66-3 at ¶ 3.)

And there is no evidence that Maraj continued to work on the recording past early August. Therefore, based on the undisputed evidence, this first and most important factor – the "purpose and character of the use" – strongly favors a finding of "fair use" here.

### B. The Effect of the Use on the Potential Market for or Value of the Copyrighted Work

The other important factor in evaluating fair use under section 107, the fourth factor, is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). And of course, as pointed out in the moving papers, the creation of a derivative work for the limited, private purposes of artistic experimentation and securing the copyright owner's consent for broad distribution has precisely zero impact on the commercial market for the original work. Chapman's only response is that Maraj supposedly leaked the recording to Flex; therefore, commercial harm may be presumed. (Dkt. 67 at 14:17-16:2.) For purposes of the present motion, however, that leak is irrelevant. Now, we are strictly concerned with whether the creation of the studio recording, for the limited purposes of experimentation and licensing, constituted "fair use." A recording made for those purposes could not have harmful effects on the commercial market for Chapman's song. Thus, this factor as well weighs heavily in favor of finding fair use.

### C. The Second and Third "Fair Use" Factors

The second and third factors are "the nature of the copyrighted work," and "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. §§ 107(2) and (3). As pointed out in the moving papers, neither factor is of any real significance here. The work is a musical composition, and much of it was used. These facts neither add to, nor detract from, the real inquiry: do we want to encourage experimentation and musical expression, and does a demo recording actually facilitate, not hinder, the licensing process?

In her opposition, Chapman argues that the second factor, the "nature of the copyrighted work," is important, because musical works are "precisely the sort of expression that the copyright law aims to protect." (Dkt. 67 at 17:23-25.) "Fair use," however, presupposes that the work is protectable; otherwise, we would not have to consider "fair use." A protectable work is the starting point for any discussion of "fair use." Therefore, this factor really adds nothing. See *Mattel v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (The second factor "typically has not been terribly significant in the overall fair use balancing"); and *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012) ("The relative importance of factor one . . . and factor four . . . has dominated the case law").

With regard to the third factor, Chapman argues that a "substantial portion" of the work was used. Chapman, however, misses the true meaning of the third factor. We are not merely considering, in a vacuum, how much was used. On the contrary, we are considering the amount used "in relation to the justification for that use." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) ("[T]his factor will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use"). Here, the intended use was to create a demo to submit to Chapman for approval. The portion of Chapman's *Baby Can I Hold You* that Maraj used was precisely that portion necessary to show Chapman how Maraj intended to use the work in her song – no more and no less. Therefore, if anything, factor three weighs in favor of finding fair use.

In sum, the important factors, one and four, both weigh heavily in favor of finding fair use. Of the less important factors, factor three weighs in favor of finding fair use, and factor two is essentially neutral. The Court should find fair use here.

### IV. MARAJ HAS A PUBLISHED LEGAL CASE THAT SUPPORTS HER POSITION

In her opposition, Chapman proclaims with conviction: "Ms. Maraj does not

cite a single case supporting [her claim of "fair use"]. In fact, none exist." Actually, a case does exist, *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194 (4th Cir. 1998). *Sundeman* has some striking similarities to the present case. In both cases, a copy was made of a copyrighted work for the purpose of seeking permission from the rights holder to publish the work. In both cases, permission was denied, and the work never was published. In *Sundeman,* the production of a copy, for the purpose of seeking permission, was deemed "fair use." That result was upheld by the Fourth Circuit.

The facts of *Sundeman* are as follows. Marjorie Kinnan Rawlings Baskin ("Rawlings") was a well-known author. Her most famous book, *The Yearling,* won a Pulitzer Prize in 1939 (and was a childhood favorite.) After Rawlings' death, her husband ("Baskin") became the personal representative of her estate. The defendant ("Seajay") came into possession of a manuscript of Rawlings' first, and unpublished, novel, *Blood of My Blood*. Seajay made two copies. Seajay sent the first to a literary critic ("Blythe") to prepare a critical analysis of the work. She did so and presented her analysis at a symposium held by the Marjorie Kinnan Rawlings Society. Blythe hoped to publish her critical analysis but knew she would need permission to do so. Seajay sent the second copy of *Blood of My Blood* to the University of Florida library for the following purposes: (i) authentication by Baskin (the personal representative of Rawlings' estate), (ii) to gauge the University of Florida's interest in publishing the work, and (iii) to seek permission from Baskin to publish the work. Baskin denied permission to publish either Blythe's literary criticism or the work itself. Neither was published. Nevertheless, Baskin sued Seajay for copyright infringement. His suit was based principally on Seajay's creation of the two copies.

Following trial, the district court held that the creation of the copies was "fair use":

> The lower court found that the complete copy of *Blood of*

> *My Blood* given to Blythe was permissible since it was provided to prevent damage to the original manuscript during the course of her scholarly work. Regarding the partial copy sent to the University of Florida Library, the district court found that it was made for the dual purposes of allowing Baskin, or his designee, to authenticate it and to allow the University of Florida Press to determine whether it was worthy of publication. The court also decided that Seajay knew that no publication of the novel would take place without first obtaining the permission of the copyright holder. (Id. at 201.)

This result was upheld on appeal, where the Court noted:

> Fair use is an "equitable rule of reason," for which "no generally applicable definition is possible." H.R.Rep. No. 94–1476, at 65 (1976), U.S. Code Cong. & Admin. News at 5659, 5679. The statute requires a "case-by-case analysis" to determine whether a particular use is fair. *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994). (Id. at 202.)

* * *

> Obviously, the copies of *Blood of My Blood* provided to Blythe and the University of Florida Library were qualitatively and quantitatively substantial. Nonetheless, when the extent of the copying is considered with the purpose and character of the uses, the amount and substance of the copies are justified. *See Campbell,* 510 U.S. at 586–87, 114 S.Ct. at 1175–76. In order for Blythe to perform her scholarly criticism of the novel, she obviously needed access to either the original or an entire copy. Similarly, in order for the Library to authenticate *Blood of My Blood* as being Rawlings' work, to determine whether the work was worthy for publication, and to obtain the necessary permission from the copyright holder, it too needed either the original or a nearly complete copy. * * * Thus, we find that the amount and substantiality of the portion of *Blood of My Blood* copied for Blythe and the Library did not exceed the amount necessary to accomplish these legitimate purposes. *See Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors,* 786 F.2d 1400, 1409 (9th Cir.1986). (Id. at 206.)

* * *

> A use that does not materially impair the marketability of the copyrighted work generally will be deemed fair. *Advanced Computer Services,* 845 F.Supp. at 366 (citing *Sony,* 464 U.S. at 450–51, 104 S.Ct. at 792–93; *Harper & Row,* 471 U.S. at 566–67, 105 S.Ct. at 2233–34; *N.A.D.A. Servs. Corp. v. Business Data of Virginia, Inc.,*

651 F.Supp. 44, 48 (E.D.Va.1986)). The only evidence presented at trial as to the market effect of the allegedly infringing uses was that, despite the Blythe presentation and the copies to Blythe and the Library, the University of Florida Press still wanted to publish *Blood of My Blood*. Based on this evidence, the district court held that the uses made by Seajay did not diminish the potential market for, or value of, *Blood of My Blood*. [¶] This finding of fact was not clearly erroneous. (Id. at 206-07.)

In short, in *Sundeman,* by making a copy of a literary work, for the purposes of gauging interest in its publication *and seeking permission to publish,* the defendant Seajay made "fair use" of that work. Similarly here, Maraj made use of the work in issue for artistic experimentation (to try to come up with something worthy of artistic release) and to seek permission from the rights holder. In the present case, as in *Sundeman*, Maraj's use of the work in issue should be found to be "fair use".

## V. MARAJ DOES NOT ASK THE COURT TO ELIMINATE AN AUTHOR'S RIGHT TO PREPARE DERIVATIVE WORKS

According to Chapman, "Ms. Maraj asks this Court to virtually extinguish [the derivative work] right." (Dkt. 67 at 2:1-2.) Because the Copyright Act gives owners the exclusive right to "prepare" a derivative work, Chapman argues, Maraj should be held liable for infringing that right, even if she had nothing to do with the broadcast of *Sorry* on the radio. (Id. at 6-8.)

In making this argument, Chapman forgets that "fair use" is a recognized defense to alleged infringement by preparing a derivative work. 17 U.S.C. section 106 is the code section that grants an author the exclusive right to prepare derivative works. The introduction to that section states that it is "subject to sections 107 through 122." Section 107 is the fair use provision on which Maraj's motion is based. Dkt. 57 at 5-8. Further, many cases apply the fair use defense in the context of derivative works. For example, in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), the Supreme Court signaled it was most likely a fair use for the rap group "2 Live Crew" to have created (and commercially released) a recording of a

derivative version of Roy Orbison's *Oh, Pretty Woman*.

Second, as a practical matter, Chapman's fear that the "sky is falling" is simply unfounded. Right now, no one seeks a license to experiment in the studio to create derivative works. If the Court were to side with Maraj in this dispute, the Court would merely be preserving the status quo. Nothing would change. No rights would be "eviscerated." Chapman would still have the right to prevent others from distributing derivative works to the public. On the other hand, were this Court to decide against Maraj, the recording industry would enter into a strange new era, where merely holding a studio session, with the tape rolling, would put an artist in peril.

## VI. CONCLUSION

In light of the above, and for the reasons further set forth in Maraj's initial moving papers, summary judgment is warranted as to Chapman's draconian theory. Copyright law should incentivize creativity, not stifle it in the way Chapman's opposition seeks. Maraj's use of Chapman's work as part of creative experimentation and to facilitate the clearance process was a fair use.

DATED: August 31, 2020

BROWNE GEORGE ROSS LLP
Peter W. Ross
Eric C. Lauritsen

By:     */s/Peter W. Ross*
Peter W. Ross
Attorney for Defendant Onika Tanya Maraj p/k/a Nicki Minaj